**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANISSA JONES,**<br>**Mother of the minor child D.M.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>**Defendant.** | **Civil Action No.**<br>**1:15-cv-01505 (BAH/GMH)** |

**REPORT AND RECOMMENDATION**

This matter was referred to the undersigned for full case management. Presently ripe for review are the parties' cross-motions for summary judgment. Plaintiff Anissa Jones is the mother of D.M., a child protected by the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Plaintiff initiated this action pursuant to the IDEA, challenging a Hearing Officer's Determination ("HOD").

D.M. is fourteen years old. He has been diagnosed with Emotional Disturbance, entitling him to services under the IDEA. AR 4, 459. During the 2014–2015 school year, when he was in fifth grade, he experienced significant behavioral problems that have interfered with his ability to access educational resources. Principally at issue in this litigation are the adequacy and implementation of his March 2014 and January 2015 IDEA-mandated Individualized Education Programs ("IEP") covering his time at Stanton Elementary School. The Hearing Officer found D.M.'s March IEP adequate, but his January IEP so deficient that it denied D.M. access to a Free and Appropriate Public Education ("FAPE"). Plaintiff claims that the Hearing Officer's finding with respect to the March 2014 IEP was in error, and that the remedy the Hearing Officer awarded him

with respect to the January 2015 IEP, inadequate. Specifically, she seeks more independent educational assessments for D.M. than the Hearing Officer awarded, speech therapy, a dedicated aide, compensatory education, and D.M.'s placement at the Foundation School, a private school in Maryland. Defendant seeks to hold the line at what the Hearing Officer awarded D.M. in the HOD – including a significant increase to D.M.'s specialized education outside of general education, funding for an Independent Educational Evaluation ("IEE"), an IEP Team meeting to incorporate the results of that assessment, and the denial of a private school placement.

A motions hearing was held on December 7 and 12, 2016. Upon review of the entire record,[1] the undersigned recommends that the Court grant in part and deny in part both parties' motions.

## BACKGROUND

### A. D.M.'s Educational Chronology

#### *1. Second Grade, Imagine Southeast Public Charter School, 2011–12*

In school year 2011–12, D.M. attended Imagine Southeast Public Charter School. *See* AR 82–143. At the beginning of that year, he was administered a psychoeducational evaluation, the Woodcock-Johnson III Standard Battery of Tests of Achievement, the results of which suggested that he had a low-average IQ, weak mental control and disorders of reading and writing. *See id.*

[1] The relevant docket entries for the purposes of this Report and Recommendation are: (1) Plaintiff's Complaint ("Compl.") [Dkt. 1]; (2) the Administrative Record ("AR") [Dkts. 19 & 20]; (3) the Hearing Officer's Determination [Dkts. 19-1 & 19-2]; (4) Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl. Mot.") [Dkt. 22-1]; (5) District of Columbia's Opposition to Plaintiff's Motion for Summary Judgment and Cross Motion for Summary Judgment ("Def. Mot.") [Dkt. 24]; (6) Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Plaintiff's Opposition to Defendant's Cross Motion for Summary Judgment ("Pl. Reply") [Dkt. 25]; (7) District of Columbia's Reply to Plaintiff's Opposition to the District of Columbia's Cross Motion for Summary Judgment ("Def. Reply") [Dkt. 27]; (8) Plaintiff's Supplemental Response to Plaintiff's Motion for Summary Judgment ("Pl. Post-Hearing Brief") [Dkt. 28]; and (9) District of Columbia's Response to Plaintiff's Supplemental Brief ("Def. Post-Hearing Brief") [Dkt. 29]. With the exception of the Administrative Record and Hearing Officer's Determination, all citations to page numbers within a particular document will be to the ECF docket page numbers for the document. For the Administrative Record and Hearing Officer's Determination, citations will be to the Bates numbering appearing in those documents.

at 82–91. The evaluator made several recommendations on the basis of these results, including the formation of a multidisciplinary team to create an educational program for D.M. *Id.* at 88. A speech and language assessment conducted in December 2011 showed his capacities to be "borderline" in receptive language; "very low" in expressive language, language content and language memory; "moderately to slightly below average" in vocabulary; in the third percentile in core language; but "in the normal range of functioning" in speech. *Id.* at 95–99. The assessment did not recommend speech and language therapy.

In the first part of the school year, D.M. refused to do schoolwork, had a tendency "to act out in a physically aggressive way," and was suspended for punching another student. *Id.* at 101. In January 2012, he told school staff members that he wished he were dead. *Id.* In February, a clinical psychological evaluation suggested that he suffered from adjustment disorder with mixed disturbance of emotions and conduct, a reading disorder, and a disorder of written expression. *Id.* at 109. The evaluation's narrative reported that D.M. suffered from a "significant loss" caused by the death of D.M.'s maternal great grandfather a year prior to the evaluation, and from stress caused by his father's incarceration two months prior to the evaluation. *Id.* at 101.

Imagine Southeast found D.M. eligible for special education because of a diagnosis of Emotional Disturbance. *Id.* at 114–15; 130–34. The school conducted a Functional Behavioral Assessment ("FBA") and developed a Behavior Intervention Plan ("BIP") as a result of his "aggressive, non-compliant and inattentive behaviors." *Id.* at 116–23. He received his first IEP in April 2012, identifying as areas of concern mathematics, reading, written expression, and emotional, social and behavioral development. *Id.* at 135–43. The IEP provided for sixteen hours per week of specialized instruction outside of general education, four hours per month of behavioral

support services inside of general education, and two hours per month of behavioral support services outside of general education. *Id.* at 140.

In June 2012, D.M. was arrested for burglary. *Id.* at 244. The charges were dropped. *Id.*

*2. Third Grade, Stanton Elementary School, 2012–13*

Several weeks before the end of the 2011–2012 school year, D.M. transferred to Stanton Elementary School. *See* AR 175. Plaintiff moved D.M. because of her perception that his behavior was worsening. *Id.* at 701. At Stanton, he received his academic instruction in PATH Academy, a "small classroom environment" within the school. *Id.* at 150. D.M.'s behavior and performance improved at PATH Academy. *Id.* at 154. His October 2012 IEP noted that his behavior had "greatly improved" since the past year, that he was "much better able to calm himself down" and "considered to be a strong classroom leader." *Id.* Accordingly, D.M.'s services were reduced in his IEP to 4.5 hours of specialized education outside of general education in mathematics and reading, two hours per week outside of general education in behavior, and 2.5 hours per week inside general education in writing. *Id.* at 156.

*3. Fourth Grade, Stanton Elementary School, 2013–14*

D.M. continued in Stanton's PATH Academy for fourth grade in school year 2013–14. AR 194–98. His IEP Team met in September. *Id.* at 190. This was the first IEP to include a form addressing "Consideration of Positive Behavior Interventions and Supports." *Id.* at 192; *see also* 20 U.S.C. § 1414(d)(3)(B)(i). While this form indicated via a checked box that D.M.'s behavior did "impede the child's learning or that of other children," its narrative description claimed that, since entering PATH Academy, D.M. had "proven to be able to consistently manage his behavior" and did "not impede the learning of others." AR 192. The only change made to his educational

services in his September 2013 IEP was to move two hours per week of mathematics special education into general education. *Id.* at 199.

D.M.'s IEP Team next met in March 2014. *Id.* at 212. The adequacy of the resulting IEP is at issue in this case. Its "Consideration of Positive Behavior Interventions and Supports" form and description of D.M.'s behavioral development remained unchanged from his September 2013 IEP. *Compare id.* at 213, 220, *with* 192, 197.

Later in April 2014, D.M. was arrested for throwing rocks. *Id.* at 243. He was released into Plaintiff's custody and referred to the Child Guidance Clinic by the Superior Court of the District of Columbia. *Id.* A June 2014 psychoeducational evaluation by the Child Guidance Clinic suggested that D.M. exhibited "borderline cognitive performance" and "very limited to low average" academic skills. *Id.* at 250, 252. Further, the evaluator suggested that D.M. might suffer from posttraumatic stress disorder and language disorder. *Id.* at 252. The evaluator's recommendations included therapy, psychiatry and tutoring to help "build his vocabulary, develop his reading and writing skills, and communicate better verbally." *Id.* at 252–53. Plaintiff did not submit the June 2014 psychoeducational evaluation to the District for over six months—a delay that fuels another of the parties' disputes.

*4. Fifth Grade, Stanton Elementary School, 2014–15*

At the beginning of the 2014–15 school year, D.M. was transferred out of PATH Academy into the general education program at Stanton. HOD at 27 ¶ 108; *see also* AR 704. The record does not disclose why D.M. was transferred. Plaintiff testified at the administrative hearing that Defendant never communicated any basis for the change. AR 704. In any event, she disagreed with it. *Id.* at 705.

The move coincided with a marked deterioration in D.M.'s behavior. *Id.* at 705. In September 2014, he stole a teacher's wallet and charged a significant amount of money on her credit cards. *Id.* at 294, 296. In October, he engaged in unspecified "reckless behavior." *Id.* at 292. In November, he made threats and slapped another student's face. *Id.* at 290, 299. In December, Stanton requested that D.M. not come to school on five different days, and asked Plaintiff to pick him up at midday each day during one week. HOD at 32 ¶¶ 139–40.

On December 10, 2014, Plaintiff requested that D.M. receive a battery of assessments: a comprehensive psychological evaluation, a speech language evaluation, an occupational therapy evaluation, a functional behavioral assessment, an adaptive assessment, an assistive technology evaluation, and "any other evaluations of any type that are warranted." AR 277. She reiterated this request twice in early January 2015. *Id.* at 303–04. Nevertheless, the only assessment the District used to evaluate D.M. was the Woodcock-Johnson III Tests of Achievement. *Id.* at 311–19. It also reviewed his existing data. *Id.* The adequacy of the District's evaluation of D.M. in January 2015 is at issue in this case. Further, because the Defendant refused to conduct a more comprehensive evaluation of D.M., Plaintiff requested that it fund an IEE. *Id.* 33–46. The District's refusal to do so is also at issue.

In mid-January 2015, D.M. told a Stanton social worker he wanted to kill himself. *Id.* at 268. A new BIP was formulated two days later, on January 17, 2015, without the Defendant first performing a new FBA. *Id.* at 320–21; 32. The BIP listed as "targeted behaviors" "aggression towards peers, refusal to follow directions, and at times sadness and suicidal ideation." *Id.* at 320. Its proposed strategies for addressing D.M.'s behavioral issues consisted of encouraging D.M. to correct his behavior before referring him to a "behavior technician" and then to a mental health staff member. *Id.*

On January 22, 2015, the IEP Team met. *Id.* at 327. At the meeting, Plaintiff reiterated her request for additional assessments of D.M., and added requests for an increased number of hours of specialized education for him and for a one-on-one aide. *Id.* at 708–11; *see also* HOD at 35 ¶ 159. When the IEP Team was unable to complete the IEP during the meeting, they promised to forward a final draft to Plaintiff for her consideration before approving it. *Id.* at 708. This was not done. *Id.*; *see also* HOD at 36 ¶ 169. The finalized IEP was provided to Plaintiff's counsel when she visited Stanton on February 5, 2015 to obtain D.M.'s educational records. AR 307–08.

It is the IEP resulting from the January 22, 2015 IEP Team meeting[2] that the Hearing Officer would later find deficient. The IEP made only modest changes to D.M.'s educational program. While a few sentences were added to the "Consideration of Positive Behavior Interventions and Support" section, no changes were made to the description of his behavioral development. *Compare id.* at 367, 373, *with* 323, 329. Indeed, his behavioral goals were lowered from his March 2014 IEP, *compare id.* at 373, *with* 220, and no changes were made to his special education services, *compare id.* at 375, *with* 222. No dedicated aide was provided. *Id.* at 375.

D.M.'s behavioral issues continued in the winter and spring of 2015. At the end of January, D.M. got in a fight at school. *Id.* at 288. In March, he engaged in unspecified "reckless behavior" and theft. *Id.* at 286, 409. At some point, in response to these behavioral issues, Stanton initiated the practice of assigning a staff member to supervise D.M. individually throughout the day. *Id.* at 714–17. Sometimes this was a janitor, sometimes a Spanish teacher, sometimes a "Response to Intervention" paraprofessional. *Id.*; *see also id.* at 519; HOD at 53 ¶¶ 239, 241. During the times

[2] The record does not clearly indicate the date the IEP arising from the January 22, 2015 IEP Team meeting was finalized. The document itself bears a marker that it was "Created on 02/05/2015," *id.* at 366, but this appears to be an artifact of its facsimile transmission on that date, perhaps to Plaintiff. The undersigned will refer to this document as the "January 2015 IEP."

the individual staff member was assigned to D.M., he was not receiving academic instruction; he would simply "follow [the staff member] around." AR 714; HOD at 53 ¶ 239.

On April 10, 2015, the IEP Team met again to determine whether D.M.'s behavior was caused by his disability, an assessment referred to as a "manifestation meeting." *Id.* at 413. It considered the 2011 and 2014 psychoeducational evaluations at this meeting. *Id.* at 542–44. The team ultimately determined that the theft was not a manifestation of D.M.'s disability. *Id.* at 411.

A week later, Stanton's Principal agreed to administer cognition and speech and language assessments of D.M. *Id.* at 428. There is no indication in the record whether these assessments were ever conducted.

A few days later, D.M. was caught smoking in the bathroom and threatened a staff member. *Id.* at 474. He was not suspended, but Plaintiff was requested to keep him home for one day. *Id.* Plaintiff's counsel demanded another manifestation meeting, as a suspension at this point would have placed D.M. in excess of the ten days a school can suspend a special education student. *Id.*; *see also* 20 U.S.C. § 1415(k)(1)(B). She further requested that a "staff member" be designated "to serve as a dedicated aide for [D.M.] until the paperwork is processed 'downtown.'" AR 474.

Another manifestation meeting was held on April 24, 2015, and this time the IEP Team concluded that D.M.'s behavior was a manifestation of his disability. *Id.* at 508. In response, five additional hours of unspecified specialized instruction outside of general education were added to D.M.'s January 2015 IEP, in addition to six hours per day with a one-on-one aide. *Id.* at 469. D.M.'s need for a dedicated aide is presently the subject of dispute between the parties. The justification for the aide included in the IEP amendment recited D.M.'s behavioral problems. *Id.* at 473. The justification also lists a variety of "alternative strategies previously employed" to address

D.M.'s behavior issues, none of which included a placement for D.M. entirely outside of general education. *Id.*

Ordinarily, a school must seek approval from a District of Columbia Public Schools ("DCPS") Program Manager prior to adding a dedicated aide to a student's IEP. *See id.* at 795. In this case D.M.'s IEP Team reversed the normal process: after adding the aide, it submitted the change for approval to DCPS. *Id.* Later in May, the Program Manager visited the school to decide the appropriateness of a dedicated aide for D.M. *Id.* at 519–23, 744–45, 761–62. The Program Manager found that Stanton's justification for an aide for D.M. "wasn't thorough . . . at all" and lacked the sort of data required to justify a dedicated aide. *Id.* at 792. Based on observation of D.M., she concluded that he would do better in a small group setting, and that adding a dedicated aide in such a setting would be "almost a little overkill." *Id.* at 787–90. Accordingly, the aide was removed from D.M.'s IEP. *Id.* at 510. The Program Manager's report recommended updating D.M.'s BIP, and contained more than a single-spaced page of suggested strategies and techniques for Stanton's use in working with him. *Id.* at 521–22.

**B. Due Process Hearing**

Plaintiff's Due Process Complaint was filed on April 24, 2015. HOD at 5. At the Due Process Hearing, Plaintiff argued that D.M. had been denied a FAPE:

- because his March 2014 IEP was inappropriate and Stanton failed to implement it from the beginning of 2014–15 school year until January 2015, *id.* at 7;
- because Defendant failed to evaluate D.M. in all areas of suspected disability and failed to conduct an appropriate comprehensive evaluation in January 2015, *id.*;
- because Defendant refused to fund the IEE that Plaintiff requested in January 2015, *id.*;
- because Defendant failed to reconvene D.M.'s IEP Team to review the results of the June 2014 psychoeducational evaluation when Plaintiff provided it to Defendant on January 27, 2015, *id.*;

- because of procedural and substantive defects in D.M's January 2015 IEP and Stanton's failure to properly implement that IEP, *id.*; and

- because Defendant failed to provide D.M. with a dedicated aide, *id.*

As a remedy, Plaintiff sought private placement for D.M. at the Foundation School. *Id.* at 8. Further, she sought a revision of D.M.'s IEP to require that all of his instruction be provided outside of the general education setting, that he receive at least one hour per week of speech and language therapy, and that he be assigned a full-time, dedicated aide. *Id.* at 9. Further, she sought academic, cognitive and social emotional testing, a speech and language evaluation, an occupational therapy evaluation, an assistive technology evaluation and a new FBA. *Id.* Finally, Plaintiff sought to update D.M.'s IEP based on the findings of those assessments once they were completed. *Id.* In her Due Process Complaint, Plaintiff had also sought compensatory education in the form of tutoring. *Id.* at 8 n.4. In her five-day disclosures prior to the administrative hearing, however, she withdrew the request for compensatory education, purporting to "reserve[]" it "as relief to be raised in the future." *Id.*

The nearly five-hour Due Process Hearing was conducted on June 5 and June 15, 2015. HOD at 6. Testifying on Plaintiff's behalf were Plaintiff, a family support worker, and an Admissions Coordinator from the Foundation School. *Id.* The Program Manager who observed D.M. in May 2015 with respect to D.M.'s need for an aide testified for Defendant. *Id.* She was qualified as an expert regarding Least Restrictive Environment (LRE)[3] and the determination of appropriate

[3] The IDEA requires that students be placed in the "Least Restrictive Environment" compatible with their special education requirements. That is to say that, "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C § 1412(a)(5)(A).

behavioral and academic interventions. *Id.* The Hearing Officer received into evidence fifty-six exhibits from Plaintiff and thirty-three exhibits from Defendant. *Id.*

**C. Hearing Officer's Determination**

The HOD was issued on June 22, 2015. It is a thorough, seventy-five-page opinion. In it, the Hearing Officer largely rejected Plaintiff's challenge to Defendant's re-evaluation of D.M. leading up to his January 2015 IEP, only finding deficient Defendant's decision to consider a BIP developed without first completing a new FBA. *Id.* at 59–60 ¶¶ 7–10, 69–70 ¶¶ 35–36. He also determined that the failure of the IEP Team to consider D.M.'s 2014 psychoeducational evaluation was attributable to Plaintiff's own failure to provide it to the team before their January 2015 meeting. *Id.* at 59 ¶¶ 5–6.

Nevertheless, and most important to Plaintiff, the Hearing Officer upheld her substantive challenge to the January 2015 IEP, finding that it denied D.M. a FAPE because "significant changes" were made to it without communicating them to Plaintiff after the January 2015 IEP meeting, and because the IEP's emotional, social and behavioral goals for D.M. were inappropriate. *Id.* at 36–41 ¶¶ 166, 169–170, 176; 65–66 ¶¶ 21–22; 68 ¶ 26. On the other hand, the Hearing Officer found that Plaintiff failed to meet her burden of proving that the other goals outlined in the January 2015 IEP were inappropriate and that Stanton had failed to properly implement the IEP. *Id.* at 68 ¶ 29, 73 ¶ 50. Further, the Hearing Officer rejected Plaintiff's challenges to D.M.'s earlier IEP in March 2014, finding that it was reasonably calculated to confer him educational benefit and was properly implemented by Stanton. *Id.* at 68 ¶¶ 25, 29.

As a remedy for the inadequate January 2015 IEP, the Hearing Officer ordered that D.M.'s IEP be modified to provide for all of his academic instruction to be in a small classroom setting outside of general education and for an escort to be with him throughout the entirety of the school

day. *Id.* at 74–75 ¶ 1. Further, Defendant was ordered to fund one independent assessment for Plaintiff, at her election. *Id.* at 75–76 ¶¶ 3–5. The Hearing Officer ordered D.M.'s IEP Team to meet to review the independent assessment when completed. *Id.* at 76–77 ¶¶ 6–7. The HOD made no provision for a dedicated aide for D.M., however, as the Hearing Officer found that Plaintiff had not carried her burden of showing the need for one, especially given his order that D.M. receive all of his academic instruction going forward in a small classroom, specialized education setting outside of general education. *Id.* at 51–52 ¶ 230.

Finally, the Hearing Officer ordered Defendant to find a placement to implement D.M.'s modified IEP, and for his IEP Team to meet one month later to review his performance in the new placement. *Id.* at 75 ¶ 2. As will be seen, Plaintiff claims error to that portion of the HOD as well. According to her, the Hearing Officer should not have remanded the matter back to the District for placement, but should have immediately placed D.M. in the Foundation School, or some other private school. Compl. at 12 ¶ 52.

### D. Events Subsequent to the Due Process Hearing

Following the issuance of the modified IEP, Defendant placed D.M. at Kramer Middle School for school year 2015–16. Letter from Thomas Flanagan to Anissa Jones, July 29, 2015 [Dkt. 9-4]. D.M.'s behavioral issues did not improve at Kramer. In fall 2015, he overturned tables in the classroom, threatened to spray staff with a fire extinguisher, ran through the hallways and in and out of classrooms, and punched a staff member. Pl. Points and Authorities in Support of the Mot. for a Preliminary Injunction [Dkt. 7-1], at 5–6. The Metropolitan Police Department was called three times, each time removing D.M. from the school in handcuffs. *Id.* On one occasion, he threatened the responding officers; on another he was held for the evening in a juvenile facility. *Id.* As a result of these incidents, he had been suspended for twenty-seven days by November. *Id.*

It was at this time that Plaintiff filed a motion for a temporary restraining order, styled as a motion for a "stay-put" injunction as provided for by 34 C.F.R. § 300.518. Pl. Mot. for a Temporary Restraining Order [Dkt. 7], at 1. She asked that D.M. be placed at the Foundation School. *Id.* at 1. Defendant opposed this motion on the grounds that a stay-put injunction prevents a public agency from changing a student's placement, while Plaintiff herself was seeking to have the Court move D.M. to the Foundation School. Although Defendant opposed the motion, it nevertheless consented to D.M.'s placement at the Foundation School, effective immediately. Def. Opp. to Pl. Mot. for a Temporary Restraining Order [Dkt. 12], at 1, 10. D.M. enrolled at the Foundation School at the beginning of December. Pl. Reply at 5. Unfortunately, in May 2016, D.M. was expelled from the Foundation School after allegedly bringing a gun to school. Def. Mot. at 13.

## LEGAL STANDARD

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). A FAPE is defined as "special education and related services that– (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate . . . secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required[.]" *Id.* § 1401(9). When a student qualifies for a FAPE, DCPS is required to develop and implement an IEP, which is the "primary vehicle" for meeting the special educational needs of each disabled student. *Id.* § 1414(d)(2)(A); *Honig v. Doe*, 484 U.S. 305, 311 (1988) (noting that Congress "[e]nvision[ed] the IEP as the centerpiece of the [IDEA's] delivery system for disabled children").

The IEP is "[p]repared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child." *Honig*, 484 U.S. at 311 (citing 20 U.S.C. § 1401(19)). It "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.* The IEP must be reviewed at least annually and, when necessary, revised to ensure that the local school district is tailoring the statutorily required FAPE to each child's unique needs. 20 U.S.C. § 1414(a)(5).

Once the IEP is developed, the school system must provide an appropriate educational placement that comports with the IEP. *Alston v. Disrict of Columbia*, 439 F. Supp. 2d 86, 90 (D.D.C. 2006). "If no suitable public school is available, the school system must pay the costs of sending the child to an appropriate private school." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 519 (D.C. Cir. 2005) (citation and alterations omitted). Parents who object to their child's "identification, evaluation, or education placement" are entitled to an impartial due process hearing. 20 U.S.C. §§ 1415(b)(6), (f)(1). A qualified hearing officer conducts the hearing in accordance with the IDEA. *Id.* § 1415(f)(3)(A). A party "aggrieved by" a hearing officer's findings may bring a civil action in federal court. *See id.* § 1415(i)(2). Under the IDEA, the district court has broad remedial authority to grant "such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C)(iii).

Although fashioned as motions for summary judgment, plaintiffs' motions in IDEA cases more accurately seek the district court's review of an administrative decision. *S.B. v. District of Columbia*, 783 F. Supp. 2d 44, 50 (D.D.C. 2011); *see also L.R.L. ex rel. Lomax v. District of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) ("[R]ather than applying the typical standard

applicable to a summary judgment motion . . . , the Court in an IDEA case conducts a summary adjudication."). Under the IDEA, the reviewing court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2). The burden of proof is always on the party challenging the administrative decision, who must "at least take on the burden of persuading the court that the hearing officer was wrong." *Reid*, 401 F.3d at 521 (internal quotations omitted); *see also Schaffer v. Weast*, 546 U.S. 49, 51 (2005); 5 D.C.M.R. § 3030.3. When an HOD is challenged, "a court's inquiry . . . is twofold." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). First, the district court must determine whether the procedural requirements of the IDEA have been followed. *Id.* Second, it must determine whether the IEP developed under those procedures is "reasonably calculated to enable the child to receive educational benefits." *Id.* at 207.

The IDEA's preponderance of the evidence standard does not authorize unfettered *de novo* review. *Id.* at 206. Courts may not substitute their own views for those of the hearing officer, but must "accord the [h]earing [o]fficer's decision due weight," given the hearing officer's expertise. *See id.*; *see also K.S. v. District of Columbia*, 962 F. Supp. 2d 216, 221 (D.D.C. 2013) ("When assessing a student's progress, courts should defer to the administrative agency's expertise."). That said, the IDEA "plainly suggest[s] less deference than is conventional" in administrative proceedings. *See Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988).

## DISCUSSION

In her motion for summary judgment, Plaintiff asserts nine claims of error with respect to the HOD.[4] Several of these issues are only relevant to an eventual award of compensatory education, any right to which the undersigned believes Plaintiff has waived. Her attacks on the HOD also do not fare well. Again, the Hearing Officer already found that D.M. was denied a FAPE and awarded him significant relief in the form of full-time specialized education outside of general education, neither of which the Defendant challenges on appeal. Plaintiff's attempt here to improve on D.M.'s already successful outcome before the Hearing Office is largely ineffective. She is correct, however, that D.M.'s January 2015 re-evaluation was deficient and also denied him a FAPE, but the impact of that decision is significantly diminished because the Hearing Officer already found that the resulting IEP denied D.M. a FAPE. Plaintiff is also correct that the Hearing Officer improperly limited the number of publicly-funded assessments to which she was entitled, and did not expressly order the Defendant to conduct a new FBA. Beyond these limited errors, the undersigned believes that Plaintiff's claims of error should be denied and the HOD upheld. The rationale for the Court's conclusions follows.

### A. Plaintiff's Claim for Compensatory Education

Before addressing Plaintiff's claims of error related to the HOD, her request for compensatory education arising from the Hearing Officer's finding of a denial of FAPE should be addressed as it significantly impacts what additional relief, if any, to which she may be entitled. In her Due Process Complaint, Plaintiff sought compensatory education in the form of tutoring for D.M. HOD at 8 n.4. Plaintiff withdrew her request for compensatory education, however, prior

[4] Plaintiff raised a tenth claim of error in her federal Complaint. It alleged that following issuance of the HOD, the Defendant failed to modify D.M.'s IEP to comport with the the HOD's requirements. Compl. at 13–14 ¶ 62. Plaintiff withdrew this claim in her motion for summary judgment. Pl. Mot. at 22.

to the administrative hearing, purporting to "reserve[]" it "as relief to be raised in the future." *Id.* Plaintiff's counsel claimed at the motions hearing before the undersigned that she did so because formulating a plan for compensatory education can be complicated and would be expensive. Accordingly, Plaintiff put on no evidence at the administrative hearing as to what, if any, compensatory education D.M. would be owed were Plaintiff to prevail on her claims of error.

Now, having prevailed in part on her claims before the Hearing Officer, Plaintiff requests that this matter be remanded back to the Hearing Officer for a determination of an award of compensatory education based on the denial of FAPE identified in the HOD. Pl. Mot. at 24. In the HOD, the Hearing Officer "expresse[d] no opinion" on whether Plaintiff's "reservation" of her claim to compensatory education would be effective. HOD at 8 n.4. The undersigned is of the view that it was not. Plaintiff's unilateral attempt to bifurcate before the Hearing Officer her claims of error from her request for compensatory education effectively worked a waiver of the latter.

In a federal civil action, a court may bifurcate issues to be tried "for convenience, to avoid prejudice, or to expedite or economize." Fed. R. Civ. P. 42(b). Bifurcation can include, as Plaintiff desires here, adjudicating the liability and relief phases of a matter separately. *See, e.g.*, *Queen v. Schultz*, 747 F.3d 879, 889 (D.C. Cir. 2014) (instructing the trial court to bifurcate trial into a liability and a damages phase). But while a party may certainly request bifurcation from the court, "in our system, it is the province of the courts, not a single party acting unilaterally, to determine whether issues present in a case might better be separated out for later trial." *U.S. Indus., Inc. v. Blake Const. Co.*, 765 F.2d 195, 209 (D.C. Cir. 1985). Consequently, "a party who makes a unilateral, unauthorized determination not to go forward on issues that were properly in the case does so at its own peril." *Id.* at 209–10.

Similarly, in an IDEA administrative hearing in the District of Columbia, a hearing officer has discretion to divide or extend proceedings as necessary. *See Lopez-Young v. District of Columbia*, No. CV 15-1476 (RC), 2016 WL 5485101, at *6 (D.D.C. Sept. 29, 2016) (describing a plaintiff's request to a hearing officer to bifurcate proceedings).[5] Further, this Court has previously found that, where an IDEA plaintiff had offered some evidence as to compensatory education during the administrative hearing, but that evidence was later deemed insufficient to support an award, the equitable nature of IDEA awards permits the plaintiff to present additional evidence as to compensatory relief. *Gill v. District of Columbia*, 751 F. Supp. 2d 104, 113–14 (D.D.C. 2010), *aff'd*, No. 11-7032, 2011 WL 3903367 (D.C. Cir. Aug. 16, 2011); *see also Stanton v. District of Columbia*, 680 F. Supp. 2d 201, 207 (D.D.C. 2010) (hearing officer may provide the parties additional time to supplement the record if there is insufficient evidence to support a specific award of compensatory education).

Here, however, Plaintiff presented no evidence concerning a plan of compensatory education as was her burden. *See T.P. v. D.C.*, 736 F. Supp. 2d 240, 248 (D.D.C. 2010) ("[T]he plaintiff has the burden of proposing a well-articulated plan" for a compensatory award). Rather, she made a "unilateral, unauthorized determination not to go forward" on that issue at the administrative hearing, and, in so doing, waived her claim to compensatory relief. *U.S. Indus., Inc.*, 765 F.2d at 209–10. Plaintiff's decision to unilaterally bifurcate this IDEA proceeding robbed the Hearing Officer (and now this Court) of the opportunity to resolve the matter as expeditiously as possible,

[5] For complaints filed after July 2016, District of Columbia regulations now explicitly authorize bifurcation in the context of a proceeding seeking reimbursement for a unilateral placement by a parent. D.C. Code § 38-2571.03(6)(a)(ii).

that is, at the same time that Plaintiff's claims of denial of FAPE are adjudicated. To permit Plaintiff's election here without penalty, would also serve to encourage other IDEA plaintiffs to do as Plaintiff did here, leading to further inefficiencies in the adjudication of IDEA cases.

Nevertheless, in the event the Court determines that Plaintiff has not waived her claim to compensatory education, as there is no evidence in the record concerning how an award of compensatory education for D.M. should be calculated, the parties agree that this matter should be remanded back to the Hearing Officer for purposes of hearing evidence and determining an appropriate award based on the finding of a denial of FAPE in the HOD and any additional errors identified by this Court.

**B. Plaintiff's Claims of Error**

*1. Whether the March 2014 IEP Was Deficient*

On the merits, Plaintiff first challenges the Hearing Officer's determination that D.M.'s March 2014 IEP was reasonably calculated to confer educational benefit. Compl. at 13 ¶ 56; Pl. Mot. at 19. Having reviewed the record, the undersigned finds no reason to disturb that conclusion.

While the Hearing Officer found that, by January 22, 2015, D.M. had "languish[ed] in an inappropriate placement and engag[ed] in repeated serious misconduct" for the previous "half a year," HOD at 42 n.17, he also found that Plaintiff had introduced no evidence that any of D.M.'s goals in the March 2014 IEP were inappropriate, *id.* at 19 ¶ 60; 20 ¶ 68; 22 ¶ 75; 23 ¶ 81. Further, he found that Plaintiff had introduced no evidence showing that D.M. required in March 2014 more hours of specialized instruction or behavior support services than were provided for in that IEP. *Id.* at 24 ¶ 87. Accordingly, the Hearing Officer found that the March 2014 IEP was reasonably calculated to confer educational benefit at the time it was formulated. *Id.* at 68 ¶ 25.

With the benefit of hindsight, Plaintiff argues that the deterioration in D.M.'s behavior in the fall of 2014 demonstrates that the March 2014 IEP was inappropriate. Pl. Mot. at 19–20; Pl. Reply at 6–7. But an IEP is reviewed "prospectively" and "not in hindsight." *Kelsey v. District of Columbia*, 85 F. Supp. 3d 327, 331 n.4 (D.D.C. 2015); *see also Beckwith v. District of Columbia*, No. 15-CV-1284-RCL, 2016 WL 4990591, at *2 (D.D.C. Sept. 15, 2016); *Moradnejad v. District of Columbia*, 177 F. Supp. 3d 260, 279 (D.D.C. 2016); *S.S. ex rel. Shank v. Howard Rd. Acad.*, 585 F. Supp. 2d 56, 66 (D.D.C. 2008) ("Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement."). When an IEP is challenged by a parent or student as inadequate, the appropriate question is not whether the student actually progressed under the IEP, but whether the IEP was reasonably calculated to confer educational benefit based on the record at the time it was developed. *See Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 530 (3d Cir. 1995) ("[A]ppropriateness is judged prospectively so that any lack of progress under a particular IEP . . . does not render that IEP inappropriate."). While D.M.'s deterioration in fall 2014 is disconcerting and may be a basis to challenge the next year's IEP absent a change in its terms, it is not evidence of the inadequacy of the March 2014 IEP. As Plaintiff advanced no other evidence demonstrating that the March 2014 IEP was not reasonably calculated to confer educational benefit when it was formulated, the undersigned recommends that the Hearing Officer's denial of Plaintiff's challenge to that IEP be upheld.

*2. Whether the January 2015 Re-evaluation of D.M. Was Deficient*

Plaintiff next alleges that the Hearing Officer erred by not finding Defendant's January 2015 re-evaluation of D.M. defective. Compl. at 11 ¶ 42, Pl. Mot. at 6. According to Plaintiff, a Local Educational Agency ("LEA") must conduct a re-evaluation when requested by a parent and, when it conducts such a re-evaluation, all areas of suspected disability must be assessed. Pl. Mot.

at 4, 6. Given D.M.'s deteriorating behavior in the fall of 2014, Plaintiff contends his behavioral, social, and emotional issues should have been evaluated in January 2015. *Id.* In fact, DCPS used only one test to evaluate D.M.—the Woodcock-Johnson Test of Achievement. Pl. Mot. at 6; AR 311–319. Plaintiff claims that diagnostic assessment was inadequate because it tested only D.M.'s academic progress, not the behavioral, social or developmental issues that were central to his struggle. *Id.*

The Hearing Officer rejected Plaintiff's challenge to the sufficiency of D.M.'s January 2015 re-evaluation, finding that the IEP Team, not the parent, decides what diagnostic assessments and data are necessary and appropriate as part of a re-evaluation. HOD 60 ¶ 9 (citing 20 U.S.C. §1414(c)(1); 34 C.F.R. § 300.305). While that is true as far as it goes, the parent may bring a complaint challenging the sufficiency of the resulting re-evaluation, as Plaintiff did here. Although the Hearing Officer acknowledges that Plaintiff followed the proper procedure in bringing her Due Process Complaint, HOD 60 ¶ 10, nowhere in the HOD does he address the merits of Plaintiff's challenge to the sufficiency of D.M.'s January 2015 re-evaluation. Perhaps this is because the Hearing Officer ultimately found wanting the January 2015 IEP that resulted from the re-evaluation, *id.* at 36 ¶ 166; 41 ¶ 176; 68 ¶ 26, thus largely making academic the question of what assessments were used to draft it. For completeness, and because it may impact Plaintiff's remedy and/or D.M.'s assessments going forward, the undersigned will consider Plaintiff's challenge to the January 2015 re-evaluation on its merits.[6]

Generally, unless the parent and LEA agree otherwise, a re-evaluation of a special education student may occur at most yearly, and must occur at least once every three years. 20 U.S.C.

[6] At the motions hearing, counsel for Plaintiff argued that the adjudication of this issue could impact the calculation of an award of compensatory education for D.M., if the case were to be remanded to the Hearing Officer for that purpose.

§ 1414(a)(2)(B); 34 C.F.R. § 300.303(b). Within those limits, a parental request is sufficient to trigger the re-evaluation. 20 U.S.C. § 1414(a)(2)(A)(ii); 34 C.F.R. § 300.303(a)(2). Once requested by a parent, it is the responsibility of the LEA to ensure that the child is evaluated in "all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). Further, the LEA evaluator must "not use any single measure or assessment as the sole criterion" for determining an appropriate program, but must "use a variety of assessment tools." 20 U.S.C. § 1414(b)(2); 34 C.F.R. § 300.304(b). The instruments used "may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." *Id.*; *see also* 34 C.F.R. § 300.304(c)(4) (assessment should include "if appropriate, . . . social and emotional status[.]"). The evaluator must also review existing evaluation data, and decide whether the collection of any additional data is necessary. 20 U.S.C. § 1414(c); 34 C.F.R. § 300.305(a). Finally, in developing an IEP of a child whose behavior impedes his learning or that of others, the IDEA requires the IEP Team to "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i).

Judged by these standards, D.M.'s January 2015 re-evaluation was inadequate. Given the rapid and significant deterioration in D.M.'s behavior in the fall of 2014, D.M.'s emotional, social and behavioral development should have been a focus of that re-evaluation. It was not. The resulting analysis of D.M.'s emotional, social and behavioral development in the January 2015 IEP is summary and conclusory, largely lacking in both "analysis" and "data." *See* AR 358–59 (conclusory sentences purporting to "analyze" data, such as, "Student has had up and down results from previous interventions" or, "He stays on course for short periods of time and then he has had episodes of disruption."). The analysis was deficient because the diagnostic assessment the District picked to evaluate D.M. was inadequate to the task of assessing his areas of obvious weakness.

The IDEA warns against the LEA doing exactly what the District did here: using only a "single measurement or assessment"—the Woodcock-Johnson Test of Achievement—to evaluate a student rather than a "a variety of assessment tools." 20 U.S.C. § 1414(b)(2); 34 C.F.R. § 300.304(b).

Moreover, Defendant is not correct when it suggests that the Woodcock-Johnson assessment addressed D.M.'s most significant areas of concern. That test provides "a measure of [a student's] academic achievement and oral language abilities." AR at 311. It does not appear to have any emotional, social or behavioral components—at least in the format that was used to assess D.M. Indeed, the Woodcock-Johnson has not been relied on by this Court to reach conclusions in those areas, but only with regard to a student's academic and intellectual abilities, including reading, vocabulary, writing, spelling, math, memory and auditory processing. *See Lopez-Young v. District of Columbia*, No. CV 15-1476 (RC), 2016 WL 5485101, at *3 (D.D.C. Sept. 29, 2016); *Hill v. District of Columbia*, No. 14-CV-1893 (GMH), 2016 WL 4506972, at *2 (D.D.C. Aug. 26, 2016); *Holman v. District of Columbia*, 153 F. Supp. 3d 386, 394 (D.D.C. 2016); *S.S. ex rel. Shank v. Howard Rd. Acad.*, 585 F. Supp. 2d 56, 61 (D.D.C. 2008); *Roca v. District of Columbia*, No. CIV.A.02-01646 (HHK), 2005 WL 681462, at *4 n.3 (D.D.C. Mar. 14, 2005).

Accordingly, the undersigned recommends that the Court find deficient Defendant's January 2015 re-evaluation of D.M. Because the District's failure to adequately evaluate him materially interfered with the development of his January 2015 IEP—indeed, the January 2015 IEP made minimal changes to D.M.'s emotional, social and behavioral goals and no changes to his support services, AR 69 ¶ 35—D.M. was denied a FAPE for this independent reason as well.

*3. Whether the Hearing Officer Erred in Limiting the Number of Diagnostic Assessments that Could Be Conducted as Part of D.M.'s IEE*

Plaintiff next alleges that the Hearing Officer erred in limiting the number of assessments that could be conducted as part of the IEE that the Hearing Officer ordered as part of D.M.'s remedy. Compl. at 11 ¶ 46; Pl. Mot. at 8. The undersigned agrees.

The basis for D.M.'s entitlement to an IEE is undisputed. The Hearing Officer found that Plaintiff requested an IEE in January and February 2015 after she disagreed with the scope of Defendant's January 2015 educational re-evaluation of D.M. HOD at 35 ¶ 159; 43 ¶ 183; 61 ¶ 14. Because Defendant sought no due process hearing to defend its contested evaluation, IDEA regulations obligated the District to fund the requested IEE. *Id.* at 45 ¶¶ 207–08, 60–61 ¶¶ 11–14; *see also* 34 C.F.R. § 300.502(b). For this reason, Defendant concedes Plaintiff is entitled to one publicly-funded IEE. Def. Mot. at 11 n.2.

The dispute between the parties then—though it is difficult to tease it out of their briefs—concerns not D.M.'s entitlement to an IEE, but the limitation the Hearing Officer placed in the relief he granted Plaintiff on the number of assessments that could be conducted as part of the IEE. Citing IDEA regulations, the Hearing Officer asserted that Plaintiff was entitled to only one IEE at public expense because Defendant "conducted only one assessment" with which Plaintiff disagreed—referring to the January 2015 educational re-evaluation that included the Woodcock-Johnson Test of Achievement. HOD at 61 ¶¶ 15–16; 30 ¶ 125; 34 ¶ 154. For that reason, as part of his ordered relief, the Hearing Officer limited Plaintiff to conducting one of a list of five diagnostic assessments, any one of which he believed constituted an IEE. HOD at 75 ¶ 3. Specifically, that list included a "comprehensive psychological evaluation, including academic, cognitive and social/emotional testing and ADHD assessment," a "comprehensive speech-language evaluation that includes assessment of the student's language processing," a "comprehensive occupational therapy

evaluation," a "comprehensive assistive technology evaluation," or a "Functional Behavioral Assessment."[7] *Id.*

The Hearing Officer's limitation on the number of diagnostic assessments that could be conducted during D.M.'s IEE was erroneous. Properly understood, an IEE can comprise multiple tests or assessments necessary to evaluate the student's suspected areas of disability and to determine an appropriate educational program for the child, as determined by the independent professional conducting the IEE and consistent with the standards and limitations for evaluations prescribed by IDEA regulations.

The Hearing Officer correctly observed that IDEA regulations entitle a student to only one IEE at public expense each time the educational agency conducts an evaluation or re-evaluation with which the parent disagrees. *Id.* at 61 ¶ 15; *see also* 34 C.F.R. § 300.502(b)(5). However, the question here is not how many IEEs Plaintiff is entitled to receive; it is undisputed that she should receive only one. Rather, it is how many diagnostic assessments may be conducted as part of that IEE. The parties' discussion of this issue is hampered by an apparently shared misunderstanding of the difference between an "evaluation," or "re-evaluation," and an "assessment." They use the terms interchangeably, adding to the confusion.

In fact, the IDEA defines them differently. *See generally T.P. ex rel. T.P. v. Bryan Cty. Sch. Dist.*, 792 F.3d 1284, 1291 n.13 (11th Cir. 2015). Diagnostic assessments—which the IDEA refers to simply as "assessments," *see, e.g.*, 20 U.S.C. § 1414(b)(3) (referring to "assessments and other evaluation materials used to assess a child")—are the tools used as part of an evaluation or re-evaluation of a student to ensure that the child is evaluated in "all areas of suspected disability"

[7] The list appears to have been derived from assessments that Plaintiff had previously requested for D.M. *See* AR 277.

and to "determin[e] an appropriate educational program for the child." 20 U.S.C. §§ 1414(b)(3)(B), (b)(2)(B); *see also* § 1414(a)(2) (stating that a re-evaluation is conducted in the same manner as an evaluation). The statute envisions that an evaluation or re-evaluation will make use of multiple assessments to fully evaluate the child's needs and determine his or her educational program. As stated previously said, an evaluation or re-evaluation must "use a variety of assessment tools" and "not use any single measure or assessment as the sole criterion" for evaluating the child or determining an appropriate program. 20 U.S.C. §§ 1414(b)(2)(A), (B); 34 C.F.R. § 300.304(b). On the other hand, an "evaluation" or "re-evaluation," is the process during which these assessments occur. *See* 20 U.S.C. § 1414(b)(2) ("In conducting the evaluation, the local educational agency shall ... use a variety of assessment tools, . . . [and] not use any single measure of assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child"); *see also Bryan Cty. Sch. Dist.*, 792 F.3d at 1291 n.13. As the Eleventh Circuit has instructed:

> An evaluation, whether public-agency or independently conducted, includes not only the completion of diagnostic assessments, but also the review of existing data, *see id.* § 1414(c)(1), and determinations of eligibility and educational needs on the basis of the results of assessments and other evaluation materials, *see id.* § 1414(b)(4). Thus, the District conducts an initial evaluation, singular, not initial evaluations, plural; it conducts a reevaluation, singular, not reevaluations, plural; and, relevant here, parents may obtain an IEE at public expense, singular, not IEEs, plural. *Cf.* 34 C.F.R. § 300.502(b)(5) ("A parent is entitled to only one independent educational evaluation at public expense each time the public agency conducts an evaluation with which the parent disagrees.").

*Id.* The undersigned would add, like any other evaluation or re-evaluation under the IDEA, the IEE may include multiple diagnostic assessments paid for at public expense. *See* 20 U.S.C. §§ 1414(b)(2)(A) & (B); 34 C.F.R. § 300.304(b)(1).[8]

---

[8] The Department of Education interprets the IDEA and its regulations in the same way. *See* Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, 71 Fed. Reg. 46,540,

Defendant overstates its concern that some limitation must be placed on the number of diagnostic assessments that can be conducted as part of an IEE lest the expense to the public be too great. There are, in fact, a number of restraints that address Defendant's concern, most importantly, the professionalism of the evaluator conducting the IEE. The student's parent does not decide alone which diagnostic tools will be used to evaluate the student; rather, that is a decision that will be made by a trained professional evaluator who will assess what is necessary to assess the student's suspected areas of disability and to develop his or her educational program. Moreover, an IEE is subject to the same requirements applicable to public agency evaluation. *See* 34 C.F.R. § 300.502(e) ("If an independent educational evaluation is at public expense, the criteria under which the evaluation is obtained . . . must be the same as the criteria that the public agency uses when it initiates an evaluation[.]"); *see also* 34 C.F.R. §§ 300.304–300.305 (describing requirements for evaluations and re-evaluations). Among other things, the regulations require any evaluator to gather only "relevant functional developmental and academic information about the child" and to use only "technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in additional to physical and developmental factors." *Id.* at §§ 300.304(b)(1), (3). These standards will protect a public agency from the cost of extravagant or unreasonable IEEs.

Accordingly, the Hearing Officer's limitation on the number of diagnostic assessments that could be conducted during D.M.'s 2015 IEE was erroneous and should be reversed.

---

46,690 (Aug. 14, 2006) (stating that it is not "necessary" to add language to regulations to permit an evaluator conducting an IEE to "select the instruments to evaluate the child" because evaluator already has that authority under 34 C.F.R. § 300.304(b)(1); "It would be inconsistent with the Act for a public agency to limit the scope of an IEE in a way that would prevent an independent evaluator from fulfilling these purposes.").

*4. Whether D.M. Is Entitled to a New FBA*

The Hearing Officer also concluded that Defendant's failure to conduct a new, formal FBA before developing D.M.'s BIP in January 2015 resulted in a denial of FAPE because it contributed to minimal changes being made to his January 2015 IEP's emotional, social and behavioral goals and no changes to its support services. HOD at 69–70, ¶¶ 35–36. Oddly, as Plaintiff notes, the Hearing Officer did not order as a remedy that Defendant conduct a new FBA for D.M.'s benefit. Pl. Mot. at 7. Rather, he included an FBA among the list of diagnostic assessments from which he permitted Plaintiff to choose one to be conducted at Defendant's expense as part of the IEE. HOD at 75 ¶ 3. As discussed above, that portion of the HOD was erroneous. Because the Hearing Office specifically found that Defendant's failure to conduct a FBA resulted in a denial of FAPE, the undersigned recommends that Defendant be ordered to perform a new FBA of D.M. prior to developing a revised BIP and IEP.

*5. Whether the Hearing Officer Was Barred from Making Alternate Findings*

Plaintiff next alleges that the Hearing Officer erred by entering alternate—Plaintiff would say "unnecessary"—findings helpful to Defendant after concluding that D.M. had been denied a FAPE as a result of deficiencies in the January 2015 IEP.[9] Compl. at 12–13 ¶¶ 54, 58; Pl. Mot. at 19–21. Specifically, Plaintiff challenges the Hearing Officer's conclusions that some aspects of the January 2015 IEP were not deficient and that Plaintiff failed to prove that the IEP was not properly implemented by Defendant. *Id.*; HOD at 68 ¶ 29, 73 ¶ 50. Plaintiff argues that there was no basis for the Hearing Officer to reach either of these conclusions because he had already determined that the January 2015 IEP was inadequate for other reasons. Pl. Mot. at 19, 21.

[9] Again, the Hearing Officer found the January 2015 IEP deficient because it failed to address adequately D.M.'s behavioral needs, and because significant changes were made to it between its draft and final versions without consultation with Plaintiff. HOD at 36–40 ¶¶ 169–170; 65–66 ¶¶ 21–22; 68 ¶ 26.

The Court need not linger long on this claim as it is not well-taken. It is undisputed that Plaintiff put both contested issues before the Hearing Officer for adjudication. AR 832–33 (arguing the issues related to the January 2015 IEP). She cannot fairly complain when, at her invitation, the Hearing Officer in fact adjudicated them. Moreover, the use of alternative findings by administrative adjudicators has been repeatedly upheld by courts, as they promote efficiency on appeal, avoid error, and help more thoroughly explain the basis of the administrative decision. *See Murrell v. Shalala*, 43 F.3d 1388, 1389 (10th Cir. 1994); *Otero v. Colvin*, No. 14-CV-206-PB, 2015 WL 5089810, at *7 (D.N.H. Aug. 27, 2015); *Isabell v. Comm'r, Soc. Sec.*, No. CIV. JKB-13-0479, 2013 WL 5883409, at *2 (D. Md. Oct. 29, 2013).

Here, had Defendant appealed the Hearing Officer's finding that the January 2015 IEP was deficient and prevailed, then the Hearing Officer's ruling regarding Plaintiff's other challenges to the January 2015 IEP would have become paramount. By ruling on all issues related to the IEP at one time, the Hearing Officer avoided the burden and expense of a potential remand and second administrative hearing. Plaintiff's claim on this score should be denied.

*6. Whether Defendant Was Required to Reconvene D.M's IEP Team Following Disclosure of the June 2014 Evaluation*

Also unavailing is Plaintiff's challenge to the Hearing Officer's conclusion that Plaintiff was at fault for the IEP Team's failure to consider the June 2014 psychoeducational evaluation at the January 22, 2015 IEP Team meeting. HOD at 59 ¶ 5–6, 74 ¶ 53. As the Hearing Officer found, Plaintiff waited six months to share the results of the evaluation with Defendant. She did not do so—or even disclose the assessment's existence—until January 27, 2015, five days *after* the IEP Team meeting. *Id.* at 59 ¶ 5. Plaintiff's belief that Defendant was obligated to reconvene the IEP Team immediately upon receiving the evaluation is unreasonable and finds no support in regulations governing IDEA matters. Compl. at 12 ¶ 50; Pl. Mot. at 11.

Those regulations provide that when a parent obtains an evaluation and shares it with the public agency, the agency must consider the evaluation "in any decision made with respect to the provision of FAPE to the child." 34 C.F.R. § 300.502(c)(1). The regulations do not require that a new IEP meeting be held each time a new evaluation is shared with an IEP Team, but merely that all evaluations be considered whenever decisions are made. *Id.* Other regulations provide for when an IEP Team meeting must be held. *See id*. at § 300.323(c)(1) (IEP meeting should be held within the 30 days of the determination that a child is eligible for services); *id.* at § 300.324(b)(1)(I) (requiring at least annual reviews of the IEP). None of them require an immediate meeting of the IEP Team whenever new information becomes available, much less information that was six months old when it was disclosed by the parent. Since Plaintiff did not provide the evaluation prior to the January 2015 IEP Team meeting, there was no violation of the IDEA regulations. *Id.*

Further, the record indicates that the 2014 psychoeducational evaluation was discussed at a Resolution Session Meeting ("RSM") in March 2015 in another proceeding involving D.M., HOD at 44, ¶ 190, and at a manifestation meeting in this matter on April 10, 2015, AR 413. Considering the entire record of this case, the undersigned cannot say that considering the evaluation at that time was untimely. In any event, the discussion of the psychoeducational evaluation is largely academic because the Hearing Officer otherwise found deficient the January 2015 IEP which Plaintiff believes should have been informed by the evaluation. Accordingly, Plaintiff's claim with respect to the 2014 psychoeducational evaluation was properly denied by the Hearing Officer.

### 7. *Whether the Hearing Officer Properly Adjudicated Plaintiff's Prospective Private Placement Claim*

In perhaps her most significant challenge to the HOD, Plaintiff argues that the Hearing Officer, having found a denial of FAPE arising from deficiencies in the January 2015 IEP, erred by not ordering a prospective private school placement for D.M., specifically at the Foundation School. Compl. at 12 ¶ 52; Pl. Mot. at 13. Instead, the Hearing Officer modified D.M.'s IEP to include all of his academic instruction in a specialized education setting outside of general education and permitted Defendant an opportunity to identify a school, whether public or private, that could implement that program. HOD at 74–75, ¶¶ 1–2. At the Due Process Hearing, Plaintiff argued that, having been found to have violated the IDEA, Defendant should not have been permitted "another bite at the apple." AR 770–71; 773–74; 780–83. Rather, D.M. should have been immediately placed at the Foundation School to be paid for at public expense. Pl. Mot. at 15–19.

Defendant contends, on the other hand, that D.M.'s expulsion from the Foundation School in the spring of 2016, effectively moots any entitlement Plaintiff may have had to D.M.'s placement there. Def. Mot. at 14; Def. Reply at 4. The undersigned agrees. Importantly, Defendant's mootness argument focuses not on the District's voluntary placement of D.M. at the Foundation School in the fall of 2015, but on his expulsion for allegedly bringing a gun to school a few months later. Def. Mot. at 15; Def. Reply at 4. Because the Foundation School—a private, third party to this litigation—has determined that it can no longer accept D.M. for safety reasons, the Court cannot grant any meaningful relief. As the D.C. Circuit has instructed, if "events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot." *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conf. of the U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001). This requirement "applies independently to each form of relief sought," and it "subsists through all stages of federal judicial proceedings." *Id.*

Here, the only private school that Plaintiff presented any evidence below that may be able to implement D.M's educational program, will no longer accept him as a student. Accordingly, Plaintiff's claim to a prospective placement at the Foundation School is moot, a point Plaintiff's counsel conceded at the motions hearing.[10]

In the event the Court does not believe that Plaintiff's prospective private placement claim is moot, the undersigned recommends upholding the Hearing Officer's decision on that claim on the merits. The Hearing Officer found that Plaintiff had failed to show that only a private school could implement D.M.'s educational program. HOD at 72, ¶¶ 44–45. He therefore rejected Plaintiff's demand of an immediate placement at the Foundation School and remanded the matter to Defendant for purposes of identifying a school, whether public or private, that could implement D.M.'s HOD as modified by the Hearing Officer. *Id.*; *see also id.* at 74–75.

The Hearing Officer's decision is consistent with the law of this Circuit. "Although the IDEA guarantees a free appropriate education, it does not . . . provide that this education will be designed according to the parent's desires." *Shaw v. District of Columbia*, 238 F. Supp. 2d 127, 139 (D.D.C. 2002). "The Act contemplates that such education will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as nonhandicapped children, but the Act also provides for placement in private schools at public expense where this is not possible." *Burlington v. Massachusetts Dept. of Education*, 471 U.S. 359, 369 (1985). Accordingly, this Court has previously instructed that DCPS is "not required to consider private-school placement when appropriate public-placement options are available." *T.T. v. District of Columbia*, No. CIV.A.06 0207 JDB, 2007 WL 2111032, at *9 (D.D.C. July 23, 2007);

[10] In any event, Plaintiff's counsel represented at the hearing that the District is presently paying for D.M.'s placement at High Road School, a private school located in Prince George's County that provides specialized schooling for students facing learning and social challenges.

*see also N.T. v. District of Columbia*, 839 F. Supp. 2d 29, 35 (D.D.C. 2012) ("Because DCPS can craft an appropriate IEP to provide a FAPE, it is not required to pay for [the plaintiff's private] placement."). As the D.C. Circuit has observed:

> If no suitable public school is available, the District must pay the costs of sending the child to an appropriate private school; however, if there is an "appropriate" public school program available, i.e., one "reasonably calculated to enable the child to receive educational benefits," the District need not consider private placement, even though a private school might be *more* appropriate or better able to serve the child[.]

*Jenkins v. Squillacote*, 935 F.2d 303, 305 (D.C. Cir. 1991) (internal citations omitted) (emphasis in original).

Consistent with both the IDEA and that case law, the District's IDEA regulations impose an order of priority for prospective special education placements. D.C. Code § 38-2561.02(c). It requires that placements be considered first, in DCPS schools or District of Columbia public charter schools; second, in private or residential facilities within the District of Columbia; and third, in facilities outside of the District of Columbia. *Id.* The regulations additionally require that a placement be "based upon consideration of the proximity of the placement to the student's place of residence," D.C. Code § 38-2561.01(6)(C), and be in the school the student would attend if not disabled, if possible under his or her IEP, *see* 5-E D.C.M.R. § 3013.7.

On the basis of these authorities, the Hearing Officer properly found that Plaintiff's success in proving the inadequacy of D.M.'s January 2015 IEP was a necessary but not sufficient condition for a prospective private placement. HOD at 71 ¶ 38. Missing from Plaintiff's showing, however, was any evidence demonstrating that D.M.'s special education program required implementation in a private school, or in a school in Maryland (where the Foundation School is located) rather than one located in the District of Columbia. *Id.* at 72 ¶¶ 44–45.

The Hearing Officer acted well within his discretion in taking Defendant's location of services regulations into account when crafting his remedy. As the he found, while the "order of priority is not binding upon a Hearing Officer, a Hearing Officer is not precluded from taking these priorities into consideration in ordering a placement."[11] HOD at 72, n. 32. Certainly, there is no requirement under the IDEA that a hearing officer set those priorities aside in fashioning a remedy for the denial of FAPE. Indeed, states are free to impose their own special educational standards provided that they are not inconsistent with federal standards established by IDEA, and those state standards are likewise enforceable in an IDEA action. *See W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23, Missoula, Montana., 960 F.2d 147*9, 1483 (9th Cir. 1992) (state standards are enforceable in federal court so long as they are "not inconsistent" with federal standards); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 987 (1st Cir. 1990) (same).

The undersigned thus finds no basis to disturb the Hearing Officer's prospective placement decision on its merits. Given that Plaintiff failed to demonstrate that her choice of the Foundation School satisfied the District's prospective placement priority regulation, *see* HOD at 72, ¶¶ 44–45,[12] the Hearing Officer reasonably remanded the matter to the District for purposes of identifying a school, whether public or private, that could implement the modified HOD consistent with the District's order of priority regulation.

[11] Similarly, a federal court has the authority to "grant such relief as [it] determines is appropriate" to remedy a violation of IDEA. 20 U.S.C. § 1415(i)(2)(C)(iii). In determining appropriate relief, a court enjoys "broad discretion" and "equitable considerations are relevant." *Brown*, 179 F. Supp. 3d at 28 (quoting *Florence Cty.*, 510 U.S. at 16). Were a court to determine that the District's order of priority regulation stood in the way of relief it determined to be appropriate, that regulation would have to give way. But, just like for a hearing officer, there is no prohibition in the IDEA that would preclude a court from taking those priorities into account when crafting an appropriate remedy for an IDEA violation.

[12] Plaintiff's assertion that requiring IDEA plaintiffs to do so imposes an impossible burden on them, is overstated. Such testimony could be offered at the Due Process Hearing through an educational expert. Indeed, at the motions hearing, Plaintiff's counsel outlined a serviceable presentation that an expert could have offered at the Due Process Hearing to satisfy the District's order of priority regulations, had Plaintiff elected to do so. Tr. 12/7/2016 Hearing at 30-31.

*8. Whether D.M. Required a Dedicated Aide*

Next, Plaintiff alleges that the Hearing Officer erred in not ordering Defendant to provide a one-on-one aide for D.M. Compl. at 11–12 ¶ 48; Pl. Mot. at 9. Plaintiff sought a dedicated aide to address D.M's behavioral issues throughout the school day, especially during transitions, an appropriate use for an aide if deemed necessary for the student to access the general education curriculum. *Id.; see also Jackson v. District of Columbia*, 826 F. Supp. 2d 109, 119 (D.D.C. 2011) (aide used to assist student in transitions over the course of the school day). Indeed, as Plaintiff points out, Stanton began assigning a staff member to supervise D.M. individually sometime in the spring of 2015.[13] AR 474, 519, 714–17. Further, his IEP Team provided him with a dedicated aide at the end of April 2015, a practice that ended the following month after the observation of D.M. by the District Program Manager who concluded that an aid was unnecessary. *Id.* at 469, 510.

The Hearing Officer correctly determined that Plaintiff had not met her burden of proving D.M.'s need for dedicated aide, at least on a prospective basis given the other services and accommodations the Hearing Officer ordered going forward.[14] Since Plaintiff was the party seeking relief in the form of an amendment to D.M.'s IEP, the Hearing Officer properly assigned her the burden of showing that an aide was necessary. HOD at 9–10; 51–52 ¶ 230; *see also Schaffer v. Weast*, 546 U.S. 49, 51 (2005) (IDEA party seeking relief in due process hearing bears burden of proof); 5 D.C.M.R. § 3030.3. The Hearing Officer found that Plaintiff did not satisfy this burden

---

[13] During these times, D.M. was placed with the "Spanish teacher, the janitor, [or] other non-teacher adult" and he would "follow them around." HOD at 53 ¶¶ 239, 241. The record does not indicate how long this practice lasted. The Hearing Officer found that the practice "served only to exclude [D.M.] from instruction, to isolate him from peers, and to interfere with his emotional, social and behavioral development." *Id.* at ¶ 241.

[14] Any complaint Plaintiff may have had arising from Defendant's refusal to provide an aide while D.M. was inside general education during the 2014-15 school year is not redressable as Plaintiff has waived her claim to compensatory education by electing not to pursue it at the Due Process Hearing. *See supra* Section A.

given the remedy he ordered to address Defendant's denial of FAPE with respect to the January 2015 IEP, which included placing D.M into a small, self-contained special education classroom taught by at least two adults for all his academic instruction. HOD at 52 ¶ 230 n.23; 74–75. The Hearing Officer also ordered that D.M. should be "escorted by a teacher or other school staff member in all non-classroom environments . . . provided that the escort may be escorting other students at the same time." *Id.* at 75 ¶ 1. Together, the Hearing Officer believed this placement "should obviate any need for a one-on-one dedicated aide." *Id.* at 52 ¶ 230 n.23; *see also* 74–75 ¶ 1.

The undersigned cannot say that this conclusion is incorrect, especially given the "due weight" courts must accord a Hearing Officer's decision given his or her expertise in IDEA matters. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). Indeed, Plaintiff offered no evidence at the Due Process Hearing that a dedicated aide would be necessary in the event D.M. were placed full-time outside of general education. On appeal, she argues that D.M.'s significant behavioral problems were sufficient to carry her burden of proof. Pl. Mot. at 10. But again, D.M.'s behavioral issues arose when he was in the general educational setting at Stanton, not when he was receiving all of his academic instruction in small, specialized education classrooms outside of general education, as the Hearing Officer ordered in his HOD. The Hearing Officer's conclusion that the small student-to-teacher ratio that D.M. would experience in that setting, combined with an escort for him during transitions and other non-classroom environments, vitiated D.M.'s need for a dedicated aide was not erroneous.[15]

[15] Plaintiff's reliance on events that transpired after D.M.'s placement at the Foundation School as a result of HOD are necessarily outside the administrative record and are not a proper basis on which to challenge the Hearing Officer's decision. Pl. Reply at 5 (Plaintiff arguing that D.M. was assigned an aide while at the Foundation School prior to his expulsion).

*9. Whether Plaintiff Demonstrated that D.M. Required Speech Therapy*

Finally, Plaintiff alleges that the Hearing Officer erred in concluding that she failed to meet her burden of showing that D.M. required speech and language services. Compl. at 13 ¶ 60; Pl. Mot. at 21. Reviewing the conclusions of a 2011 speech and language evaluation and the 2014 psychoeducational evaluation, the Hearing Officer found that, while both evaluations indicated weaknesses in D.M.'s expressive language, neither demonstrated a need for speech and language therapy. HOD at 25–26 ¶¶ 100, 105; 74 ¶ 54. The 2011 evaluation concluded that his speech was in "the normal range of functioning." *Id.* at 11 ¶¶ 10–15. The June 2014 evaluation indicated that D.M. "may have an expressive language disorder," but only recommended a tutor for him to "build his vocabulary, develop his reading and writing skills, and to communicate better verbally." *Id.* at 25 ¶ 100, 26 ¶¶ 104–05; AR 253. Neither evaluator recommended speech and language therapy. *Id.*

Plaintiff produced nothing at the Due Process Hearing beyond those two evaluations regarding any speech deficiency that D.M. may have, or benefit he would receive from speech and language therapy. Plaintiff attempts to explain that deficiency by asserting that hiring an expert at the administrate level in an effort to do so would have been expensive. Pl. Reply at 7. The fact remains that Plaintiff has provided no basis to challenge the Hearing Officer's conclusion that she failed to satisfy her burden of proving D.M.'s need for speech and language services at the time of the hearing. The 2011 and 2014 evaluations may demonstrate a need for further investigation of D.M.'s speech and language challenges.[16] As the Hearing Officer properly found, however, they

---

[16] It appears from the record that Stanton's Principal agreed to administer cognition and speech and language assessments of D.M. in mid-April 2015. AR 428. The results of those tests, if any, are not in the record.

were insufficient to provide a basis for ordering Defendant to provide D.M. with speech and language therapy when the HOD was issued.

## CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court grant in part and deny in part both parties' motions for summary judgment. Specifically, the undersigned recommends that this Court conclude that Plaintiff waived any claim to compensatory education that she may have had when she unilaterally purported to "reserve" that claim prior to the Due Process Hearing. If the Court determines that she did not do so, the undersigned recommends, with the concurrence of the parties, that the case be remanded to the Hearing Officer for calculation of an appropriate award of compensatory education consistent with the Court's decision on the other issues raised in the parties' motions for summary judgment.

With respect to the other issues raised, the undersigned recommends that the Court find that:

- Defendant's January 2015 re-evaluation of D.M. was deficient and denied him a FAPE;
- the Hearing Officer's limitation on the number of diagnostic assessments that could be conducted during D.M.'s IEE was erroneous; and
- the Hearing Officer's failure to order Defendant to perform a new FBA of D.M. prior to developing his revised BIP and January 2015 IEP was erroneous.

As relief, in addition to that ordered by the Hearing Officer, the undersigned would recommend that the Defendant be ordered to (1) fund an IEE of D.M. comprised of as many diagnostic tests and assessments as is necessary to evaluate D.M.'s suspected areas of disability and to determine an appropriate educational program for him, as determined by the independent professional conducting the IEE and consistent with the standards for evaluations prescribed by the IDEA and its regulations; and (2) conduct a new FBA of D.M. Finally, Defendant should be ordered to hold an

IEP Team meeting to consider the results of both the IEE and the FBA within 30 days of their completion.

Beyond these limited issues, the undersigned finds no other basis to disturb the Hearing Officer's findings.

* * * * *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date: January 31, 2017

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE