# District of Columbia
# Office of the State Superintendent of Education
### Office of Dispute Resolution
### 810 First Street, N.E., Suite 2001
### Washington, DC 20002

| | |
|---|---|
| **STUDENT**[1], **By and through PARENT,** | Case No. 2015-0152 |
| *Petitioner,* | Date Issued: June 22, 2015 |
| | Dates of Hearing: |
| **v.** | June 5, 2015 Hearing Room 2006 |
| | June 15, 2015 Hearing Room 2003 |
| | Representatives: |
| | Elizabeth T. Jester, Esq. for Petitioner |
| | Tanya Joan Chor, Esq. for Respondent |
| **DISTRICT OF COLUMBIA PUBLIC SCHOOLS,** | Impartial Hearing Officer: Charles M. Carron |
| *Respondent.* | |

## HEARING OFFICER DETERMINATION

### I. BACKGROUND

The Student is male, Current Age, and attends Current Grade at a public school (the "Attending School"). The Student has been determined to be eligible for special education and related services under the Individuals with Disabilities Education Act

---

[1] Personally identifiable information is attached as Appendix A to this decision and must be removed prior to public distribution.

PLAINTIFF'S EXHIBIT
1
ALL-STATE LEGAL®

("IDEA"), as amended, 20 U.S.C. §§1400 *et seq.* as a child with a disability, Emotional Disturbance ("ED").

Petitioner claims that Respondent has denied the Student a Free Appropriate Public Education ("FAPE") by failing to provide an appropriate Individualized Education Program ("IEP"), failing or refusing to evaluate him in all areas of suspected disability, failing or refusing to provide Petitioner the Independent Educational Evaluations ("IEEs") that she requested, failing or refusing to convene an IEP Team meeting to review the results of an evaluation obtained by Petitioner, failing to consider Petitioner's concerns regarding the Student's needs, developing the Student's IEP without providing Petitioner the opportunity to provide input, and failing or refusing to provide the Student a one-on-one aide, all as described in more detail in Section IV *infra*.

Respondent asserts that the Student's evaluations and IEPs have been appropriate, that it has convened and reconvened the Student's IEP Team as appropriate, that Petitioner has had full opportunity for input, that Petitioner did not disagree with Respondent's evaluation of the Student and therefore was not entitled to IEEs, and that the Student does not require a one-on-one aide.

## II. SUBJECT MATTER JURISDICTION

This is a Due Process Complaint ("DPC") proceeding pursuant to the IDEA. The Due Process Hearing ("DPH") was held pursuant to the IDEA, 20 U.S.C. §1415(f); IDEA's implementing regulations, 34 C.F.R. §300.511, and the District of Columbia Code and Code of D.C. Municipal Regulations, *see* DCMR §§5-E3029 and E3030. This decision constitutes the Hearing Officer Determination ("HOD") pursuant to 20 U.S.C. §1415(f), 34 C.F.R. §300.513, and §1003 of the *Special Education Office of Dispute Resolution Due Process Hearing Standard Operating Procedures.*

### III. PROCEDURAL HISTORY

The DPC was filed April 24, 2015 on behalf of the Student, who resides in the District of Columbia, by Petitioner, the Student's Parent, against Respondent, District of Columbia Public Schools ("DCPS").

On April 27, 2015 the undersigned was appointed as the Impartial Hearing Officer.

On May 4, 2015, Respondent filed its timely Response, stating, *inter alia*, that Respondent had not denied the Student a FAPE.[2]

A Resolution Session Meeting ("RSM") was held on May 6, 2015 but it failed to resolve the DPC. The statutory 30-day resolution period ended on May 24, 2015.

The 45-day timeline for this HOD started to run on May 25, 2015 and will conclude on July 8, 2015.

The undersigned held a Prehearing Conference ("PHC") by telephone on May 13, 2015, at which the parties discussed and clarified the issues and the requested relief. At the PHC, the parties agreed that five-day disclosures would be filed by May 29, 2015 and that the DPH would be held on June 5, 2015. The undersigned issued a Prehearing Conference Summary and Order ("PHO") on May 14, 2015 and an Amended Prehearing Conference Summary and Order ("Amended PHO") on May 19, 2015.

On May 29, 2015 Petitioner filed her five-day disclosures, comprising a cover letter with lists of witnesses and documents, and 56 proposed exhibits numbered P-1 through P-56.

On May 29, 2015, Respondent filed its five-day disclosures, comprising a cover letter with lists of witnesses and documents, and 33 proposed exhibits numbered R-1 through R-5, R-7 through R-27 and R-29 through R-35.

---

[2] On May 11, 2015, Respondent filed a corrected Response, correcting the Student's date of birth.

On May 29, 2015, via an exchange of emails, the parties and the undersigned agreed that the DPH would commence as previously scheduled on June 5, 2015, and that it would continue on June 15, 2015.

No motions were filed by either party and the DPH was held on June 5, 2015 from 9:44 a.m. to 12:20 p.m. in Room 2006, and on June 15, 2015 from 9:05 a.m. to 11:22 a.m. in Room 2003, at the Office of Dispute Resolution, 810 First Street, NE, Washington, DC 20002.  Petitioner elected for the hearing to be closed.

Petitioner participated in the DPH in person.

At the DPH, the following documentary exhibits were admitted into evidence without objection: Petitioner's Exhibits P-1 through P-56 and Respondent's Exhibits R-1 through R-5, R-7 through R-27 and R-29 through R-35.

The following witnesses testified on behalf of Petitioner at the DPH: Petitioner/Parent, Family Support Worker, and Private School Admissions Coordinator.

DCPS Office of Specialized Instruction Program Manager ("Program Manager") testified on behalf of Respondent at the DPH. Program Manager was admitted, over Petitioner's objection, as an expert regarding Least Restrictive Environment ("LRE")[3], and regarding determining appropriate interventions, including behavioral and academic interventions.

The parties gave oral closing arguments. The undersigned did not permit written closing arguments or briefs because oral closing arguments had been agreed to at the PHC as documented in the Amended PHO.  However, the undersigned allowed the parties to submit, by June 16, 2015, citations to any case law supporting their positions. Neither party did so.

---

[3] With regard to LRE, the undersigned allowed Program Manager to testify regarding her opinion of the setting appropriate for the Student; however, the determination of LRE is a legal conclusion made by the undersigned.

4

## IV. ISSUES

As discussed at the PHC and confirmed in the Amended PHO, the following issues were presented for determination at the DPH:

(a) From the beginning of School Year ("SY") 2014-2015 until January 2015, did Respondent deny the Student a FAPE (i) because his March 2014 IEP was inappropriate to meet his academic, social, emotional and behavioral needs because it provided insufficient hours of specialized instruction and related services (specifically, speech therapy), and because the goals were inappropriate and insufficiently measurable; and (ii) because Attending School could not implement the IEP?

(b) Since December 2014, has Respondent denied the Student a FAPE by failing and refusing to evaluate him in all areas of suspected disability, specifically by failing to conduct an updated Functional Behavioral Assessment ("FBA"), speech/language evaluation, comprehensive psychological evaluation including testing for Attention Deficit Hyperactivity Disorder ("ADHD"), behavior and social-emotional issues, and by failing to conduct an appropriate triennial evaluation?

(c) Since December 2014 has Respondent violated IDEA by failing and refusing to fund IEEs at Petitioner's request?

(d) Since January 2015, has Respondent denied the Student a FAPE by failing and refusing to convene an IEP Team meeting to review the results of an independent psychoeducational evaluation that Petitioner provided to Respondent?

(e) Did Respondent deny the Student a FAPE when developing the Student's January 2015 IEP because (i) Respondent failed to consider Petitioner's concerns regarding the Student's academic, social, emotional, developmental, behavioral and functional needs, (ii) Respondent developed the final version of the IEP without providing Petitioner the opportunity to review and provide input, and/or (iii) the IEP fails to meet the Student's academic, social, emotional and behavioral needs because it provided insufficient hours of specialized instruction and related services (specifically, speech therapy), and because the goals were inappropriate and insufficiently measurable; and (ii) because Attending School could not implement the IEP?

(f) Since April 10, 2015, has Respondent denied the Student a FAPE by failing to provide him a one-on-one aide?

## V. RELIEF REQUESTED

Petitioner requests the following relief:[4]

(a) an Order that, within five days of the HOD, Respondent place the Student at Private School or another appropriate full time special education program;

---

[4] In the DPC, Petitioner also sought compensatory education in the form of tutoring. However, in Petitioner's five-day disclosures, Petitioner withdrew the request for compensatory education services, stating that compensatory education was "reserved as relief to be raised in the future." The undersigned expresses no opinion on whether compensatory education "relief" can be "reserved" and raised "in the future." If and when Petitioner reasserts a right to compensatory education for the denials of FAPE alleged in the instant DPC, and found in this HOD, the Hearing Officer assigned to that case will make that determination.

(b) an Order that, within five days of the Student's matriculation at the new school, Respondent convene the Student's IEP Team to develop an IEP that reflects the need for specialized instruction outside the general education setting throughout the school day, with a full time one-on-one aide and at least one hour per week of speech/language therapy;

(c) an Order that Respondent fund the following IEEs: a comprehensive psychological evaluation including academic, cognitive and social/emotional testing, a comprehensive evaluation; a comprehensive speech/language evaluation that includes evaluation of the Student's language processing, a comprehensive occupational therapy ("OT") evaluation, a comprehensive assistive technology evaluation, and an FBA;

(d) an Order that, within five days after receipt of the reports of the IEEs, Respondent convene the Student's IEP Team at the school the Student is attending to review those reports as well as the report from the Student's June 2014 psychoeducational evaluation and review and revise the Student's IEP as appropriate; and

(e) any other relief that is just and fair.

## VI. BURDEN OF PROOF

In a special education DPH, the burden of persuasion is on the party seeking relief. DCMR §5-E3030.3; *Schaffer v. Weast,* 546 U.S. 49 (2005). Through documentary evidence and witness testimony, the party seeking relief must persuade the

Impartial Hearing Officer by a preponderance of the evidence. DCMR §5-E3022.16; *see also, N.G. v. District of Columbia,* 556 F. Supp. 2d 11, 17 n.3 (D.D.C. 2008).

## VII. CREDIBILITY

The undersigned found all of the witnesses to be credible, to the extent of their firsthand knowledge or professional expertise.

## VIII. FINDINGS OF FACT

Facts Related to Jurisdiction

1. The Student is a male of Current Age. P-1-1.[5]

2. The Student resides in the District of Columbia. *Id.*

3. The Student has been determined to be eligible for special education and related services under the IDEA as a child with ED. *Id.*

August 26, 2011 Psychoeducational Evaluation

4. On August 26, 2011 Previous School conducted a Psychoeducational Evaluation of the Student, with a report dated September 6, 2011. P-35.

5. The Student's Full Scale IQ ("FSIQ") was found to be 80, which is in the Low Average range, with no significant difference between his verbal and nonverbal reasoning. P-35-2 and -3.

6. The Student was found to have weak mental control. P-35-3 and -4.

---

[5] When citing exhibits, the third range represents the page number within the referenced exhibit, in this instance, page 1.

7. The Student's academic achievement scores fell in the Low Average to Very Low ranges. P-35-5, -6 and -10.

8. The Student was diagnosed with Reading Disorder and Disorder of Written Expression. P-35-6.

December 2, 2011 Referral for Speech and Language Evaluation

9. On or about December 2, 2011, Previous School referred the Student for a speech and language evaluation, a psychoeducational evaluation and a clinical evaluation. P-29.

December 9, 2011 Speech and Language Evaluation

10. On December 9, 2011 Previous School conducted a speech and language evaluation of the Student. P-33.

11. The Student scored in the 13th percentile, the borderline range of functioning, on Receptive Language. P-33-3.

12. The Student scored in the first percentile, the very low range of functioning, on Expressive Language, Language Content and Language Memory. P-33-3 and -4.

13. The Student's scores on Vocabulary fell in the fourth to tenth percentiles, the moderately to slightly below average ranges of functioning. P-33-5.

14. Overall, the Student's Core Language score was in the third percentile. *Id.*

15. The Student's speech was found to be in the normal range of functioning. *Id.*

February 7, 2012 Clinical Psychological Evaluation

16. On February 7, 2012 Previous School conducted a clinical psychological evaluation of the Student, with a report dated February 16, 2012. P-34.

17. The Student had been reluctant to attend school, had been suspended for hitting a peer, had drawn pictures of guns and people killing each other, and had made statements about wanting to die. P-34-2 and -3.

18. The evaluator assigned diagnoses of Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Reading Disorder and Disorder of Written Expression. P-34-10.

19. The evaluator opined that the Student's "current difficulties are serious enough to warrant the ED classification." *Id.*

February 28, 2012 Eligibility Meeting

20. On February 28, 2012 Previous School, which is its own Local Educational Agency ("LEA") under IDEA (P-23-1), convened a meeting to determine the Student's eligibility for special education (P-24-2).

21. A Disability Worksheet[6] was completed, concluding that the Student met the criteria for ED under IDEA. P-25.

February-March 2012 FBA

22. Previous School conducted an FBA of the Student, with observations on February 28 and 29, 2012. P-39-4.

_____

[6] The worksheet bears the date February 28, 2011 but it is apparent from the context that it was prepared February 28, *2012*.

23. The FBA is not dated and the evaluator is not identified.  P-39, *passim.*

24. The Student had been referred for the FBA due to aggressive, non-compliant and inattentive behaviors. P-39-1.

25. The behaviors of concern occurred in the afternoon. P-39-2.

26. The Student was inattentive at least 11 or 12 times per hour, physically and verbally aggressive at least three times per day, and non-compliant six or seven times out of ten "opportunities." *Id.*

27. The Student's maladaptive behaviors occurred when he perceived himself as being "unskillfully challenged and when his mood is agitated." *Id.*

March 8, 2012 Behavior Intervention Plan

28. On March 8, 2012 Previous School developed a Behavior Intervention Plan ("BIP") for the Student. P-39.

29. The BIP called for the Student's teachers and staff to provide him with positive attention only in response to desired behaviors, and to use non-verbal cueing to redirect him. P-39-1.

30. The BIP prescribed a reward points system and a daily call to Petitioner. *Id.*

April 12, 2012 Analysis of Existing Data and Prior Written Notice of Evaluation

31. On April 12, 2012 Previous School provided Petitioner an Analysis of Existing Data (P-26) and a Prior Written Notice ("PWN") of its proposal to conduct an initial assessment or evaluation of the Student based upon information already

available[7] (P-28).

### April 13, 2012 PWN Regarding Identification

32. On April 13, 2012 Previous School provided Petitioner a PWN of its proposal to identify the Student as a student with a disability under the IDEA. P-27.

### April 13, 2012 Final Eligibility Determination Report

33. On April 13, 2012 Previous School issued a Final Eligibility Determination Report finding the Student eligible for special education with the primary disability classification of ED.  P-24-1.

### April 16, 2012 IEP

34. The Student's initial IEP was developed on April 16, 2012. P-23.

35. The April 16, 2012 IEP provided the Student 16 hours per week of specialized instruction in the outside of general education setting, four hours per month of behavioral support services in the general education setting, and two hours per month of behavioral support services in the outside of general education setting. P-23-6.

### June 16, 2012 Burglary Charge

36. On June 16, 2012 the Student was detained and charged with Burglary II. P-31-2.

37. The charge was not petitioned. *Id.*

---

[7] This PWN is internally inconsistent, stating, *inter alia*, that Previous School proposed "to conduct an initial assessment and no additional evaluations are needed." P-28-1.

Matriculation at Attending School

38. The Student matriculated at Attending School several weeks before the end of SY 2011-2012.  P-52-18.


October 31, 2012 IEP Team Meeting

39. On October 31, 2012, Attending School convened a meeting of the Student's IEP Team to review his IEP.[8] P-22-1.

40. The Student's behavior had improved "greatly" since SY 2011-2012. P-22-6.

41. The Student was in the second highest of four status levels and had earned more honors and privileges than the majority of his peers. *Id.*

42. The Student's IEP developed on October 31, 2012 reduced the Student's specialized instruction in the outside of general education setting from 16 to 4.5 hours per week (two hours in Mathematics and 2.5 hours in Reading), added 2.5 hours per week of specialized instruction in the general education setting (in Written Expression), retained the Student's two hours per month of behavioral support services in the outside of general education setting, and eliminated the Student's four hours per month of behavioral support services in the general education setting. *Compare* P-22-8 *with* P-23-6.


April 22, 2013 PWN Regarding IEP Amendment

43. On April 22, 2013, Attending School provided Petitioner a PWN of its proposal to amend the Student's IEP to add the following accommodations: flexible

---

[8] This review was called an "annual" review even though the Student's current IEP had been developed only six months before the October 31, 2012 meeting.

scheduling, breaks during subtests, preferential seating, and oral reading of some test questions. P-20-1.

44. Petitioner agreed to amend the Student's IEP as described in Finding of Fact 43, *supra,* without convening an IEP Team meeting. P-19-1.

45. On April 22, 2013, the Student's IEP was amended as described in Finding of Fact 43, *supra.* P-21-1 and -10.


September 11, 2013 IEP Team Meeting

46. On September 11, 2013, a meeting of the Student's IEP Team was held for the annual review of his IEP. P-17-1, P-18-1 and -2.

47. During SY 2012-2013, the Student had been placed in Attending School Academy, a small general education classroom at Attending School with eight students, a low student to teacher ratio (a teacher and an aide for the eight students), intensive behavior supports and interventions, and leadership opportunities. P-8-2, P-10-2, P-17-3, testimony of Petitioner.

48. During SY 2012-2013, the Student was "able to consistently manage his behavior, and in that setting, his behavior is positive and does not impede the learning of others. Additionally, he is a leader in the classroom and is helpful to the teacher and students." *Id.*

49. The Student's September 11, 2013 IEP retained his 2.5 hours per week of specialized instruction in the general education setting in Written Expression and his 2.5 hours per week of specialized instruction in the outside of general education setting in Reading, converted his two hours per week of specialized instruction in Mathematics

from the outside of general education setting to the general education setting, and

retained his two hours per month of behavioral support services in the outside of general

education setting. *Compare* P-17-10 *with* P-22-8 and -10.

### The Student's Progress on his IEP Goals From the Beginning of SY 2013-2014 to March 28, 2014

50. During the first half of SY 2013-2014, the Student was progressing on two of

his Mathematics goals, one of his Written Expression goals, and two of his Emotional,

Social and Behavioral Development goals. R-1-1 through -5.

51. There is no evidence in the record as to the Student's progress on his other

IEP goals during the first half of SY 2013-2014.

52. From January 27 to March 28, 2014, the Student almost mastered one of his

Mathematics goals, made progress on the other two of his Mathematics goals that had

been introduced, made progress on one of his Reading goals, did not make progress on

two Reading goals that had just been introduced, made progress on both of his Written

Expression goals, and made progress on all three of his Emotional, Social, and

Behavioral Development goals. R-5-1 through -6.

### March 12, 2014 IEP Team Meeting

53. Attending School convened a meeting of the Student's IEP Team on

March 12, 2014 to review his IEP.[9] P-16-1.

---

[9] This review was called an "annual" review even though the Student's current IEP had been developed only six months before the March 12, 2014 meeting. In addition, the IEP developed at the March 12, 2014 meeting incorrectly stated that the Student's last annual review was October 31, 2012. P-16-4.

54. The Student's Present Levels of Academic Achievement and Functional Performance ("PLOPs") in Mathematics, Written Expression and Emotional, Social and Behavioral Development in the March 12, 2014 IEP are substantially identical to the PLOPs in the September 11, 2013 IEP, including paragraphs copied verbatim. *Compare* P-16-4, -8 and -10 *with* P-17-4, -7 and -8, respectively.

55. There is no evidence in the record explaining Attending School's failure to update the Student's PLOPs in these areas.

56. The Student's PLOPs in Reading indicate that he had improved 1.6 grade levels in reading since September 2013. P-16-7.

57. The Student's Mathematics goals in the March 12, 2014 IEP were as follows:

> **Annual Goal 1:**
> Given 5 multiplication problems, [the Student] will multiply a whole number of up to four digits by a one-digit whole number, and multiply two two-digit numbers with fluency and at least 80% accuracy in 3 out of 4 trials.
>
>                       * * *
>
> **Annual Goal 2:**
> When given no more than 5 division problems, [the Student] will find whole-number quotients and remainders with up to four-digit dividends and one-digit divisors with fluency and at least 80% accuracy in 3 out of 4 trials.
>
>                       * * *
>
> **Annual Goal 3:**
> When given 5 whole numbers between 1 and 100, [the Student] will find all factor pairs with 80% accuracy in 4 out of 5 trials.
>
>                       * * *
>
> **Annual Goal 4:**
> When given no more than 5 addition and subtraction of fractions problems with unlike denominators, [the Student] will solve the problems and write the answer in simplest form with at least 80% accuracy in 3 out of 4 trials.

P-16-5 and -6.

58. Petitioner introduced no evidence that the Student's Mathematics goals were not measurable.[10]

59. The undersigned finds that all of the Student's Mathematics goals were measurable.

60. Petitioner introduced no evidence that these Mathematics goals were inappropriate for the Student.

61. The undersigned finds that Mathematics Goal 1 was appropriate for the Student because it represented a reasonable improvement from his baseline of 60 percent accuracy on multiplying multi-digit numbers with fluency, due in part to his failure to master his 8 and 9 times tables. P-16-5.

62. The undersigned finds that Mathematics Goal 2 was appropriate for the Student because it represented a reasonable improvement from his baseline of having mastered basic division facts with 80 percent accuracy, but lacking fluency and mastery of his 8 and 9 times tables, and sometimes forgetting the correct order of long division steps. *Id.*

63. The undersigned finds that Mathematics Goal 3 was appropriate for the Student because it represented a reasonable improvement from his baseline of being able to find the factors of small numbers (*e.g.*, 2, 4 and 8) but not the factors of more complex, two-digit numbers. P-16-6.

_____

[10] In argument, without citation of any statute, regulation or case law, Petitioner's counsel asserted that teachers' observations cannot constitute measurement. Argument is not evidence.

64. The undersigned finds that Mathematics Goal 4 was appropriate for the Student because it represented a reasonable improvement from his baseline of being able to add and subtract fractions with like denominators with 100 percent accuracy, while building equivalent fractions and simplifying fractions with only 20 percent accuracy. *Id.*

65. The Student's Reading goals in the March 12, 2014 IEP were as follows:

> **Annual Goal 1:**
> [The Student] will grow 1.3 years on his reading level according to the Fountas and Pinnell Assessment, going from a level N independently (GE=3.5) to a level R (GE=4.8).
>
> * * *
>
> **Annual Goal 2:**
> [W]hen given a list of 50 words containing prefixes and suffixes [the Student] will correctly read aloud 40/50 words in 4 of 5 consecutive trials as measured by (teacher's running record of correct words read).
>
> * * *
>
> **Annual Goal 3:**
> When given a grade level passage that is separated into parts, [the Student] will read aloud fluently with appropriate intonation and expression with no more than 5 errors (excluding self corrections) in 4 of 5 trials as measured by teacher running record.

P-16-7 and -8.

66. Petitioner introduced no evidence that the Student's Reading goals were not measurable.[11]

67. The undersigned finds that all of the Student's Reading goals were measurable.

68. Petitioner introduced no evidence that these Reading goals were inappropriate for the Student.

---

[11] *See*, Note 10, *supra.*

69. The undersigned finds that Reading Goal 1 was appropriate for the Student because it represented a reasonable improvement from his baseline of reading on level N independently as of February 2014. P-16-8.

70. The undersigned finds that Reading Goal 2 was appropriate for the Student because it represented a reasonable improvement from his baseline of struggling with decoding multi-syllabic words with prefixes and suffixes. *Id.*

71. The undersigned finds that Reading Goal 3 was appropriate for the Student because it represented a reasonable improvement from his baseline of failing to include appropriate intonation and expression when reading grade level texts. *Id.*

72. The Student's Written Expression goals in the March 12, 2014 IEP were as follows:

> **Annual Goal 1:**
> Given a set of five CVC [Consonant-Vowel-Consonant] words and five words with long vowel spellings, [the Student] will be able to spell the words with 80% accuracy.
>
> &#42; &#42; &#42;
>
> **Annual Goal 2:**
> [The Student] will be able to write complete sentences using appropriate punctuation and capitalization with 80% accuracy with 5 out of 6 trials.

P-16-9.

73. Petitioner introduced no evidence that the Student's Written Expression goals were not measurable.[12]

74. The undersigned finds that both of the Student's Written Expression goals were measurable.

---

[12] *See*, Note 10, *supra.*

75. Petitioner introduced no evidence that these Written Expression goals were inappropriate for the Student.

76. The undersigned finds that Written Expression Goal 1 was appropriate for the Student because it represented a reasonable improvement from his baseline of spelling CVC and long vowel words with 20 percent accuracy. P-16-9.

77. The undersigned finds that Written Expression Goal 2 was appropriate for the Student because it represented a reasonable improvement from his baseline of failing to use complete sentences correctly and failing to incorporate proper punctuation and capitalization. *Id.*

78. The Student's Emotional, Social, and Behavioral Development goals in the March 12, 2014 IEP were as follows:

> **Annual Goal 1:**
> [The Student] will verbally express his feelings and articulate his triggers, when faced with challenging academic tasks, or when agitated by peers, in 9 out of 10 trials.
>
>          * * *
>
> **Annual Goal 2:**
> [The Student] will demonstrate his ability to remain focused and on-task during small group instruction during 9 out of 10 3-minute intervals.
>
>          * * *
>
> **Annual Goal 3:**
> [The Student] will continue in small group counseling outside of the classroom for 2 hours a month for emotional support and an avenue to express his thoughts about situations in his life that really bother him. He will control his impulse to fight 4 out of 5 times.

P-16-10.

79. Petitioner introduced no evidence that the Student's Emotional, Social, and Behavioral Development goals were not measurable.[13]

80. The undersigned finds that all of the Student's Emotional, Social, and Behavioral Development goals were measurable.

81. Petitioner introduced no evidence that these Emotional, Social, and Behavioral Development goals were inappropriate for the Student.

82. The undersigned finds that Emotional, Social, and Behavioral Development Goal 1 was appropriate for the Student because it represented a reasonable improvement from his baseline of self-regulating more than 80 percent of the time. P-16-10.

83. The undersigned finds that Emotional, Social, and Behavioral Development Goal 2 was appropriate for the Student because it represented a reasonable improvement from his baseline of becoming distracted by peers and attempting to engage in off-task conversations. *Id.*

84. The undersigned finds that Emotional, Social, and Behavioral Development Goal 3 was appropriate for the Student because it represented a reasonable improvement from his baseline of getting into physical altercations with peers that said unpleasant things to him. P-16-11.

85. Petitioner introduced no evidence that the Student required speech-language services.

86. The March 12, 2014 IEP made no changes to the Student's hours of specialized instruction and behavioral support services. *Compare* P-16-12 *with* P-17-10.

---

[13] *See*, Note 10, *supra.*

87. Petitioner introduced no evidence that the Student required more hours of specialized instruction or behavior support services as of March 12, 2014.

April 23, 2014 BIP

88. On April 23, 2014, Attending School developed a BIP for the Student. P-37.

89. The Context and Intervention Strategies in the April 23, 2014 BIP were identical to those in the Student's March 8, 2012 BIP from Previous School. *Compare* P-37-3 *with* P-40-1.

90. The Rewards/Reinforcements in the April 23, 2014 BIP were as follows:

> [The Student] will receive a "blue face" for very good behavior in the classroom and throughout the school day in the building. He will be able to run errands, receive an extra lunch and attend a pizza party once a week if he has good to excellent behavior.

P-37-1 and -3.

91. The Consequences in the April 23, 2014 BIP were as follows:

> [The Student] will receive ongoing reminders about desired behaviors. He will receive a "red face" when his behavior is not acceptable. He will be provided opportunities to earn his way back to green and blue faces for acceptable and excellent behavior.

*Id.*

April 30, 2014 Arrest

92. On April 30, 2014, the Student was arrested, detained, charged with Felony Destruction of Property and Throwing Missiles, and released to Petitioner. P-31-1 and -2.

May 14, 2014 Superior Court Status Hearing

93. On May 14, 2014, at the Student's Superior Court status hearing, he pled "involved" to the charge of Throwing Missiles, and the count of Felony Destruction of Property was dismissed. P-31-2.

94. The Student was referred for a psychoeducational evaluation to assess his cognitive and personality functioning. P-31-1.

June 9, 2014 Psychoeducational Evaluation

95. On June 9, 2014, the Child Guidance Clinic of the Social Services Division of the Family Court of the Superior Court of the District of Columbia conducted a psychoeducational evaluation of the Student, with a report dated June 23, 2014. *Id.*

96. The Student's FSIQ was found to be 78, in the seventh percentile, which is in the Borderline range. P-31-5.

97. The Student's score on the Verbal Comprehension Index ("VCI"), which measures receptive and expressive language, abstract thinking, social knowledge, and previous learning, was in the first percentile, which is in the Borderline range. P-31-5 and -6.

98. The Student's scores on the other cognitive indices were in the Low Average and Average ranges. P-31-5.

99. The Student's academic achievement skills fell in the very limited to low average range, with his highest scores in math and his lowest scores in reading. P-31-8.

100. The Student's academic skills appeared to be consistent with his cognitive functioning, and indicated that he may have an expressive language disorder. *Id.*

101. With regard to emotional and personality functioning, the Student met the criteria for Posttraumatic Stress Disorder ("PTSD") and Persistent Depressive Disorder, and a provisional diagnosis of Language Disorder. P-31-8 through -10.

102. The evaluator administered the Conners Comprehensive Behavior Rating Scales to determine whether the Student had ADHD. P-31-1.

103. The evaluator concluded that, although the Student had been diagnosed previously with ADHD, his "attentional problems and irritability appear more consistent with symptoms of a trauma history." P-31-10.

104. The evaluator's recommendations included a tutor to address the Student's weakness in his expressive and receptive language skills, and a mentor. P-31-11.

105. The evaluator's recommendations did *not* include speech-language services. P-31-10 and -11.


The Student's Progress on his IEP Goals From March 31 to June 19, 2014

106. From March 31 to June 19, 2014, the Student almost mastered three of his Mathematics goals and made progress on the remaining Mathematics goal, mastered one of his Reading goals and made progress on the remaining two Reading goals, made progress on both of his Written Expression goals, and made progress on all three of his Emotional, Social, and Behavioral Development goals. R-4-1 through -6.

107. Despite the April 30, 2014 incident, based upon the entire record, including the lack of contrary recommendations in the June 9, 2014 Psychoeducational Evaluation, the undersigned finds that the Student's goals in his March 12, 2014 IEP remained appropriate as of June 19, 2014.

Change in the Student's Classroom for SY 2014-2015

108. As of the beginning of SY 2014-2015, the Student no longer was placed in Attending School Academy; instead he was placed in Attending School's regular general education classroom setting with more than 20 students. Testimony of Petitioner.

September 25, 2014 Incident

109. On September 25, 2014, the Student engaged in theft of property without force, specifically, the Student stole a teacher's wallet and charged an "extreme amount of money" on her credit cards. P-50-14 and -16.

110. Attending School proposed a three-day off-site suspension. P-50-14.

October 29, 2014 Incident

111. On October 29, 2014, the Student engaged in reckless behavior for which Attending School proposed a two-day off-site suspension. P-50-12.

The Student's Progress on His IEP Goals From the Beginning of SY 2014-2015 to November 2, 2014

112. From the beginning of SY 2014-2015 to November 2, 2014, the Student regressed on one of his Mathematics goals, and made no progress on the remaining Mathematics goals that had been introduced. R-3-1 and -2.

113. From the beginning of SY 2014-2015 to November 2, 2014, the Student mastered one of his Reading goals (*i.e.,* reading on the target level) and was progressing on his other two Reading goals (*i.e.*, reading 42 out of 50 multi-syllable words correctly and reading at the average level of accuracy and fluency). R-3-3 and -4.

114. From the beginning of SY 2014-2015 to November 2, 2014, the Student mastered one of his Written Expression goals (*i.e.,* writing complete sentences using appropriate punctuation and capitalization with 80 percent accuracy) and was progressing on his other Written Expression goal (*i.e.,* spelling CVC words). R-3-4 and -5.

115. From the beginning of SY 2014-2015 to November 2, 2014, the Student was reported to have progressed on both of his Emotional, Social, and Behavioral Development goals. R-3-50.

116. However, Attending School Social Worker noted that during a group counseling session on October 21, 2014, the Student was "somewhat aggressive towards another student and hyperactive," he had to be redirected several times, and he was being influenced by "outside negative people and he is making wrong choices on many occasions." P-53-8.

117. Despite the September 25 and October 29, 2014 incidents, based upon the entire record, including the fact that the Student was adjusting to a larger classroom lacking the supports provided by Attending School Academy, the undersigned finds that the Student's goals in his March 12, 2014 IEP remained appropriate as of November 2, 2014.

November 21, 2014 Incident

118. On November 21, 2014, the Student made threats (P-50-10) and slapped a peer across the face, causing injury (P-50-19) for which Attending School proposed a one-day off-site suspension (P-50-10).

December 10, 2014 Request for Reevaluation

119. On December 10, 2014, Petitioner's counsel wrote to Attending School Principal, *inter alia* requesting that the Student be comprehensively reevaluated including a comprehensive psychological evaluation, educational/academic evaluation, speech/ language evaluation, OT evaluation, FBA, adaptive assessment, and assistive technology evaluation. P-46-1.

120. In her email, Petitioner's counsel did not inform Respondent of the June 9, 2014 Psychoeducational Evaluation. *Id.*

January 7, 2015 Request for Reevaluation

121. On January 7, 2015, Petitioner's counsel emailed Attending School Principal, stating, *inter alia,* that Petitioner had requested reevaluation on December 10 and 18, 2014, but no response had been received, and asking when Respondent would complete the requested evaluations. P-47-1.

122. In her email, Petitioner's counsel did not inform Respondent of the June 9, 2014 Psychoeducational Evaluation. *Id.*

January 9, 2015 Request for Reevaluation

123. On January 9, 2015, Petitioner's counsel emailed Attending School Principal, stating that she had not heard back from anyone regarding, *inter alia,* evaluations. P-47-2.

124. In her email, Petitioner's counsel did not inform Respondent of the June 9, 2014 Psychoeducational Evaluation. *Id.*

January 14, 2015 Educational Evaluation

125. On January 14, 2015, Attending School Special Education Teacher conducted an Educational Evaluation of the Student. P-30.

126. The Student's Broad Math, Oral Language, Broad Written Language and Broad Reading scores fell in the low average range when compared to same-age peers. P-30-1 and -2.

127. The Student had particular difficulty spelling orally-presented words correctly. P-30-1.

128. The Student's scores were in the average to superior range on recalling complex details and details of stories presented, respectively. P-30-2.

129. The Student's fluency with academic tasks was in the low range. *Id.*

130. Attending School Special Education Teacher made recommendations concerning instructing the Student in reading (P-30-3 through -5), math (P-30-5 and -6) and writing (P-30-6 and -7).

January 17, 2015 BIP

131. On January 17, 2015, Attending School Social Worker developed a BIP for the Student. P-36-1.

132. The BIP identified the Student's targeted behaviors as aggression toward peers, refusal to follow directions, and "at times" sadness and suicidal ideation. *Id.*

133. The BIP identified the following "POSITIVE INTERVENTION STRATEGIES: Student Objectives":

1) Talk to student 1:1 to encourage him to cooperate and follow
   directives;
2) Ask one of the mental health staff to come and speak with
   the student when he is in crisis;
3) Continue with the small group counseling.

*Id.*

134. The BIP described implementation as follows:

1) A Dean (Behavior Technician) is call[ed] when the student
   become[s] aggressive, or refuses to follow directions;
2) If the situation escalates to crisis or just prior to crisis level,
   a mental health staff member will be called.

*Id.*

135. The BIP identified the following "POSITIVE INTERVENTION

STRATEGIES: Teacher Strategies":

1) Teacher will encourage student by allowing him to assist him
   or her in classroom duties, being a line leader etc.

*Id.*

136. The BIP described the monitoring system as follows:

1) Teacher and Dean will write a weekly Google-Doc with a copy to
   the School Social Worker ... with student's progress.
2) Social worker will continue seeing student in small group and
   document his progress.

*Id.*

The Student's Behavior During the First Half of SY 2014-2015

137. During the first half of SY 2014-2015, the Student was constantly fighting,

aggressive, defiant to authority, and eloping from the classroom and the school.

Testimony of Petitioner.

138. In December 2014, Petitioner received telephone calls from Attending School about the Student's behavior. *Id.*

139. Approximately five times, Attending School asked Petitioner to keep the Student home from school, even though he was not suspended. *Id.*

140. For one week in December 2014, Attending School instructed Petitioner to pick up the Student mid-day because Attending School did not have staff to watch him. *Id.*

141. Petitioner's older child picked up the Student at Attending School at noon each day that week. *Id.*

142. On December 2, 2014, Attending School Social Worker noted that the Student "still fights with other students; he won't obey his mother and he has been in numerous incidents of law breaking." P-53-7.

143. As of January 22, 2015, the Student had three referrals to the dean's office for behavior infractions and three suspensions. P-12-7.

144. As of January 22, 2015, the Student had the fourth worst behavior of students in Current Grade at Attending School. *Id.*

145. There is no evidence in the record that Attending School conducted an FBA prior to January 22, 2015;[14] accordingly the undersigned finds that, as of that date, Respondent had no basis for determining the current antecedents to the Student's behaviors of concern, the current reinforcers of those behaviors, why the Student was engaging in those behaviors, and how the Student's IEP might be amended to address any deficits the Student may have that contributed to those behaviors.

---

[14] In fact, it appears that Attending School cut and pasted the Student's May 28, 2012 FBA from Previous School. *Compare* P-38 *with* P-39.

The Student's Grades During the First Half of SY 2014-2015

146. During the first term of SY 2014-2015, the Student performed significantly below Current Grade level ("Below Basic") in Writing and Language and in Speaking in Listening, and approaching expectations for Current Grade level ("Basic") in the other subjects for which he received grades. P-52-1.

147. During the second term of SY 2014-2015, the Student performed Below Basic in World Language and Basic in the other subjects for which he received grades. *Id.*

148. During the first half of SY 2014-2015, marks (*i.e.* grades) were not entered for the Student in most subjects (P-52-1 through -3) because he was not in the classroom to receive instruction and to be graded on his work (Testimony of Petitioner).

The Student's January 15, 2015 Suicide Threat

149. On January 15, 2015, Attending School Social Worker met with the Student because he had threatened suicide and summarized her counseling session with the Student as follows:

> The student expressed sadness because he felt his mother didn't love him and his family didn't want him. He said he was leaving home and planning to live in back of the Safeway grocery store. He also said he wanted to kill himself and he was doing a computer search on how to hang himself when I came in to talk with him. He would not speak orally, but by the end of the session he was gesturing with head nods and other non verbal indicators. The Mobil[e] crisis unit was called and the student's mother. She said she was coming up to the school. [The Student's] mother refused for him to go with the Mobile Crisis Unit or to let them talk with him. Response: Student initially was very upset, but he was able to calm down and walk home with his mother.

P-53-4.

The Student's Progress on his IEP Goals From November 3, 2014 to January 23, 2015

150. From November 3, 2014 to January 23, 2015, the Student progressed on all of his Mathematics goals, mastering multiplying a whole number by a one digit number, almost mastering two digit by two digit multiplication, making slow but consistent progress on long division, finding factors for numbers through multiples of nine, and adding and subtracting fractions with unlike denominators with teacher support. R-3-1 through -3.

151. From November 3, 2014 to January 23, 2015, the Student mastered all three of his Reading goals and was progressing on both of his Written Expression goals. R-3-3 and -4.

152. From November 3, 2014 to January 23, 2015, the Student regressed on one of his Emotional, Social and Behavioral Development goals (*i.e.*, verbally expressing his feelings and articulating his "triggers") and was reported to be progressing on his remaining Emotional, Social and Behavioral Development goals (*i.e.*, remaining focused and on-task during small group instruction, participating in small group counseling, and controlling his impulse to fight). P-3-5 and -6.

153. The undersigned finds that the Student could not reasonably be found to be progressing on his Emotional, Social and Behavioral Development goal of controlling his impulse to fight given his disciplinary history. *See*, Findings of Fact 118 and 142.


January 22, 2015 PWN Regarding Evaluation and Analysis of Existing Data

154. On January 22, 2015, Attending School provided Petitioner (a) a PWN of its intent to (re)evaluate the Student (P-14) and (b) an Analysis of Existing Data (P-15).

January 22, 2015 IEP Team Meeting, Draft and Final IEPs

155. Attending School convened a meeting of the Student's IEP Team on January 22, 2015 to reevaluate his eligibility (P-11) and to review his IEP (P-8).

156. There is no evidence in the record that Petitioner or her counsel mentioned the June 9, 2014 Psychoeducational Evaluation at the January 22, 2015 meeting.

157. The Team determined that the Student continued to be eligible with the primary disability classification of ED.  P-12, P-13.

158. The Team discussed transferring the Student to a different school. Testimony of Petitioner; *see also,* Attending School Social Worker's notes of January 13, 2015 group counseling session, P-53-4 ("student says he has been informed that he will be transferred … as soon as his mother signs the paperwork").

159. Petitioner requested additional evaluations, additional services and a dedicated aide[15] for the Student. *Id.*

160. There is no evidence in the record that Petitioner or her representative expressed how a one-on-one or dedicated aide would improve the Student's behavior or his access to the general education curriculum.

161. There is no evidence in the record that at the January 22, 2015 IEP Team meeting, Respondent failed to *consider* Petitioner's concerns regarding the Student's academic, developmental and functional needs.

---

[15] The parties use the terms "dedicated aide" and "one-on-one aide" interchangeably. The undersigned notes that a dedicated aide may serve more than one student simultaneously. However, the distinction is not material to deciding the issues in the instant case.

162. The draft IEP that was discussed at the meeting updated the Student's academic PLOPs to reflect the results of the January 14, 2015 Educational Evaluation. P-8-3 through -7.

163. However, the draft IEP made no changes to the Student's goals or baselines (P-8-4 through -9) despite the progress the Student had made on his academic goals (R-3, R-4).

164. Based upon the entire record, the undersigned finds that the academic goals in the Student's draft IEP were no longer appropriate as of January 22, 2015.

165. The draft IEP did not update the Student's Emotional, Social and Behavioral Development PLOPs, or the statement of how the Student's behavior impeded his learning or that of other children, which were copied verbatim from his March 12, 2014 IEP. *Compare* P-8-2 and -8 *with* P-16-3 and -10.

166. Based upon the entire record, in particular the Student's behavioral infractions and suspensions despite half a school year to adapt to the larger classroom, the undersigned finds that the Emotional, Social and Behavioral goals in the Student's draft IEP were no longer appropriate as of January 22, 2015.

167. The draft IEP made no changes in the Student's hours of specialized instruction or behavioral support services, or the settings of those services. *Compare* P-8-10 *with* P-16-12.

168. The draft IEP did not provide the Student a one-on-one or dedicated aide. P-8-10.

169. The draft IEP was made final without Petitioner having had the opportunity to review the final version. Testimony of Petitioner.

170. The final IEP made significant changes from the draft IEP, including the following:

    (a) The description of how the Student's behavior impeded his learning or that of others was revised from:

> Since then, [the Student] has been able to consistently manage his behavior, and in that setting, his behavior is positive and does not impede the learning of others. Additionally, he is a leader in the classroom and is helpful to the teacher and students.

(P-8-2) to:

> Since then, [the Student's] behavior has improved, but it is still inconsistent. He is now in … classes of 22 students. [He] enjoys leadership opportunities and building relationships with teachers and students. However, many things trigger frustration, sadness, or irritability in [the Student], and it leads to disruptive behavior in the classroom and during transitions. When his behavior is in this state, it greatly impacts his learning and the learning environment of others. [His] behavior is more consistent in small groups.

(P-10-2).

    (b) The Student's Mathematics Goal 1 was updated to read as follows:

> By 1/21/16, when given (10) numerical expressions with parentheses, brackets, and braces and a mnemonic device (e.g. PEMDAS), [the Student] will correctly evaluate each expression by using the order of operations to write the simplified version of the expression for (8 out of 10) expressions, for (2 out of 3) activities.

P-10-3.

    (c) The Student's Baseline for Mathematics Goal 1 was updated to read as follows:

> [The Student] is able to solve single step addition, subtraction, multiplication and division problems with 80% accuracy. He has not yet mastered multi-step numerical expressions. He has made progress with 2 step word problems (50% accuracy). More than 2 step expressions are very difficult for him (10% accuracy).

P-10-4.

>(d) The Student's Mathematics Goal 2 was updated to read as follows:

>>By 1/21/16, when given (10) word problems involving the addition or subtraction of fractions with like or unlike denominators, [the Student]will find a common denominator and then use a checklist with the steps for adding or subtracting fractions or area models to solve, scoring (8 out of 10 correct) in (2 out of 3 activities). Example Problem: Jorge has 2/4 bag of Skittles and Juan has 1/3 bag of Skittles. What part of a whole bag do they have together? Example Student Solution: Student finds common denominator of 12, then breaks an area model into 12 equal pieces. Student fills in 2/4 (6/12) first and then shades in 1/3 (4/12) more, finding out that together they have 10/12 bag of Skittles.

*Id.*

>(c) The Student's Baseline for Mathematics Goal 2 was updated to read as

follows:

>>[The Student] struggles with adding and subtracting factions with both like an[d] unlike denominators. He can add and subtract fractions with like denominators with 10% accuracy. He can add fractions with [un]like denominators with 0% accuracy without teacher assistance. He cannot yet simplify fractions without teacher assistance unless they are simple fractions that have multiples of 2.

*Id.*

>(d) The Student's Mathematics Goal 3 was updated to read as follows:

>>By 1/21/16, when given (20) multiplication and (20) division expressions within 100 on a worksheet (e.g. 5 x 2 =, 10 [x] 2 =), [the Student] will continue to increase the speed and accuracy at which he can write the correct product or quotient of (18 out of 20) multiplication and (18 out of 20) division facts.

*Id.*

>(e) The Student's Baseline for Mathematics Goal 3 was updated to read

as follows:

> [The Student] can find the correct products and quotients within 100 with 60% accuracy, and it takes him awhile. He will benefit from continued time practice to work on his multiples of 6, 7, 8 and 9 and to work on his accuracy and fluency with division problems.

P-10-5.

(f) The Student's Reading Goal 1 was updated to read as follows:

> By 1/21/16, when given a grade level story, drama, or poem with highlighted structural supports, [the Student] will write a summary of the text including the theme and (3) supporting details about how characters respond to change in 4 of 5 trials as measured by teacher-charted records.

*Id.*

(g) The Student's Baseline for Reading Goal 1 was updated to read as follows:

> [The Student] currently reads on a level S independently, administered in January 2015. This is a beginning of 5th grade level equivalent.

P-10-6.

(h) The Student's Reading Goal 2 was updated to read as follows:

> By 1/21/16, after reading a grade-level non-fiction text, [the Student] will write a summary of the text discussing (2) main ideas and an explanation of how (2) key details support each main idea with (80% accuracy) as measured by a teacher-made rubric.

*Id.*

(i) The Student's Baseline for Reading Goal 2 was updated to read as follows:

> [The Student] is currently reading at a level S (grade level equivalent beginning of 5th grade), based on assessment from January 2015. He needs to improve his ability to summarize non-fiction texts and identify key details.

*Id.*

(j) The Student's Written Expression Goal 1 was updated to read as follows:

> By 1/21/16, when given a topic prompt, [the Student] will use a paragraph template to write a (5) sentence informative piece that includes (1) topic sentence, (5) domain-specific vocabulary words and a conclusion sentence scoring (5 out of 6) on a teacher-made rubric in (2 out of 3) trials.

P-10-7.

(k) The Student's Baseline for Written Expression Goal 1 was updated to read as follows:

> Written expression is an area of relative strength for [the Student]. However, composing informational texts and using research is an area of weakness for him.

*Id.*

(l) The Student's Written Expression Goal 2 was updated to read as follows:

> By 1/21/16, when given a list of 10 words bi-weekly that follow a certain phonemic pattern, [the Student] will correctly encode 1, 2 and 3 syllable words with vowel teams and consonant blends with at least 80% accuracy.

*Id.*

(m) The Common Core Standards related to the Student's academic goals were updated to those of Current Grade. P-10-3 through -7.

171. Petitioner introduced no evidence that the academic goals in the final January 22, 2015 IEP are inappropriate or not measurable.[16]

---

[16] *See*, Note 10, *supra.*

172. Based upon the entire record, the undersigned finds that the Student's academic goals in his final January 22, 2015 IEP are measurable.

173. Based upon the entire record, the undersigned finds that the Student's academic baselines and goals in his final January 22, 2015 IEP were appropriate as of that date.

174. The Student's Emotional, Social and Behavioral Development PLOPs and Baselines from the draft January 22, 2015 IEP remained unchanged in the final version. *Compare* P-10-8 and -9 *with* P-8-8 and -9.

175. The Student's Emotional, Social and Behavioral Development goals in the draft January 22, 2015 IEP were revised in the final version, *lowering* Goals 1 and 2, specifically, that he would express his feelings and articulate his triggers three out of five rather than nine out of ten times, and that he would remain focused and on-task during three out of five rather than nine out of ten three minute intervals; and raising Goal 3, specifically that the Student would control his impulse to fight five out of five rather than four out of five times. *Id.*

176. The undersigned finds that these changes in the Student's Emotional, Social and Behavioral goals were insignificant and that the goals remained inappropriate for the Student.

177. The Student's hours of specialized instruction and behavioral support services remained the same. *Compare* P-10-10 *with* P-8-10.

178. Based upon the entire record, the undersigned finds that the Student's January 22, 2015 IEP, in its final form, was not reasonably calculated to confer educational benefit on the Student because it failed to address the Student's behavior that

was preventing him from attending his classroom, accessing the general education

curriculum, and making emotional, social and behavioral progress.

179. Based upon the entire record, in particular the Student's relative success

when he attended Attending School Academy compared with his failure to succeed in a

less-structured larger classroom, the undersigned finds that as of January 22, 2015, the

Student required all of his instruction to be provided in the outside of general education

setting,[17] in a small classroom (*i.e.* not to exceed 12[18] students), with a low ratio of

students to adults (*i.e.,* not to exceed six students per adult), with at least two adults in the

classroom.


January 27, 2015 Emails from Petitioner's Counsel to Attending School

180. On January 27, 2015, Petitioner's counsel sent an email to Attending School

SEC, forwarding the June 9, 2014 Psychoeducational Evaluation and requesting a

meeting for the IEP Team to review the report. P-47-4.

181. Also on January 27, 2015, Petitioner's counsel sent an email to Attending

School Principal forwarding the June 9, 2014 Psychoeducational Evaluation, requesting a

meeting for the Student's IEP Team to review the report, and requesting that Respondent

conduct a comprehensive speech/language evaluation of the Student as well as

evaluations in any area of suspected disability. P-47-6.

---

[17] Although Attending School Academy was a general education setting, the undersigned finds that after half a year of languishing in an inappropriate placement and engaging in repeated serious misconduct, the Student could not, as of January 22, 2015, be educated with non-disabled peers.

[18] Private School Admissions Coordinator testified credibly that a classroom of 12 students is appropriate for the Student.

January 30, 2015 Incident

182. On January 30, 2015, the Student engaged in fighting for which Attending

School proposed a two-day off-site suspension. P-50-8.


February 5, 2015 Email from Petitioner's Counsel to Attending School SEC

183. On February 5, 2015, Petitioner's counsel emailed Attending School SEC,

stating, *inter alia,* that it was important for the Student's IEP Team to review the June 9,

2014 Psychoeducational Evaluation, that the evaluation completed by Respondent was

insufficient,  and that Petitioner was requesting IEEs in all areas of suspected disability.

P-47-5.


March 15, 2015 IEP Amendment

184. On March 13, 2015, Attending School proposed to amend the Student's IEP

to add the following classroom accommodation: "Text-to-Speech for the ELA/Literacy

Assessments and Reading of Test Questions (math, science and composition only)."

P-7-1.

185. Petitioner agreed to the amendment without convening an IEP Team

meeting. *Id.*

186. The proposed amendment to the Student's IEP was made on March 15, 2015.

P-6-1.

187. The undersigned finds that this amendment did not render the Student's

inappropriate January 22, 2015 IEP appropriate.

March 23, 2015 Incident

188. On March 23, 2015, the Student engaged in reckless behavior for which Attending School proposed a two-day off-site suspension. P-50-6.

March 31, 2015 Incident

189. On March 31, 2015, the Student engaged in theft of property without force for which Attending School proposed a two-day off-site suspension. P-41-1.

March 2015 Meeting

190. At a meeting in March 2015,[19] the Psychoeducational Evaluation that Petitioner's counsel had provided to Respondent on January 27, 2015 was discussed. Testimony of Petitioner.

April 10, 2015 Manifestation Determination Review

191. Attending School convened a meeting of the Student's IEP Team on April 10, 2015 to conduct a Manifestation Determination Review ("MDR") regarding the March 31, 2015 incident. P-41-5.

192. The IEP Team determined that the Student's conduct was neither caused by nor had a direct and substantial relationship to the Student's disability. P-41-3.

---

[19] There is no documentary evidence of this meeting in the record. In colloquy on the record at the DPH, Petitioner's counsel stated that the meeting was the RSM in another DPC proceeding between the parties. These details are not material to deciding the issues in the instant case.

193. The IEP Team determined that the Student's conduct was not the direct result of Respondent's failure to implement the Student's IEP. *Id.*

194. The IEP Team concluded that the Student's behavior was not a manifestation of his disability. *Id.*

195. The IEP Team subsequently[20] revised its MDR to find that the Student's conduct was caused by or had a direct and substantial relationship to his disability and therefore was a manifestation of his disability. P-42-1.

The Student's Behavior as of April 10, 2015

196. As of April 10, 2015, the Student demonstrated the following behaviors: elopement from class, transitions and the school building; being out of his seat; hitting peers; obstructive horseplay; cursing at adults and peers; and threatening adults with bodily harm. P-41-6.

197. As of April 10, 2015, the Student was "out of control" to a "marked degree" and did not use good judgment in making decisions. *Id.*

April 10, 2015 Proposed IEP Amendment

198. On April 10, 2015, Attending School convened an IEP Team meeting to amend the Student's IEP to increase his specialized instruction in the outside of general education setting by five hours per week on an interim basis until assessments and a new IEP could be developed. Testimony of Family Support Worker, P-5-1.

---

[20] The revised form (P-42) is undated.

199. All of the Team members agreed that the Student needed "more IEP time" and a dedicated aide.[21] Testimony of Family Support Worker, testimony of Petitioner.

200. The Team members noted that the Student did well in small settings, with very little trouble one-on-one, and that he required a smaller setting. Testimony of Family Support Worker.

201. The Student had difficulty in larger settings, including "open environments" such as hallways and stairwells, where he seemed to want to put on a "tough guy" image. Testimony of Program Manager.

202. For the reasons stated *supra* (*See,* Finding of Fact 179 and Note 17), the undersigned finds that the Student required all of his instruction to be provided in the outside of general education setting and in a small classroom; accordingly, the undersigned finds that the addition of five hours per week of specialized instruction did not render the Student's inappropriate IEP appropriate.

Petitioner's April 16, 2015 Request for IEEs and Respondent's Reply

203. On April 16, 2015 Petitioner's counsel emailed Attending School SEC repeating the request for IEEs. R-24-2.

204. On April 17, 2015 Attending School SEC replied to Petitioner's counsel stating, *inter alia,* that she wished to consider the "information provided this [sic thus] far, and the exhausted [sic exhaustive] data from the school … before we can assume by way of more evaluations – IEE's, that more is needed." R-24-1.

---

[21] Program Manager testified that Respondent's members of the IEP Team felt they had to put a dedicated aide on the Student's IEP because they were "strong-armed" by Petitioner's counsel. Testimony of Program Manager. The undersigned has given no weight to this hearsay testimony.

205. On April 17, 2015 Attending School Principal emailed Petitioner's counsel, informing her that Respondent would "administer" the following assessments:

1. Comprehensive cognitive assessment
2. Comprehensive speech and language
3. Review of assessments provided from attorney/family

R-14-1.

206. Attending School Principal's email also stated that Respondent would consider and review the following but would not redo them unless "we believe the above assessments dictate":

1. Current educational evaluation (Woodcock Johnson)
2. Functional Behavioral Analysis and BIP.

*Id.*

207. There is no evidence in the record that Respondent either agreed to provide an IEE or initiated a DPC proceeding to establish that its evaluation was appropriate.

208. The undersigned finds that Attending School's April 17, 2015 emails constituted a refusal to provide the IEEs requested by Petitioner.

Events of April 24, 2015

209. On April 24, 2015, prior to filing the DPC herein, Petitioner's counsel emailed Attending School Principal (a) challenging her instruction to Petitioner to keep the Student home from school that day without an MDR, (b) reiterating Petitioner's April 10, 2015 request for a dedicated aide for the Student, and (c) requesting a change in the Student's placement to a small classroom with therapeutic supports. P-48-1.

210. On April 24, 2015, also prior to filing the DPC herein, Petitioner's counsel emailed Attending School Principal requesting the following IEEs: a comprehensive OT

evaluation, a comprehensive assistive technology evaluation, a comprehensive psychological/educational evaluation, and a new FBA. R-15-1.

211. Attending School Principal replied on April 24, 2015, stating, *inter alia,* that on the previous day the Student had allegedly smoked in the bathroom and threatened another staff member after school; that she sought assistance from her superintendent; that Respondent's Office of Specialized Instruction agreed to send additional resources to Attending School to consult with Attending School SEC and her team; and that she was hopeful but not certain that a dedicated aide and a potential placement change would occur "this year." P-48-1.

212. On April 24, 2015, the Student's IEP was amended to provide an additional five hours per week of specialized instruction in the outside of general education setting (without specifying the subject areas) and to add a dedicated aide for six hours per day effective from April 27, 2015 through June 18, 2015. P-1-1, -2 and -11.

213. The following justification was provided for the dedicated aide:

> The student is identified as emotionally disturbed, yet, his infractions have been acts of deliberate disregard for school rules through deliberate acts of defiance, bullying younger and smaller students, stealing, lying, elopement, adjudication, smoking in the school bathroom and threats of bodily harm to school staff. He can be impulsive, aggressive, depressed, paranoid, antagonistic and explosive. His behavior can be unpredictable.

P-3-1.

214. The justification did not state what the dedicated aide would do, how the dedicated aide would prevent the Student from engaging in future infractions, or how the dedicated aide would assist the Student in accessing the general education curriculum. *Id.*

Program Manager's May 5, 2015 Observation of the Student and Recommendations[22]

215. On May 5, 2015, Program Manager observed the Student to determine the appropriateness of a dedicated aide. Testimony of Program Manager, P-56-1.

216. The Student has just been placed on an "alternate schedule." Testimony of Program Manager.

217. Program Manager observed the Student arguing with a peer, lying on a window ledge, refusing a teacher's instruction to sit in a chair, and being rude and disrespectful to staff. P-56-1.

218. Program Manager observed the Student working one-on-one with a special education teacher in the Library, where he attended to a Spanish "packet" and worked cooperatively, although occasionally distracted by peers until redirected. P-56-2, testimony of Program Manager.

219. Program Manager then observed the Student at lunch, assisting in the cafeteria, and in another classroom with two or three other students where he worked with another special education teacher. *Id.*

220. Program Manager observed that the Student was respectful of the special education teacher, and that he appeared to like the instructional aide and apologized to her after being disrespectful to her. Testimony of Program Manager.

221. Program Manager reviewed a variety of documents in the Student's file; however, there were no data or documents to review related to "strategies and

---

[22] The DPC herein was filed April 24, 2015. Respondent's actions or inactions occurring after that date are not at issue in the instant case. However, events occurring after April 24, 2015 inform the appropriate remedies for denials of FAPE occurring prior to the filing of the DPC.

interventions put in place to address the student's behavior or the effectiveness of the Behavior Intervention Plan." P-56-1.

222. According to Program Manager, the Student is very smart and likeable; however, when he does not get his way, he can become angry and defiant. Testimony of Program Manager.

223. Program Manager determined that the general education setting is not appropriate for the Student. *Id.*

224. In a report dated May 8, 2015, Program Manager concluded that "[u]se of a Dedicated Aide as a means to support this student **is not recommended.** P-56-3 and -5 (emphasis original).

225. Instead, Program Manager recommended that the Student's BIP be updated and data collected to determine the BIP's effectiveness. P-56-3.

226. Program Manager recommended that the staff working with the Student be trained in Safety Care and avoid power struggles with the Student. *Id.*

227. Program Manager listed guidelines to avoid power struggles. P-56-4.

228. Program Manager made the following additional recommendations:

- Avoid arguing with [the Student] or going in depth with explanations in reference to behavioral issues. Calmly deliver consequences to him without reacting to his remarks.
- Keep directions short and to the point …
- Collect data to document the levels (frequency, rate, duration or latency) and intensity of [the Student's] social behavior.
- Follow through with consequences for … inappropriate behavior.
- Use natural opportunities to provide a verbal prompt to [the Student] as a reminder to do the appropriate behavior when his teacher notices that his behavior is starting to escalate.
- Use positive reinforcement …. This involves delivering a reinforcer after behavior to increase the likelihood of a behavior occurring in the future. To be most effective, reinforcement should be delivered immediately and consistently …. Reinforcement

should be delivered continuously (every time it occurs) if building a new behavior. It should be delivered intermittently (every so often) if maintaining an existing behavior....

- Preview rules and[/]or behavioral expectations ... during transitions ....
- Problem solving skills should be practiced ... at every opportunity. This involves:
  - ➢ Identifying the problem,
  - ➢ Determining why the problem is occurring,
  - ➢ Developing solutions,
  - ➢ Making a choice.
- Self-Management skills should be taught to [the Student] so he learns how to monitor and manage his own behavior.
- Provide [the Student] with some conflict resolution strategies and practice them with him. Some examples of strategies are:
  1. When angry, separate yourself from the situation and take time to cool out.
  2. Attack the problem, not the person.
  3. Communicate your feelings assertively, not aggressively. Express them without blaming.
  4. Accept and respect that individual opinions may differ, don't try to force compliance, work to develop common agreement.
  5. Listen without interrupting; ask for feedback if needed to assure a clear understanding of the issue.
  6. Forget the past and stay in the present.
  7. Thank the other person for listening.
- Encourage [the Student] to self-monitor....
- Catch [the Student] "being good" and reinforce his appropriate and acceptable behavior.

P-56-4.

229. Because most of Program Manager's observations of the Student were made when he was working one-on-one with an adult, and because the triggers of his inappropriate behavior occurred in group settings, the undersigned finds that Program Manager's observations were insufficient to support her conclusion that the Student did not require a dedicated or one-on-one aide.

230. However, Petitioner introduced no evidence that the Student *required* a dedicated aide or *how* such an aide would have improved the Student's behavior. As

discussed in Section VI, *supra*, Petitioner has the burden of proof; accordingly, the

undersigned finds that Petitioner has not established the need for a dedicated aide.[23]


May 6, 2015 MDR

231. An MDR was held on May 6, 2015. P-45-3.

232. As of May 6, 2015, the Student had eight out-of-school suspensions during

SY 2014-2015. *Id.*

233. The Student often acted without thinking, had trouble staying seated,

disrupted the school work of others, threatened to hurt others, sought revenge, was easily

upset, was negative, sometimes failed to complete class work or tests, and sometimes

stated he hated himself and wanted to die. *Id.*

234. Attending School Psychologist determined that the Student's conduct had a

direct and substantial relationship to his disability of ED and in her opinion his behavior

was a manifestation of that disability. P-45-4.

235. The Student's IEP Team concurred that the Student's behavior was a

manifestation of his disability. P-45-5.


May 6, 2015 IEP Amendment

236. A meeting of the Student's IEP Team was held on May 6, 2015, at which

---

[23] Although the Student's IEP Team determined, for a short while, that the Student
required a dedicated aide (Testimony of Petitioner, P-48-1), the issue is whether a
dedicated aide was *required* under IDEA for the Student to access the general education
curriculum. The record is devoid of documentary evidence or testimony supporting such
a requirement. Prospectively, with the placement ordered in Section X, *infra*, the Student
will be in a small, self-contained special education classroom with at least two adults,
which should obviate any need for a one-on-one or dedicated aide.

Attending School SEC stated that Respondent had required her to remove the dedicated aide from the Student's IEP. Testimony of Family Support Worker, testimony of Petitioner.[24]

237. Attending School amended the Student's IEP to remove the dedicated aide over Petitioner's objection. Testimony of Petitioner, P-4-1.

238. Attending School's representatives stated that although the Student would not have a dedicated aide, "they always had staff around him." Testimony of Petitioner.

239. In practice, the Student often was not in a classroom; instead, he was placed with the Spanish teacher when she did not have a class, with the janitor, or with another staff member who was not a teacher, and he would "follow them around." *Id.*

240. Petitioner asked why, if Attending School was "accommodating" the Student by having adults always around him, they could say he does not need a one-on-one aide.[25] *Id.*

241. Based upon the entire record, the undersigned finds that placing the Student with the Spanish teacher, the janitor, and the other non-teacher adult[26] as a way of dealing with his behavior issues served only to exclude him from instruction, to isolate him from peers, and to interfere with his emotional, social and behavioral development.

---

[24] Program Manager testified that she had not told the Attending School Local Educational Agency ("LEA") Representative to remove the aide from the Student's IEP. Testimony of Program Manager. This discrepancy is not material to deciding the issues in the instant case.

[25] Conversely, there is no evidence in the record that Petitioner ever expressed why she believed the Student *required* an aide or how the aide would improve the Student's behavior and allow him to access the general education curriculum.

[26] The "other adult" may have been the instructional aide mentioned by Program Manager in her testimony.

May 7, 2015 Incident

242. On May 7, 2015, the Student engaged in reckless behavior for which Attending School proposed a three-day off-site suspension. P-50-4.

Need for OT and/or Assistive Technology Evaluation

243. Petitioner introduced no evidence that the Student has any motor skills deficits suggesting that he may require OT or assistive technology.

244. Petitioner testified that the Student worked well with computers and likely would benefit from having a computer to do his school work (Testimony of Petitioner); however, the same could be said for any student, disabled or non-disabled.

245. Petitioner introduced no evidence that the Student requires a computer or any other assistive technology as a result of his ED.

245. The undersigned finds that motor skills deficits have not been an area of concern for the Student and that there has been no need for either an OT or assistive technology evaluation.

Private School

246. Private School is located in Largo, Maryland. P-49-1.

247. Private School is a special education school for students in Kindergarten through grade 12 who have "full time" IEPs and BIPs. Testimony of Private School Admissions Coordinator.

248. Private School provides psychoeducational services. *Id.*

249. Private School's classrooms have no more than 12 students, with at least two teachers, and there are other adults in the classroom. *Id.*

250. All Private School teachers have special education certification although they may not be certified in their core content areas. *Id.*

251. Most of the students at Private School have a disability classification of ED and some have the disability classification of Other Health Impaired ("OHI") due to ADHD. *Id.*

252. Private School addresses student aggression through a strategy called Life Space Crisis Intervention ("LSCI") which develops students' skills to manage frustration. *Id.*

253. Private School's staff are trained in Therapeutic Aggression Control Techniques ("TACT2"), *i.e.*, physical restraint of students to prevent them from harming themselves or others. *Id.*

254. Private School has a crisis intervention staff that, among other responsibilities, monitors the hallways and conducts mediations.

255. Students at Private School can request "time outs" and have areas to which they can go away from other students, while still receiving instruction. *Id.*

256. Private School has licensed social workers and a school psychologist. *Id.*

257. Private School provides related services as prescribed by students' IEPs, including counseling, speech therapy and OT. *Id.*

258. Private School can provide a dedicated aide, or a one-on-one aide, to a student. *Id.*

259. Private School reviewed the Student's most recent educational and psychological evaluations, his December 2011 speech-language evaluation, his IEP, his FBA, his BIP, and his grades, and interviewed the Student and Petitioner. *Id.*

260. The information described in Finding of Fact 259, *supra*, was sufficient for Private School to determine that Private School was an appropriate placement for the Student and to determine the Student's educational programming. *Id.*

261. Private School considered its program to be appropriate for the Student because the issues he presented—noncompliance, bullying, elopement, verbal and physical aggression—were "not inconsistent with what we see with our students" and "nothing that we could not program for successfully." *Id.*

262. The tuition at Private School is approximately $46,528 per annum, not including a dedicated aide or related services such as counseling, speech therapy or OT. *Id.*

263. The Student was accepted at Private School. *Id.,* P-49-1.

264. Based upon the entire record, the undersigned finds that the Student would receive educational benefit at Private School.[27]

265. Petitioner introduced no evidence that the Student requires a private school or that there is no school in the District of Columbia appropriate for the Student.

---

[27] As discussed in colloquy on the record at the DPH, and in Section IX, *infra,* under prevailing case law, a finding that a private school would provide educational benefit is sufficient for reimbursement of tuition paid by a parent that unilaterally placed a child in the private school when the LEA denied the child a FAPE. Contrary to Petitioner's counsel's assertion, however, a finding that the private school would confer educational benefit is not sufficient to require a Hearing Officer to make such a placement if the private school is not the child's LRE or if the LEA has not indicated its unwillingness or inability to amend the Student's IEP. The undersigned has included Finding of Fact 264 in this HOD for the sole purpose of avoiding the necessity of a remand should a reviewing court determine that Petitioner's counsel's interpretation of the law is correct.

## IX. CONCLUSIONS OF LAW

Purpose of the IDEA

    1. The IDEA is intended

        (A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living [and] (B) to ensure that the rights of children with disabilities and parents of such children are protected....

20 U.S.C. §1400(d)(1), *accord*, DCMR §5-E3000.1.

FAPE

    2. The IDEA requires that all students be provided with a FAPE. FAPE means:

    special education and related services that –

        (A) have been provided at public expense, under public supervision and direction, and without charge;

        (B) meet the standards of the State educational agency;

        (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

        (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. §1401(9); *see also,* 34 C.F.R. §300.17 and DCMR §5-E3001.1.

Reevaluation

    3. Unless the parent and the LEA agree that a reevaluation is unnecessary, a reevaluation of a child with a disability must be conducted at least once every three years, or more frequently if conditions warrant reevaluation, if the child's parent or teacher

requests a reevaluation, or before determining that a child is no longer a child with a disability; but no more frequently than once a year unless the parent and the LEA agree otherwise. 20 U.S.C. §1414(a)(2); 34 C.F.R. §300.303; DCMR §5-E3005.7.

4. As part of a reevaluation, the IEP Team and other qualified professionals, as appropriate, are required to:

(A) review existing evaluation data on the child, including—

(i) evaluations and information provided by the parents of the child;

(ii) current classroom-based, local, or State assessments, and classroom-based observation; and

(B) on the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine—

(i) whether the child is a child with a disability …, and the educational needs of the child, or, in the case of a reevaluation of a child, whether the child continues to have such a disability and such educational needs;

(ii) the present levels of academic achievement and related developmental needs of the child;

(iii) whether the child needs special education and related services, or in the case of a reevaluation of a child, whether the child continues to need special education and related services; and

(iv) whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the individualized education program of the child and to participate, as appropriate, in the general education curriculum.

20 U.S.C. §1414(c)(1); *accord*, 34 C.F.R. §300.305. District of Columbia regulations paraphrase these federal provisions, while adding to the role of the IEP team determining whether the child has "a particular category of disability." DCMR §5-E3005.4(b)(1).

5. Respondent's failure to review the June 9, 2014 Psychoeducational Evaluation at the January 22, 2015 IEP Team meeting was the result of the failure of Petitioner and her counsel to provide that evaluation to Respondent until January 27, 2015 (Finding of Fact 180), five days after the IEP Team meeting.[28]

6. Based upon the entire record, the undersigned concludes that Petitioner, by failing to inform Respondent of the existence of the June 9, 2014 Psychoeducational Evaluation in advance of the January 27, 2015 meeting, was responsible for that evaluation not being considered by the IEP Team, and that Respondent was under no obligation to convene an IEP Team meeting thereafter just to review an evaluation that had been conducted more than half a year earlier.

7. Petitioner asserts that Respondent should have conducted a variety of assessments[29] rather than just one assessment (the January 14, 2015 Educational Assessment) prior to the January 22, 2015 IEP Team meeting.

8. Neither IDEA nor its implementing regulations give a parent the right to determine, in the first instance, what *assessments* should be conducted as part of a reevaluation that an LEA has decided to conduct. Petitioner's claim that Respondent, when conducting a reevaluation, is required to conduct whatever assessment Petitioner requests simply is not supported by statute, regulation or case law.

---

[28] Moreover, that evaluation was discussed at a subsequent meeting. Finding of Fact 190.

[29] Petitioner's counsel had requested a comprehensive psychological evaluation, educational/academic evaluation, speech/language evaluation, occupational therapy evaluation, FBA, adaptive assessment, and assistive technology evaluation. Finding of Fact 119. However, with the exception of an FBA to address the Student's behavior, Petitioner introduced no evidence that any of these assessments was required or even indicated by the Student's academic performance or behavior.

9. Rather, it is clear from 20 U.S.C. §1414(c)(1) and 34 C.F.R. §300.305 that the IEP Team, not the parent, determines what additional "data" are required. The LEA "has ultimate responsibility to ensure that the IEP includes the services that the child needs …." *Schoenbach v. District of Columbia,* 46 IDELR 67, 106 LRP 46342 (D.D.C. 2006).

10. IEP decisions are not made by majority vote.  Rather, if the Team cannot reach consensus, the LEA decides, subject to the parent's right of appeal by filing a DPC, as Petitioner has done in the instant case. *Id., citing* 34 C.F.R. Part 300, Appendix A -- Notice of Interpretations, 64 Fed. Reg. 12,473 (1999).


Independent Educational Evaluation

11. Although the parent of a child with a disability does not have the right to determine in the first instance what assessments will be conducted, the parent does have the right to obtain an IEE at public expense if the parent disagrees with an evaluation obtained by the LEA, unless the LEA files a DPC to request a hearing to show that its evaluation is appropriate.[30]  34 C.F.R. §300.502(b).

12. When a parent disagrees with an evaluation because the child was not assessed in a particular area, the parent has the right to request an IEE to assess the child in that area to determine whether the child has a disability and the nature and extent of the special education and related services the child needs. *Letter to Baus,* 115 LRP 8855 (OSEP, February 23, 2015).

---

[30] If a parent has obtained an independent evaluation and seeks reimbursement—which is not the situation in the instant case—the LEA can defend by demonstrating in a hearing that the evaluation obtained by the parent did not meet the LEA's criteria. 34 C.F.R. §300.502(b).

13. By its terms, 34 C.F.R. 300.502(b) does not allow an LEA to defend a failure to provide an IEE by demonstrating *at a hearing requested by the parent filing a DPC* that the LEA's evaluation was appropriate. Thus, even though speech-language, OT and assistive technology may not be areas of concern for the Student, the undersigned cannot deny Petitioner's right to an IEE in those areas.

14. Based upon the entire record, the undersigned concludes that Petitioner is entitled to an IEE, because she disagreed with Respondent's evaluation (Findings of Fact 159 and 183); she requested IEEs, through counsel (Findings of Fact 183 and 203); and Respondent neither agreed to provide IEE(s) nor filed a DPC asserting that its evaluation was appropriate. (Findings of Fact 207 and 208).

15. However, a parent is entitled to only one IEE at public expense each time the LEA conducts an evaluation with which the parent disagrees. 34 C.F.R. §300.502(b)(5).

16. In the instant case, because Respondent conducted only one assessment (Findings of Fact 125 and 154), Petitioner was entitled to only one IEE.

17. The undersigned concludes that since February 5, 2015, Respondent has violated IDEA by failing to provide Petitioner an IEE.

IEP

18. The "primary vehicle" for implementing the goals of the IDEA is the IEP which the IDEA "mandates for each child." *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 65 (D.D.C. 2008) (citing *Honig v. Doe*, 484 U.S. 305, 311-12 (1988)). The IDEA defines IEP as follows:

> (i) In general: The term "individualized education program" or "IEP" means a written statement for each child with a disability that is

developed, reviewed, and revised in accordance with this section and that includes—

(I) a statement of the child's present levels of academic achievement and functional performance, including—

(aa) how the child's disability affects the child's involvement and progress in the general education curriculum;

* * *

and

(cc) for children with disabilities who take alternate assessments aligned to alternate achievement standards, a description of benchmarks or short-term objectives;

(II) a statement of measurable annual goals, including academic and functional goals, designed to—

(aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and

(bb) meet each of the child's other educational needs that result from the child's disability;

(III) a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided;

(IV) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child—

(aa) to advance appropriately toward attaining the annual goals;

(bb) to be involved in and make progress in the general education curriculum in accordance with subclause (I) and

to participate in extracurricular and other nonacademic activities; and

(cc) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this subparagraph;

(V) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in subclause (IV)(cc);

(VI)

(aa) a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and districtwide assessments consistent with section 1412 (a)(16)(A) of this title; and

(bb) if the IEP Team determines that the child shall take an alternate assessment on a particular State or districtwide assessment of student achievement, a statement of why—

(AA) the child cannot participate in the regular assessment; and

(BB) the particular alternate assessment selected is appropriate for the child;

(VII) the projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications....

20 U.S.C. §1414(d)(1)(A).

<u>When an IEP Must be Revised</u>

19. IEPs must be reviewed and revised:

*Review and revision of IEPs*—(1) *General*. Each public agency must ensure that, subject to paragraphs (b)(2) and (b)(3) of this section, the IEP Team—

(i) Reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved; and

(ii) Revises the IEP, as appropriate, to address—

(A) Any lack of expected progress toward the annual goals described in §300.320(a)(2), and in the general education curriculum, if appropriate;

(B) The results of any reevaluation conducted under §300.303;

(C) Information about the child provided to, or by, the parents, as described under §300.305(a)(2);

(D) The child's anticipated needs; or

(E) Other matters.

34 C.F.R. §300.324(b).

Ensuring Parent's Presence at IEP Team Meetings

20. Parents are essential members of an IEP Team:

(a) *Public agency responsibility—general.* Each public agency must take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate, including—

(1) Notifying parents of the meeting early enough to ensure that they will have an opportunity to attend; and

(2) Scheduling the meeting at a mutually agreed on time and place.

(b) *Information provided to parents.*

(1) The notice required under paragraph (a)(1) of this section must—

(i) Indicate the purpose, time, and location of the meeting and who will be in attendance; and

(ii) Inform the parents of the provisions in §300.321(a)(6) and (c) (relating to the participation of other individuals on the IEP Team who have knowledge or special expertise about the child), and §300.321(f) (relating to the participation of the Part C service coordinator or other representatives of the Part C system at the initial IEP Team meeting for a child previously served under Part C of the Act).

\* \* \*

(c) *Other methods to ensure parent participation.* If neither parent can attend an IEP Team meeting, the public agency must use other methods to ensure parent participation, including individual or conference telephone calls, consistent with §300.328 (related to alternative means of meeting participation).

(d) *Conducting an IEP Team meeting without a parent in attendance.* A meeting may be conducted without a parent in attendance if the public agency is unable to convince the parents that they should attend. In this case, the public agency must keep a record of its attempts to arrange a mutually agreed on time and place, such as—

(1) Detailed records of telephone calls made or attempted and the results of those calls;

(2) Copies of correspondence sent to the parents and any responses received; and

(d) Detailed records of visits made to the parent's home or place of employment and the results of those visits.

34 C.F.R. §300.322.

21. The undersigned concludes that Respondent prevented Petitioner from participating meaningfully in the development of the Student's IEP by making significant changes to the Student's draft January 22, 2015 IEP (Finding of Fact 170) without convening another IEP Team meeting or even sending the proposed changes to Petitioner or her counsel for review and comment (Finding of Fact 169). Petitioner may have

disagreed with the proposed changes or made her own recommendations of additional or different changes.

22. Accordingly, the undersigned concludes that Respondent's failure to involve Petitioner in the changes to the draft January 22, 2015 IEP was a denial of FAPE.

Sufficiency of an IEP

23. To be sufficient to provide FAPE under the IDEA, an "IEP must be 'reasonably calculated' to confer educational benefits on the child ... but it need not 'maximize the potential of each handicapped child commensurate with the opportunity presented non-handicapped children.'" *Anderson v. District of Columbia*, 606 F. Supp. 2d 86, 92 (D.D.C. 2009), quoting *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley,* 458 U.S. 176, 200, 207 (1982) ("*Rowley*").

> [T]he "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.

*Rowley*, 458 U.S. at 201.

24. The United States District Court for the District of Columbia recently summarized the case law on the sufficiency of an IEP, as follows:

> Consistent with this framework, "[t]he question is not whether there was more that could be done, but only whether there was more that had to be done under the governing statute." *Houston Indep. Sch. Dist.,* 582 F.3d at 590.
>
> Courts have consistently underscored that the "appropriateness of an IEP is not a question of whether it will guarantee educational benefits, but rather whether it is reasonably calculated to do so"; thus, "the court judges the IEP prospectively and looks to the IEP's goals and methodology at the time of its implementation." Report at 11 *(citing Thompson R2-J Sch. Dist. v. Luke P. ex rel. Jeff P.,* 540 F.3d 1143, 1148-49 (10th Cir. 2008)). Academic progress under a prior plan may be relevant in

determining the appropriateness of a challenged IEP. *See Roark ex rel. Roark v. Dist. of Columbia,* 460 F. Supp. 2d 32, 44 (D.D.C. 2006) ("Academic success is an important factor 'in determining whether an IEP is reasonably calculated to provide education benefits.'") *(quoting Berger v. Medina City Sch. Dist.,* 348 F.3d 513, 522 (6th Cir. 2003)); *Hunter v. Dist. of Columbia,* No. 07-695, 2008 WL 4307492 (D.D.C. Sept. 17, 2008) (citing cases with same holding).

When assessing a student's progress, courts should defer to the administrative agency's expertise. *See Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 195 (2d Cir. 2005) ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."). This deference, however, does not dictate that the administrative agency is always correct. *See Cnty. Sch. Bd. of Henrico Cnty., Virginia v. Z.P. ex rel. R.P.,* 399 F.3d 298, 307 (4th Cir. 2005) ("Nor does the required deference to the opinions of the professional educators somehow relieve the hearing officer or the district court of the obligation to determine as a factual matter whether a given IEP is appropriate. That is, the fact-finder is not required to conclude that an IEP is appropriate simply because a teacher or other professional testifies that the IEP is appropriate ... . The IDEA gives parents the right to challenge the appropriateness of a proposed IEP, and courts hearing IDEA challenges are required to determine independently whether a proposed IEP is reasonably calculated to enable the child to receive educational benefits.") (internal citations omitted).

An IEP, nevertheless, need not conform to a parent's wishes in order to be sufficient or appropriate. *See Shaw v. Dist. of Columbia,* 238 F. Supp. 2d 127, 139 (D.D.C. 2002) (IDEA does not provide for an "education ... designed according to the parent's desires") (citation omitted). While parents may desire "more services and more individualized attention," when the IEP meets the requirements discussed above, such additions are not required. *See, e.g., Aaron P. v. Dep't of Educ.,* Hawaii, No. 10-574, 2011 WL 5320994 (D. Hawaii Oct. 31, 2011) (while "sympathetic" to parents' frustration that child had not progressed in public school "as much as they wanted her to," court noted that "the role of the district court in IDEA appeals is not to determine whether an educational agency offered the best services available"); *see also D.S. v. Hawaii,* No. 11-161, 2011 WL 6819060 (D. Hawaii Dec. 27, 2011) ("[T]hroughout the proceedings, Mother has sought, as all good parents do, to secure the best services for her child. The role of the district court in IDEA appeals, however, is not to determine whether an educational agency offered the best services, but whether the services offered confer the child with a meaningful benefit.").

*K.S. v. District of Columbia*, 962 F. Supp. 2d 216 (D.D.C. 2013).

25. The Student's IEP developed on March 12, 2014 was reasonably calculated at that time to confer educational benefit, and in fact conferred educational benefit through the first half of SY 2014-2015. Findings of Fact 59, 61, 64, 67, 69-71, 74, 76, 77, 80, 82-85, 87, and 117.

26. The Student's IEP ceased to be appropriate by January 2015 and the IEP developed on January 22, 2015, even with the changes made from the draft to the final version and the subsequent amendments, was not reasonably calculated to confer educational benefit. Findings of Fact 166, 176, 178, 179, 187, 202 and 241.

27. Accordingly, the undersigned concludes that Respondent denied the Student a FAPE by failing to revise his IEP appropriately in January 2015 or thereafter.

Implementation of the IEP

28. If an appropriate IEP is developed, but the LEA fails to implement the IEP fully, the failure constitutes a denial of FAPE only if the failure is "material." *See, e.g., Banks v. District of Columbia*, 720 F. Supp. 2d 83 (D.D.C. 2010).

29. Petitioner introduced no evidence that Attending School failed to implement the Student's IEPs.

FBA and BIP

30. A child with a disability who is removed from his current educational placement, must receive, as appropriate, "a functional behavioral assessment, behavioral intervention services and modifications, that are designed to address the behavior

violation so that it does not recur." 20 U.S.C. §1415(k)(1)(D)(ii), *accord,* 34 C.F.R. §300.530(d)(ii).

31. If an LEA, the child's parent, and relevant members of the child's IEP Team make the determination that the child's conduct violating a code of student conduct was a manifestation of the child's disability, the IEP Team must "conduct a functional behavioral assessment, and implement a behavioral intervention plan for such child...." 20 U.S.C. §1415(k)(1)(F)(i), *accord,* 34 C.F.R. §300.530(f)(1)(i) and DCMR §5-2510.13.

32. There is no evidence in the record that the Student's IEP Team made a determination prior to April 10, 2015, that his conduct was a manifestation of his disability, so the above-referenced authorities did not require an FBA prior to mid-April 2015.

33. However, apart from the specific provisions of IDEA regarding FBAs and BIPs, IDEA requires a child's IEP Team, in developing the IEP of a child whose behavior impedes his learning or that of others, to "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. §1414(d)(3)(B)(i).

34. In the instant case, the Student's behavior impeded his learning and that of others (Finding of Fact 170); accordingly, the IEP team was required to consider behavioral interventions and supports or other strategies to address his behavior when developing his IEP on January 22, 2015.

35. While the IEP Team did consider the January 17, 2015 BIP (P-36), that BIP apparently had been developed without an updated FBA, which resulted in no changes to the Student's Emotional, Social and Behavioral Development PLOPs, goals or behavioral

support services (Findings of Fact 165-167); and the final version of the January 22, 2015

IEP made minimal—and in some respects, retrogressive—changes in the goals with no

changes in the services (Findings of Fact 175-177).

36. Based upon the entire record, the undersigned concludes that Respondent's

failure to conduct a formal, current FBA before developing the Student's BIP in January

2015 constituted a failure to evaluate him adequately and materially interfered with the

development of the Student's January 22, 2015 IEP and therefore constituted a

substantive denial of FAPE.

<u>Authority of Hearing Officer to Order Prospective Placement in Private School</u>

36. Under the IDEA, a Hearing Officer has broad discretion to determine

appropriate relief, based upon a fact-specific analysis. *Reid v. District of Columbia*, 401

F.3d 516, 521-24 (D.C. Cir. 2005) ("*Reid*"). That relief may include prospective

services. *Id.* In all cases, an order of relief must be evidence-based. *Branham v. District*

*of Columbia*, 427 F.3d 7 (D.C. Cir. 2005) ("*Branham*").

37. As noted by the U.S. Court of Appeals for the District of Columbia Circuit:

> If no suitable public school is available, the District must pay the costs of
> sending the child to an appropriate private school; however, if there is an
> "appropriate" public school program available, *i.e.*, one "reasonably
> calculated to enable the child to receive educational benefits," the District
> need not consider private placement, even though a private school might
> be more appropriate or better able to serve the child.

*Jenkins v. Squillacote,* 935 F.2d 303, 305 (D.C. Cir. 1991) (internal citations omitted);

*see also, Shaw v. District of Columbia*, 238 F. Supp. 2d 127 (D.D.C. 2002) ("Although

the IDEA guarantees a free appropriate education, it does not, however, provide that this

education will be designed according to the parent's desires.") and *Kerkam v McKenzie*,

862 F.2d 884 (D.C. Cir. 1988) ("Thus, proof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the Act.").

38. Although an inadequate IEP is a *necessary* condition for private school placement, it is not a *sufficient* condition for such placement and reimbursement. *N.T. v. District of Columbia*, 839 F.Supp.2d 29 (D.D.C. 2012) ("*N.T.*"). If a public school could offer a FAPE, and DCPS has not demonstrated unwillingness or inability to modify the student's IEP, then a hearing officer may order a modification in the IEP rather than private school placement or reimbursement:

> Because DCPS can craft an appropriate IEP to provide a FAPE, it is not required to pay for [the student's private] placement.

*Id.*, citing *Jenkins v. Squillacote, supra,* and *School Comm. of Town of Burlington, Mass. v. Dept. of Educ. of Mass.*, 471 U.S. 359, 373-74 (1985) ("*Burlington*"); *see also, Pinto v. District of Columbia* (D.D.C. Civ. No. 12-01699 (DAR), September 29, 2014) ("*Pinto*").

39. When DCPS makes a special education placement, the following order or priority applies among placements that are appropriate for the student:

> (1) DCPS schools, or District of Columbia public charter schools pursuant to an agreement between DCPS and the public charter school;
> (2) Private or residential District of Columbia facilities; and
> (3) Facilities outside of the District of Columbia.

DC ST §38-2561.02(c).[31]

40. The IDEA requires that special education be provided in the Student's LRE:

> To the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the

---

[31] Although this order of priority is not binding upon a Hearing Officer, a Hearing Officer is not precluded from taking these priorities into consideration in ordering a placement.

> disability of a child is such that education in regular classes with the use of
> supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 412(a)(5)(A); *accord,* DCMR §5-E3011.1. *See also,* 34 C.F.R.

§300.114(a)(2).

41. Parental choice does not supersede the LRE requirement. *See* 71 Fed. Reg.

46541 (August 14, 2006).

42. District of Columbia law adds another element to LRE, that the placement

must be "based upon consideration of the proximity of the placement to the student's

place of residence." DC ST §38-2561.01(6)(C).[32] Implementing regulations in the

District of Columbia require that the child be educated in the school that the child would

attend if not disabled unless the IEP requires some other arrangement (DCMR

§5-E3013.1); and if a placement outside the LEA is required, the placement must be in

the program that meets the requirements of the child's IEP that is closest to the child's

residence (DMCR §5-E3013.7).

43. Petitioner introduced no evidence that the Student requires a separate special

education school, *i.e.,* a school where he will not come into contact with non-disabled

peers even in passing in the hallway, in the stairwell, in the cafeteria, or at an assembly, if

properly supervised.

44. Petitioner introduced no evidence that the Student requires a private school.

45. Petitioner introduced no evidence that the Student requires a school in

Maryland rather than the District of Columbia.

---

[32] Although this order of priority is not binding upon a Hearing Officer, a Hearing
Officer is not precluded from taking these priorities into consideration in ordering a
placement.

Summary

46. From the beginning of SY 2014-2015 until January 2015, the Student's March 12, 2014 IEP was reasonably calculated to confer educational benefit upon the student with the goals, the number of hours and settings of specialized instruction, and the related services specified in the IEP.

47. Since December 2014, Respondent has denied the Student a FAPE by failing and refusing to evaluate him in all areas of suspected disability, specifically by failing to conduct an updated FBA; however, Petitioner did not meet her burden of proving that other assessments were required.

48. Petitioner has not met her burden of proving that Respondent failed to consider the concerns she raised at the January 22, 2015 IEP Team meeting.

49. Respondent denied the Student a FAPE by making substantial changes to the draft IEP discussed at the January 22, 2015 IEP Team meeting without giving Petitioner the opportunity for input.

50. Since January 22, 2015 Respondent has denied the Student a FAPE because the Emotional, Social, and Behavioral Development goals in his IEPs have been inappropriate to meet his needs; however, Petitioner did not meet her burden of proving that other goals in the January 22, 2015 IEP were inappropriate.

51. Since January 22, 2015 Respondent has denied the Student a FAPE because his IEPs have provided insufficient hours of specialized instruction in the outside of general education setting given his emotional, social and behavioral needs.

52. Since February 5, 2015, Respondent has violated IDEA by failing and refusing to fund an IEE requested by Petitioner.

53. Respondent did not deny the Student a FAPE by failing and refusing to convene an IEP Team meeting to review the results of an independent psychoeducational evaluation that Petitioner provided to Respondent because Petitioner did not provide that evaluation to Respondent until after the January 22, 2015 IEP Team meeting at which the Student's continuing eligibility was determined, and Respondent was under no obligation to convene another meeting of the IEP Team to review the evaluation which at that point was over half a year old.

54. Petitioner has not met her burden of proving that the Student required speech therapy.

55. Petitioner has not met her burden of proving that the Student required a one-on-one or dedicated aide.

56. Petitioner has not met her burden of proving that Attending School was unable to implement the Student's IEPs.

## X. ORDER

Based upon the above Findings of Fact and Conclusions of Law, it is hereby ORDERED:

1. No later than July 6, 2015 Respondent shall convene a meeting of the Student's IEP Team to amend the Student's IEP to provide as follows:

      (a) All of the Student's academic instruction shall be specialized instruction provided in the outside of general education setting.

(b) All of the Student's instruction shall be provided in a small classroom (*i.e.* not to exceed 12 students), with a low ratio of students to adults (*i.e.,* not to exceed six students per adult).

(c) At all times during the school day, the Student shall be escorted by a teacher or other school staff member in all non-classroom environments, including hallways, stairwells, and cafeteria, provided that the escort may be escorting other students at the same time.

(d) A safety plan shall be incorporated into or appended to the IEP, or otherwise disseminated to each teacher and staff person who has recurring contact with the Student, describing the steps to be taken if the Student threatens harm to himself or others.

2. No later than July 20, 2015, Respondent shall issue to Petitioner a Prior Written Notice or other document identifying the Location of Services ("LOS") to implement the Student's IEP during School Year ("SY") 2015-2016.

3. No later than July 6, 2015, Petitioner shall inform Respondent, via email to Attending School Special Education Coordinator with copies to Attending School Principal and Respondent's counsel, which one (1) of the following Independent Educational Evaluations ("IEEs") Petitioner wishes to obtain: comprehensive psychological evaluation including academic, cognitive and social/emotional testing and ADHD assessment; comprehensive speech-language evaluation that includes assessment of the student's language processing; comprehensive occupational therapy evaluation; comprehensive assistive technology evaluation; or Functional Behavioral Assessment.

4. No later than 14 calendar days after receipt of the email described in Paragraph 3 of this Order, Respondent shall issue to Petitioner an IEE letter authorizing Petitioner to obtain the requested IEE and shall provide the name, mailing address, facsimile number, and email address of the representative of Respondent to whom the IEE report should be sent.

5. Petitioner shall cause a copy of the IEE report to be sent directly to the representative of Respondent identified pursuant to Paragraph 4.

6. Within 20 calendar days of receiving the IEE report, Respondent shall convene a meeting of the Student's IEP Team, as well as (a) at least one of the Student's teachers from SY 2014-2015 and (b) at least one of the following: Attending School SEC, Attending School Principal, Attending School Social Worker, and Attending School Psychologist. Unless excused by Petitioner, the attendance of these individuals is essential even if Attending School is not the Student's LOS for SY 2015-2016, because they have personal knowledge of the Student's needs and behavior. One or more of these individuals may participate by telephone. The meeting shall take place at the Student's then-current LOS (whether or not that LOS is Attending School) and shall be scheduled for a minimum of 90 minutes. The IEP Team shall (a) review the IEE report; (b) review the June 9, 2014 Psychoeducational Evaluation; (c) review any other updated information regarding the Student's performance, behavior, and/or disability(ies); (d) review and revise the Student's IEP if and as appropriate; and (e) develop a BIP for the Student, provided that the deadline for development of the BIP may be postponed if and to the extent agreed by Petitioner and Respondent.

7. Between 30 and 45 calendar days after the IEP Team meeting described in Paragraph 6, Respondent shall convene a meeting of the Student's IEP Team to discuss the Student's performance and behavior and to review and revise the Student's IEP and/or BIP if and as appropriate. The additional attendees referred to in Paragraph 6 are not required for this meeting.

8. All written communications from Respondent to Petitioner concerning the above matters shall include copies to Petitioner's counsel by facsimile or email.

9. Any delay caused by Petitioner or Petitioner's representatives (*e.g.*, absence or failure to attend a meeting, or failure to respond to scheduling requests within one business day) shall extend Respondent's deadlines under this Order by the same number of days.

Petitioner's other requests for relief are DENIED.

Dated this 22nd day of June, 2015.

Charles Carron
Impartial Hearing Officer

Copies to: Petitioner's Counsel Elizabeth T. Jester, Esq.
Respondent's Counsel Tanya Joan Chor, Esq.
Office of Dispute Resolution
Chief Hearing Officer Virginia Dietrich, Esq.
OSSE Division of Specialized Education
Contact.Resolution@dc.gov

## XI. NOTICE OF APPEAL RIGHTS

The decision issued by the Impartial Hearing Officer is final, except that any party aggrieved by the findings and decision of the Impartial Hearing Officer shall have 90 days from the date of the decision of the Impartial Hearing Officer to file a civil action with respect to the issues presented at the due process hearing in a district court of the United States or a District of Columbia court of competent jurisdiction, as provided in 20 U.S.C. §1415(i)(2).

**APPENDIX A**

**D████ M███ v. District of Columbia Public Schools**

**Case No: 2015-0152**

| | |
|---|---|
| Student | D███ M███ |
| Date of Birth | ████████ |
| Current Age | ███ |
| Current Grade | █ |
| Student ID Numbers | STARS: ██████ UNIVERSAL: ███████ |
| Attending School | █████ Elementary School |
| Attending School Academy | PATH Academy |
| Previous School | Imagine Southeast Public Charter School |
| Parent/Petitioner | Anissa Jones |
| Private School | The Foundation School |
| Family Support Worker | Tonya Pickett |
| Private School Admissions Coordinator | Temeka Parker |
| Attending School Special Education Coordinator ("SEC") | Deborah Fells-Pleasants |
| Attending School Special Education Teacher | Jessica Stefon |
| Attending School Social Worker | Carolyn M. Lloyd |
| Attending School Principal | Rena Johnson |
| Attending School Psychologist | Crystal Dorn |
| DCPS Office of Specialized Instruction ("OSI") Program Manager | Natalia Houston |