# DISTRICT OF COLUMBIA
## OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION
Office of Dispute Resolution
810 First Street, NE, 2nd Floor
Washington, DC 20002

---

PETITIONER,
on behalf of STUDENT,[1]

        Petitioner,

v.

DISTRICT OF COLUMBIA
  PUBLIC SCHOOLS,

        Respondent.

Date Issued: April 29, 2017

Hearing Officer: Peter B. Vaden

Case No: 2017-0050

Hearing Date: April 13, 2017

Office of Dispute Resolution, Room 2006
Washington, D.C.

---

## HEARING OFFICER DETERMINATION

## INTRODUCTION AND PROCEDURAL HISTORY

      This matter came to be heard upon the Administrative Due Process Complaint Notice filed by Petitioner (the Petitioner or MOTHER), under the Individuals with Disabilities Education Act, as amended (the IDEA), 20 U.S.C. § 1400, *et seq*., and Title 5-E, Chapter 5-E30 of the District of Columbia Municipal Regulations ("D.C. Regs."). In her due process complaint, Petitioner alleges that Respondent District of Columbia Public Schools (DCPS) has denied Student a free appropriate public education (FAPE) by not ensuring that he was offered an appropriate educational placement beginning in the 2015-2016 school year. Petitioner requests that DCPS be ordered to fund student's prospective placement at a therapeutic residential school.

---

[1]     Personal identification information is provided in Appendix A.

PLAINTIFF'S
EXHIBIT
2
ALL-STATE LEGAL®


1

Student, an AGE youth, is a resident of the District of Columbia.  Petitioner's Due

Process Complaint, filed on February 17, 2017, named DCPS as respondent.  The

undersigned hearing officer was appointed on February 21, 2017.  The parties met for a

resolution session on March 7, 2017 and were unable to reach an agreement.  My final

decision in this case is due by May 3, 2017.  On March 14, 2017, I convened a telephone

prehearing conference with counsel to discuss the hearing date, issues to be determined

and other matters.

The due process hearing was scheduled for April 12 and 13, 2017.  However, for

health reasons, Mother was not able to participate on April 12, 2017 and, by agreement

of counsel, the hearing was completed in one day, on April 13, 2017.  The hearing, which

was closed to the public, was recorded on an electronic audio recording device.  The

Petitioner appeared in person and was represented by PETITIONER'S COUNSEL.

Respondent DCPS was represented by DCPS' COUNSEL.

At the beginning of the hearing, Petitioner's Counsel made an oral motion for

sanctions in the form of a directed finding against DCPS on the grounds that DCPS'

amended response to the complaint, filed on March 16, 2017, did not comply with the

requirements of my March 14, 2017 Prehearing Order.  I denied the motion as untimely

filed and not in compliance with the Office of Dispute Resolution's *Standard Operating

Procedures.*

The Petitioner testified and called Educational Advocate as her only additional

witness.  DCPS called as witnesses NONPUBLIC SCHOOL 2 PROGRAM DIRECTOR,

DCPS MONITOR and ASSISTANT PRINCIPAL.  Petitioner's Exhibits P-1 through P-47

and DCPS' Exhibits R-1 through R-55 were all admitted into evidence without objection.

Counsel for the respective parties made opening statements.  At the request of

2

Petitioner's Counsel, the parties were granted leave until April 19, 2017 to file written

closing arguments.  Both parties timely filed written closings.

## JURISDICTION

The hearing officer has jurisdiction under 20 U.S.C. § 1415(f) and D.C. Regs. tit.

5-E, § 3029.

## ISSUES AND RELIEF SOUGHT

The following issues for determination were certified in the April 25, 2017

Prehearing Order:

A. Whether DCPS denied Student a FAPE, and violated a June 2015 Hearing Officer Determination, by failing to offer Student an appropriate full-time IEP and suitable educational placement by the beginning of the 2015-2016 school year when Student was at City School 2;

B. Whether since May 2016 through the present, DCPS has denied Student a FAPE by failing to ensure that an IEP team was convened to review his academic, social, emotional and behavioral needs and to provide for Student's placement in a therapeutic residential school;

C.  Whether since July 2015, DCPS has denied Student a FAPE by failing to ensure that Student's IEP teams discussed his least restrictive environment (LRE) and described the team's LRE consideration and decision on Student's IEPs and

D.  Whether since May 2016, DCPS has denied Student a FAPE by failing to ensure that a Prior Written Notice was issued to the parent notifying her of the IEP team's decision not to change Student's placement to a more restrictive setting, the reasons therefor and options considered.

For relief, the parent requests that the hearing officer order DCPS to place

Student at a suitable therapeutic residential school and to ensure that Student's IEP is

appropriately reviewed and revised to reflect Student's alleged need for a residential

placement.  In addition, Petitioner seeks compensatory education relief for the denials

of FAPE alleged in the complaint.

3

### FINDINGS OF FACT

After considering all of the evidence, as well as the argument of counsel, this hearing officer's findings of fact are as follows:

1.    Student, an AGE youth, resides in the District of Columbia with Mother. <u>Testimony of Mother.</u> Student is eligible for special education under the IDEA disability classification Emotional Disturbance (ED). <u>Exhibit P-4.</u>

2.    On April 24, 2015, Petitioner filed a previous request for a due process hearing for Student. Following a hearing on June 5 and June 15, 2016, former Hearing Officer Charles Carron issued a Hearing Officer Determination on June 22, 2015 (the June 22, 2015 HOD). In his decision, Hearing Officer Carron found, *inter alia*, that DCPS had denied Student a FAPE by failing to evaluate him in all areas of suspected disabilities and by failing to fund an Independent Educational Evaluation, by making changes to Student's IEP without giving the parent the opportunity for input, by not providing appropriate Emotional, Social and Behavioral goals in Student's IEP, and by providing insufficient hours of specialized instruction outside of general education, given Student's emotional, social and behavioral needs. Hearing Officer Carron ordered, *inter alia*, that DCPS ensure that Student's IEP was amended to provide specialized instruction for all academic instruction, in a small classroom, outside of the general education setting; that DCPS ensure that Student would be escorted by an adult for transitions in school and that a safety plan be incorporated in Student's IEP; that DCPS fund one IEE assessment of Student (either a psychological, speech and language, occupational therapy, assistive technology or functional behavioral assessment – to be decided my Mother) and that Student's IEP team be convened to review the IEE evaluations and revise Student's IEP as appropriate. <u>Exhibit R-1.</u>

3.      On July 22, 2015, Student's IEP team convened at CITY SCHOOL 1.  The IEP team revised Student's IEP to provide for 20 hours per week of Special Education Services Outside General Education, 240 minutes per month of Behavioral Support Services and 120 minutes per month of Speech-Language Pathology.  Exhibit P-8.  On July 29, 2015, DCPS issued a location of services letter to inform the parent that City School 2 would be the new location of special education services for Student.  Exhibit R-7.

4.      Student was brought before the D.C. juvenile court in February 2014 for allegedly throwing missiles.  He was placed by the court in a diversion program and provided social services include therapy, 1st home care, and community based services.  He was assigned a probation officer to monitor him at school and subjected to drug testing.  The court has ordered Student to attend school, but Student has not complied.  Testimony of Mother.

5.      On June 9, 2014, Student received a court-ordered psychoeducational evaluation to assess his cognitive and personality functioning.  The examiner summarized that cognitive testing indicated that Student was exhibiting a borderline cognitive performance (FSIQ) and very limited to low average academic skill performance.  His emotional and personality testing indicated significant difficulties with traumatic symptoms, which included irritability, excessive worrying, nightmares, feeling guilty, sleep disturbance and somatic complaints.  He additionally experienced depressive symptoms, which included irritability, depressed mood, sleep disturbances, feeling hopeless, poor concentration and somatic complaints.  Overall, available information indicated that Student was suffering from Posttraumatic Stress Disorder and Persistent Depressive Disorder.  The examiner diagnosed Student with

Posttraumatic Stress Disorder and Language Disorder (Provisional).  Exhibit P-18.

6.      Beginning in September 2015, INDEPENDENT PSYCHOLOGIST conducted an IEE comprehensive psychological evaluation of Student.  Due to Student's limited compliance with testing and disruptive behaviors, Independent Psychologist did not complete the evaluation until February 4, 2016.  In her written report, Independent Psychologist reported, *inter alia*, that Student's records indicated diagnoses of Attention Deficit Hyperactivity Disorder (ADHD), Post-Traumatic Stress Disorder (PTSD), Parent-Child Relational Problems, Academic Problems and a provisional expressive language disorder. Significant life stressors had been experienced by Student, including exposure to community violence and loss of contact with his father due to his father's incarceration.  Student had been involved with the judicial system and placed on probation, requiring an ankle bracelet for monitoring.  Student's pattern of disruptive behaviors in the evaluation process (*i.e.*, eloping, suspension, non-compliance with school rules) and non-compliance with testing indicated very significant difficulties with self-management of his behavior and emotions and their impact on his education, his ability to participate at school, his ability to access the curriculum, and his personal safety.  Student walked away after administration of only four of the ten subtests of the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV).  He had average range scores on three subtests, consistent with his previous, June 2014, testing. Student's impaired score on the WISC-IV similarities subtest was also consistent with previous testing of his Verbal Comprehension Index (VCI), which fell in the borderline range in 2014. The finding was also consistent with Student's previously noted expressive language difficulties.  Assessment of Student's behavior and emotion in the school environment, as reported by staff at City School 2, indicated clinical levels of

ADHD, Oppositional Defiant Disorder, Conduct Disorder, Post-Traumatic Stress, Anxiety and Depression. Significant problems with academics, including reading, mathematics and written expression, suggested concern about possible learning disabilities.  Significant problems with peers and classroom behavior were also reported. Independent Psychologist's observation of Student in his school environment at City School 2 and her conversations with his school social worker and aides indicated significant disruptive behavior and non-compliance.  When Independent Psychologist observed Student at City School 2, Student exited his classroom after only a short period of time and began walking the halls in a hostile and aggressive manner.  Taken together, the psychological evaluation indicated that Student was a student with a disability in need of significant special education support. His disruptive behavior was his most significant problem at that time.  The contribution of Student's learning difficulties to his disruptive behavior was unclear to Independent Psychologist but she posited that it may have been a contributing factor leading to frustration, shut down, and subsequent acting out behaviors.  Independent Psychologist recommended, *inter alia*, that Student's educational achievement, speech and language skills and occupational therapy (OT) needs should be further assessed.  Independent Psychologist endorsed Student's placement at NONPUBLIC SCHOOL 1 to support him behaviorally and noted that Student might require a higher level of support if Student were unable to consistently stay at Nonpublic School 1 due to his behaviors.  Independent Psychiatrist also recommended that Student's caregivers work closely with a psychiatrist for medication support and that Student engage in outpatient psychotherapy to aid in addressing his emotional and behavioral problems.  Exhibit P-15.

7.    Student began the 2015-2016 school year at City School 2.  In the fall of
the school year, Assistant Principal referred Student to DCPS for an observation for a
more restrictive environment referral, following three incidents that started with threats
to school staff and ended with attempted assaults on school staff.  Two of these incidents
had resulted in Student's arrest and a hospital admission.  The DCPS observer observed
Student in his City School 2 classroom on October 22, 2015.  She concluded that Student
could benefit from a more restrictive school setting, where his academic and behavioral
needs could be addressed.  Exhibit P-11.

8.    Following an alleged assault on the school principal at City School 2 in
November 2015, DCPS placed Student at Nonpublic School 1.  In May 2016, Nonpublic
School 1 informed the parent that due to safety concerns (after Student had allegedly
brought a gun to school), Student would be transferred to another school.  Testimony of
Mother, Exhibits P-4, R-33.

9.    DCPS convened an IEP annual review meeting for Student on May 16,
2016.  Petitioner's Attorney attended the meeting and Mother participated by telephone.
The May 16, 2016 IEP provided for Student's full-time Specialized Instruction (29.5
hours per week) in a small group setting, not to exceed 12 students, outside general
education.  The IEP also provided for 150 minutes per month of Behavioral Support
Services, 120 minutes per month of Speech-Language Pathology and a full-time
dedicated aide.  At the IEP team meeting, the team discussed that Student is educated at
a setting that has only students identified with disabilities and no time with non-
disabled peers.  At the meeting, Mother requested a residential placement for Student,
to no avail.  Exhibits R-19, R-20.  On May 16, 2016, DCPS issued a Prior Written Notice
to the parent informing her that the IEP team agreed to continue Student's services "in

the current level of restriction," *i.e.*, a special education day school.  Exhibit R-21.

10.    After the IEP meeting on May 16, 2016, Petitioner's Counsel wrote DCPS to request, in light of Student's daily struggles, refusal to cooperate with the school program and oppositional conduct, that Student be placed in a therapeutic residential school.  She asserted that Nonpublic School 1 had already implemented everything that a day school program had to offer in terms of small classes, dedicated aide, counseling, structure, behavior plan, etc. and it was not working.  The attorney requested a meeting to discuss and determine a more restrictive environment for Student.  Exhibit P-41.

11.    In the summer of 2016, Student briefly attended CLOSED NONPUBLIC SCHOOL, before that school closed.  Testimony of Mother.  In September 2016, DCPS issued a location of services letter placing Student at Nonpublic School 2, a therapeutic day school.  Exhibit R-24.

12.    In spring 2016, Student was referred for a functional behavioral assessment (FBA) due to aggression, non-compliant and inattentive behaviors and lack of empathy and concern for others.  Identified behaviors of concern included being out of seat, defiance, moodiness, physical aggression, social skills, bossiness, noncompliance, picking on others, verbal aggression, bullying, depression, fighting, being off task, talking out, withdrawal, hyperactivity, poor motivation, yelling, distracting others, minding others' business, seeking attention and leaving school property without permission.  Student was reported to display inattentive behaviors continuously, to demonstrate physically and verbally aggressive behaviors for up to 10 minutes and to display impulsive, physically and verbally aggressive. behaviors on average 8-10 times per hour.  The negative ramifications of these behaviors included disruption, interference with safe transport, danger to self, impeding educational

progress, impacting interpersonal relationships with adults, interference with social interactions, danger to others, impacting interpersonal relationships with peers, property damage, interference with instruction, intimidation of others. Exhibit R-17.

13.    From September 28, 2016 until October 28, 2016 Student was placed, under a court order for severe drug use, at TREATMENT CENTER, an inpatient facility in Maryland. While at Treatment Center, Student had episodes of aggression and anger toward staff. Exhibit P-28.

14.    In November 2016, Student began attending Nonpublic School 2, where he is currently enrolled in GRADE. Nonpublic School 2 is a special education day school for children with disabilities, primarily ED, in suburban Maryland. It provides educational services in a therapeutic climate. School staff are trained to deal with students' emotional behavior school wide. When Student first went to Nonpublic School 2, he adjusted fairly well, but had attendance issues. On January 10, 2017, the school made a truancy referral to the D.C. Superior Court. At that point, Student had been truant from school 18 days between December 14, 2016 and January 10, 2017. As of January 10, 2017, Student had not returned to school after the winter break. Student has had several behavior incidents at Nonpublic School 2. In one incident, Student had to be physically restrained. After another incident, Student required seclusion because he was so aggressive. On a third occasion, local police had to be summoned to remove Student after he shoved staff and punched a window, shattering the plexiglass. Notwithstanding, Program Director believes Nonpublic School 2 could meet Student's educational and behavioral needs if he would attend school. Testimony of Program Director, Exhibits R-27, R-28. As of the due process hearing date, Student was still refusing to go to school. Testimony of Mother.

15.     On February 6, 2017, DCPS convened an IEP team meeting to discuss Student's not attending school, and the parent's request for a more restrictive environment.  Mother and Petitioner's Counsel attended the meeting.  Petitioner's Counsel reiterated Mother's request for a residential placement for Student.  DCPS Monitor stated it was DCPS' position that Student did not require a more restrictive environment than Nonpublic School 2.  Exhibit R-28.

16.     Student's grades over the 2015-2016 and 2016-2017 school years have been mostly D's and F's.  Exhibit P-34.

## CONCLUSIONS OF LAW

Based upon the above Findings of Fact and argument and legal memoranda of counsel, as well as this hearing officer's own legal research, the conclusions of law of this hearing officer are as follows:

### Burden of Proof

As provided in the  D.C. Special Education Student Rights Act of 2014, the party who filed for the due process hearing, the Petitioner in this case, shall bear the burden of production and the burden of persuasion, except that where there is a dispute about the appropriateness of the student's IEP or placement, or of the program or placement proposed by DCPS, the District shall hold the burden of persuasion on the appropriateness of the existing or proposed program or placement; provided that the Petitioner shall retain the burden of production and shall establish a *prima facie* case before the burden of persuasion falls on the District. The burden of persuasion shall be met by a preponderance of the evidence. *See* D.C. Code § 38-2571.03(6).

### Analysis

A.

> Did DCPS deny Student a FAPE, and violate the June 22, 2015 HOD, by failing to offer Student an appropriate full-time IEP and suitable educational placement by the beginning of the 2015-2016 school year when Student was at City School 2?

Following a two-day due process hearing in June 2015, former Hearing Officer Charles Carron issued a Hearing Officer Determination on June 22, 2015. In that decision Hearing Officer Carron found that since January 22, 2015, DCPS had denied Student a FAPE because his IEPs provided insufficient hours of specialized instruction in the outside of general education setting, given Student's emotional, social and behavioral needs. Hearing Officer Carron ordered, *inter alia*, that DCPS ensure that Student's IEP be amended to provide for all of Student's academic instruction to be provided in a small classroom with a low student-to-adult ratio, in an outside of general education setting. Student's IEP team was convened on July 22, 2015. His IEP was revised to provide for 20 hours per week of Specialized Instruction in a small group, outside of general education, setting. Subsequently, DCPS issued a location of services letter informing Mother that Student's IEP would be implemented at City School 2. Student was enrolled in City School 2 from the beginning of the 2015-2016 school year until November 2015, when he was placed by DCPS at Nonpublic School 1, a full-time special education day school.

Petitioner contends that the July 22, 2015 IEP provision of only 20 hours per week of Specialized Instruction outside general education did not comply with the June 22, 2015 HOD requirement that "all of Student's academic instruction" be provided outside of the general education setting.[2] However, Assistant Principal testified that

---

[2]    Petitioner made essentially the same claim in a motion she filed on November 11, 2015 in the U.S. District Court for the District of Columbia in Case No. 15-CV-1505, in which Petitioner appealed parts of the June 22, 2015 HOD. In the motion, Petitioner

while Student was at City School 2, he was placed full-time in the self-contained

Behavior and Education Support (BES) classroom and all of his academic instruction

was provided in that setting. I find that although the July 22, 2015 IEP did not specify

that all of Student's academic instruction would be provided in the self-contained

classroom, that was, in fact, what was implemented at City School 2.

Petitioner rightly complains that, even though Student was placed in the full-time

BES classroom at City School 2, DCPS' failure to provide in his IEP for all academic

instruction to be provided outside the general education setting contravened the

requirements of the June 22, 2015 HOD. *See N.S. ex rel. Stein v. District of Columbia*,

709 F.Supp.2d 57, 73 (D.D.C.2010) ("One of the purposes of the IEP is to ensure that the

services provided are formalized in a written document that can be assessed by parents

and challenged if necessary.") However, flaws in an IEP do not necessarily rise to a

denial of FAPE. *See N.S., supra*, at 70 ("Ultimately, the question before the Court is

whether or not the defects in the . . . IEP are so significant that [d]efendant failed to

offer [the student] a FAPE.") Here, because at City School 2, Student was actually

offered all of his academic instruction in the outside of general education setting

ordered by Hearing Officer Carron and because Student only remained at City School 2

until late November 2015, when he was placed at Nonpublic School 1, I conclude that

_____

alleged that DCPS had failed to offer Student all instruction outside the general
education setting in a small class setting, as required by the HOD. Petitioner sought a
temporary restraining order to enjoin DCPS to place Student at Nonpublic School 1. By
a minute order signed by U.S. District Judge Beryl A. Howell on February 5, 2016, the
Court denied, as moot, Petitioner's motion for a temporary restraining order and
preliminary injunction, evidently because on November 18, 2015, DCPS issued a
location of services letter identifying Nonpublic School 1 as Student's new location of
services. *See* Exhibit R-11. U.S. District Judge Howell entered a final order in Case No.
15-CV-1505 on February 22, 2017. Exhibit R-33. Neither party has argued that the
federal action has any preemptive or preclusive effect in this administrative proceeding.

DCPS has met its burden of persuasion that the July 22, 2015 IEP provision for only 20 hours of Specialized Instruction, outside general education, did not result in a denial of FAPE to Student.

B.

— Since May 2016 through the present, has DCPS denied Student a FAPE by failing to ensure that an IEP team was convened to review his academic, social, emotional and behavioral needs and to provide for Student's placement in a therapeutic residential school?

— Since July 2015, has DCPS denied Student a FAPE by failing to ensure that Student's IEP teams discussed his least restrictive environment and described the team's LRE consideration and decision on Student's IEPs?

— Since May 2016, has DCPS denied Student a FAPE by failing to ensure that a Prior Written Notice was issued to the parent notifying her of the IEP team's decision not to change Student's placement to a more restrictive setting, the reasons therefor and options considered?

Petitioner's primary concern in this case is to secure DCPS funding for a residential educational placement for Student. Mother testified, and it is not disputed, that despite her best efforts and all of the interventions attempted by the court and community services agencies, as well as by DCPS, Nonpublic School 1 and Nonpublic School 2, Student will not consistently attend school unless there is what Mother calls "enforced instruction." DCPS maintains that Student can receive a FAPE in a nonpublic special education day school and that he does not require a residential placement.

Petitioner structures her residential placement claim in the context of Student's last, May 16, 2016 IEP. The May 16, 2016 IEP provides for Student's full-time Specialized Instruction (29.5 hours per week) in a small group setting outside general education. The IEP also provides for 150 minutes per month of Behavioral Support Services, 120 minutes per month of Speech-Language Pathology and for a full-time dedicated aide. Mother asserts that DCPS denied Student a FAPE because it did not

offer Student a residential placement in the May 16, 2016 IEP or at any time since.

Appropriateness of May 16, 2016 IEP

I first address the appropriateness of the educational placement provision in the May 16, 2016 IEP, as of the time it was offered to Student. *See, e.g., S.S. ex rel. Shank v. Howard Rd. Academy*, 585 F.Supp.2d 56 (D.D.C.2008) ("'[B]ecause the question . . . is not whether the IEP will guarantee some educational benefit, but whether it is reasonably calculated to do so, . . . the measure and adequacy of an IEP can only be determined as of the time it is offered to the student." *Id.* at 66.) In *Moradnejad v. District of Columbia*, 177 F. Supp. 3d 260 (D.D.C. 2016), the Court adopted the Report and Recommendation of U.S. Magistrate Judge G. Michael Harvey, which explained how a court or a hearing officer must assess an IEP:

> The Supreme Court explained in [*Bd. of Educ. v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)] that a court's assessment of an IEP involves two inquiries:
>
>> First, has the State complied with the procedures set forth in the [IDEA]? And second, is the [IEP] developed through the [IDEA's] procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Moradnejad* at 274-75. In *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988 (2017)*, the U.S. Supreme Court elaborated on the "educational benefits" requirement pronounced in *Rowley*:

> To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. . . . Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal. . . . When a child is fully integrated in the regular classroom, as the Act prefers, what that typically means is providing a level of instruction reasonably calculated to permit advancement through the general curriculum. . . . If that is not a

15

> reasonable prospect for a child, his IEP need not aim for grade-level advancement. But his educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives.

*Endrew F., supra*, 137 S. Ct. at 999–1000 (citations omitted).

Petitioner asserts that DCPS violated the IDEA procedural requirements, when developing the May 16, 2016 IEP, in two respects. First, Petitioner alleges that Student's IEP team did not discuss his least restrictive environment (LRE) or described the team's LRE consideration and decision on Student's IEP.[3] I disagree. The May 16, 2016 IEP team meeting notes establish that the IEP team discussed that Student would be educated at a setting that has only students identified with disabilities and no time with non-disabled peers. The final IEP provided that for his Specialized Instruction, 29.5 hours per week, Student required instruction in a small group, not to exceed 12 students, outside of the general education setting. I find that this was a sufficient IEP description of the Student's least restrictive environment.

Petitioner also alleges that DCPS denied Student a FAPE by not issuing a Prior

---

[3]    While school districts must inform parents about placements alternatives that were considered and rejected, there is no requirement to detail LRE considerations in a child's IEP. *See* U.S. Department of Education, *Assistance to States for the Education of Children with Disabilities*, 71 Fed. Reg. 46579, 46588 (August 14, 2006) (While public agencies have an obligation under the [IDEA] to notify parents regarding placement decisions, there is nothing in the Act that requires a detailed explanation in children's IEPs of why their educational needs or educational placements cannot be met in the location the parents' request. We believe including such a provision would be overly burdensome for school administrators and diminish their flexibility to appropriately assign a child to a particular school or classroom, provided that the assignment is made consistent with the child's IEP and the decision of the group determining placement;) 71 Fed. Reg. 46662 (Public agencies only required to include information in IEP which is explicitly required by the IDEA.) *But see Brown v. District of Columbia*, No. 15-0043, 2016 WL 1452330 (D.D.C. Apr. 13, 2016) (IEP is inadequate if it does not include a description of the student's least restrictive environment and discussion of his appropriate placement along the continuum of alternative placements.)

16

Written Notice (PWN) since May 2016, notifying her of the District's decision not to change Student's placement to a residential setting. The IDEA requires that the LEA must give prior written notice before the LEA proposes to initiate or change the identification, evaluation, or educational placement of child with a disability or the provision of FAPE to the child. *See* 34 CFR § 300.503(a). The notice must include (1) A description of the action proposed *or refused* by the agency; (2) An explanation of why the agency proposes or refuses to take the action and (3) A description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action. *See* 34 CFR § 300.503(b) (emphasis supplied).

On May 16, 2016, DCPS issued a PWN to the parent informing her that the IEP team agreed to continue Student's services "in the current level of restriction," *i.e.*, a special education day school. This PWN was inadequate because it omitted any explanation of DCPS' refusal to change Student's educational setting to a residential placement, which was requested by the parent and her attorney at the IEP meeting. An agency's failure to give the required PWN is a procedural violation of the IDEA. *See Honig v. Doe,* 484 U.S. 305, 312, 108 S.Ct. 592, 598 (1988) (Safeguards include prior written notice whenever the responsible educational agency refuses to change the child's placement or program.) Procedural violations may only be deemed a denial of FAPE if the procedural inadequacies—

(i) Impeded the child's right to a FAPE;

(ii) Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or

(iii) Caused a deprivation of educational benefit.

34 CFR § 300.513(a)(2).

The purpose of the prior written notice requirement "is to ensure that parents are aware of the decision so that they may pursue procedural remedies." *M.B. ex rel. Berns v. Hamilton Southeastern Schools*, 668 F.3d 851, 861-862 (7th Cir.2011). In this case, Petitioner has been represented at all times by able counsel, who represented her at the May 16, 2016 IEP meeting, communicated on her behalf with DCPS and, seasonably, filed the present due process complaint. DCPS' procedural omission in the May 16, 2016 PWN to provide an explanation for its refusal to change Student's placement to a residential school did not impede the parent's opportunity to participate in the process or result in harm to Student. I find that, on these facts, the inadequacy of DCPS' May 16, 2016 PWN did not result in denial of FAPE to Student.

I turn, next, to the second, substantive, prong of the *Rowley/Endrew F.* inquiry: Was the May 16, 2016 IEP, at the time it was developed, specifically Student's placement at a therapeutic special education day school, reasonably calculated to enable Student to make progress appropriate in light of this student's individual circumstances? The IDEA contemplates a continuum of educational placements to meet the needs of students with disabilities. Depending on the nature and severity of his disability, a student may be instructed in regular classes, special classes, special schools, at the home, or in hospitals and institutions. *See* 5E DCMR § 3012, 20 U.S.C. § 1412(a)(5), 34 CFR § 300.115. The IDEA requires that students with disabilities be placed in the "least restrictive environment" so that they can be educated in an integrated setting with students who are not disabled to the maximum extent appropriate. *See, e.g., Smith v. District of Columbia*, 846 F.Supp.2d 197, 200 (D.D.C. 2012). Before placing a child in a residential institution, the most restrictive of settings, a school district must consider intermediate steps wherever appropriate. *See, e.g., Oberti by Oberti v. Bd. of Educ. of*

18

*Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1218 (3d Cir. 1993); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1050 (5th Cir.1989).

In this case, until late November 2015, Student's special education had been provided in special classes in DCPS public schools. As of the May 16, 2016 IEP meeting, Student had only attended Nonpublic School 1 since December 2015. Independent Psychologist had endorsed Student's placement at Nonpublic School 1, although she noted that Student might require a higher level of support if Student was unable to consistently stay at Nonpublic School 1 due to his behaviors. Prior to the May 16, 2016 IEP team meeting, Nonpublic School 1 informed the parent that Student would be transferred out due to safety concerns. At the IEP meeting, DCPS maintained Student's special school placement, but ultimately changed his location to Nonpublic School 2, a small private school which primarily serves students, like Student, who have emotional disturbance disabilities. At Nonpublic School 2 Student has responded well to the school staff and was doing well on the days when he attended. The concern is that Student does not regularly attend school.

Petitioner's expert, Educational Advocate, opined that after Student was expelled from Nonpublic School 1 in spring 2016, his IEP should have been revised to provide for a 24 hour, highly structured, residential program. However, Student was expelled from Nonpublic School 1 for allegedly carrying a weapon to school, not because he could not receive educational benefits there. Moreover, Educational Advocate never evaluated Student or spoke to him or to any of his instructors at Nonpublic School 1. In her testimony, she denied knowledge of the weapon incident. When Educational Advocate did her observation at Nonpublic School 2, she observed that Student was compliant and had good rapport with school staff. I find unpersuasive her opinion that Student

19

should have been placed at a residential institution following his expulsion from Nonpublic School 1 after the alleged weapon incident. In sum, on these facts, I find that DCPS has met its burden of persuasion that at the time of the May 16, 2016 IEP meeting, the IEP team's decision to maintain Student's placement at a nonpublic special day school for students with emotional disabilities was reasonably calculated to enable Student to make progress appropriate in light of his circumstances. *See Endrew F., supra.*

### Present Need for Residential Placement

On February 6, 2017, Student's IEP team was convened by DCPS to consider Mother's renewed request for a residential placement. On January 30, 2017, Petitioner's Counsel had written DCPS Monitor by email requesting the meeting because, according to the attorney, due to Student's behavior/psychiatric issues, Student was refusing to attend school and had not attended Nonpublic School 2 since early January. Petitioner's Counsel represented that Student was in crisis and needed a residential school placement immediately. At the February 6, 2017 meeting, Program Director stated that Student had not shown any major disruptive behaviors during his time at Nonpublic School 2. At the due process hearing, Program Director confirmed that Student has been not been attending school regularly since after the school's winter break. Program Director was unable to propose a solution for Student's nonattendance. DCPS Monitor stated at the February 6, 2017 meeting that DCPS' position was that Student did not require a more restrictive environment and Student's IEP placement was not changed. Petitioner asserts that this was a denial of FAPE.

In *McKenzie v. Smith*, 771 F.2d 1527 (D.C.Cir. 1985), the D.C. Circuit adopted a test, first enunciated by the Third Circuit Court of Appeals in *Kruelle v. New Castle*

*County School District*, 642 F.2d 687, 693 (3d Cir.1981), for determining whether a

parent is entitled to reimbursement for making a private residential placement. In

*Kruelle*, an intellectually disabled child, who was unable to speak and not toilet trained,

was found to need extensive, around-the-clock, care as part of his FAPE. The *Kruelle*

test focuses on whether a child's medical, social, or emotional problems are "inextricably

intertwined" with the learning process. "To determine whether a residential placement

is appropriate, a court must analyze 'whether full-time placement may be considered

necessary for educational purposes, or whether the residential placement is a response

to medical, social or emotional problems that are segregable from the learning process.'"

*McKenzie v. Smith*, *supra*, 771 F. 2d at 1534, quoting *Kruelle*, *supra*, 642 F.2d at 693.)

Under this test, if a hearing officer cannot segregate a child's medical, social, or

emotional problems from the learning process, the school district must be ordered to

fund a full time residential placement. In its decision, the D.C. Circuit upheld the

district court's finding that based on the preponderance of the evidence, the student's

educational and emotional needs could not be segregated, and that a residential

placement was therefore appropriate. *Id.* at 1535.

   Importantly, in *McKenzie v. Smith,* the parents were seeking reimbursement for

their unilateral placement of their son at a private residential school and DCPS

presented no evidence in support of its proposed placement of the student at "a large

public high school where at least one-fourth of his time would be spent in regular

classes." By contrast, in the present case, DCPS has placed Student at a private special

education day school which primarily serves students, like Student, who have Emotional

Disturbance disabilities. But, Student refuses to go to the school and neither the parent,

nor the private school, nor DCPS has a solution for Student's school refusal, except for

the parent's proposal to place Student at a residential facility.

In support of her argument that DCPS must fund a residential placement for Student, Petitioner cites the decision in *Indep. Sch. Dist. No. 284 v. A.C., by & through her Parent, C.C.*, 258 F.3d 769 (8th Cir. 2001). In that case, the school district characterized the student's need for a residential placement as a need for confinement, and argued that confinement was not a "related service" that it was required to provide under the IDEA. The Eighth Circuit instructed that the focus should not be on characterizing the child's "problem," but on whether the problem needs to be addressed in order for the child to learn:

> If the problem prevents a disabled child from receiving educational benefit, then it should not matter that the problem is not cognitive in nature or that it causes the child even more trouble outside the classroom than within it. What should control our decision is not whether the problem itself is "educational" or "non-educational," but whether it needs to be addressed in order for the child to learn.

*Id.* at 777. The Circuit Court relied heavily on an independent educational evaluation conducted by a university neuropsychologist, who strongly recommended that the student be placed in a secure facility, largely to prevent truancy, and predicted that, after a course of treatment, the student would probably be able to return to the classroom. Importantly, the Circuit Court found that "mere confinement was [not] the evaluator's reason for recommending a residential placement. An independent and sufficient reason for that recommendation was to provide treatment for a psychological problem that has prevented [the student] from making acceptable academic progress." *Id.* at 778. The Court overturned the lower court's decision that a residential placement was not educationally necessary for the student.

In support of its position that the IDEA does not require it to fund a residential

placement, when the Student refuses to attend an otherwise appropriate therapeutic day school, DCPS cites the Seventh Circuit's decision in *Dale M. ex rel. Alice M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 307*, 237 F.3d 813, 817 (7th Cir. 2001). In *Dale M.*, the Seventh Circuit concluded that sending the student to a residential facility was not for educational reasons, but to keep the child out of trouble. "[T]he purpose of the 'service' that the school district is being asked to pay for is to keep Dale out of jail, both directly, because the judge was willing to release him from jail to [the residential facility], and indirectly, because Dale is less likely to commit burglary and other crimes when he is in a residential facility than when he is living at home with only his mother to keep an eye on him." *Id.* at 817. Overturning the lower court, the Seventh Circuit held that for Dale M., residential placement was a "response to medical, social or emotional problems that are segregable from the learning process." *Id.* at 307 (quoting *Kruelle v. New Castle County School District*, 642 F.2d 687, 693 (3d Cir.1981); citing *Tennessee Dep't of Mental Health & Mental Retardation v. Paul B.*, 88 F.3d 1466 (6th Cir.1996); *McKenzie v. Smith*, 771 F.2d 1527 (D.C.Cir.1985)).

Although the Circuit Courts in *A.C.* and *Dale M.* reached divergent conclusions, their analyses are parallel. First, these courts agree with the D.C. Circuit that residential placement must be necessary for educational purposes or reasons. *See A.C.* at 774*; Dale M.* at 817. The Circuit Courts also appear to agree that the residential placement must offer therapeutic treatment to address the student's disability, not merely confinement. *See A.C.* at 778 (A reason for residential placement recommendation was to provide treatment for a psychological problem that has prevented A.C. from making acceptable academic progress;) *Dale M.* at 817 (For Dale M., all residential school provides is confinement.) Finally, both decisions emphasized that the student's truancy and

23

defiance must result from a "genuine emotional disturbance" rather than from a "purely moral failing." *A.C.* at 776. *See Dale M.* at 817 (Student's problem is a lack of proper socialization, as a result of which, despite his tender age, he has compiled a significant criminal record.) These considerations are helpful in applying the D.C. Circuit's standard from *McKenzie v. Smith* to the principle query in this case, namely, whether for this Student, "full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process." *Id.,* 771 F. 2d at 1534.

First, Petitioner and DCPS agree that Student has a qualifying emotional disturbance disability and there is no dispute that his disability is severe. The preponderance of the evidence makes it likely that student's defiant truancy results from his ED disability rather than from a "purely moral failing." *See A.C., supra.* Petitioner's expert, Educational Advocate, opined that Student's bullying, noncompliance, argumentativeness, and nonattendance were glaring manifestations of his ED disability. Her opinion was consistent with Independent Psychologist's February 2016 psychological evaluation report that Student exhibited clinical levels of ADHD, Oppositional Defiant Disorder, Conduct Disorder, Post-Traumatic Stress, Anxiety and Depression.

It is also clear that the parent's request to place Student at a residential institution is for an educational reason, that is, as she and Educational Advocate testified, to make sure Student goes to school.

What is not clear from the evidence is whether Student needs a residential placement merely for confinement and to try to ensure he attends school, or in order to

get therapeutic treatment to address his disability.  Program Director testified that when Student attended school at Nonpublic School 2, he was doing well, but Student was not making progress because he was not attending.  Mother was clear in her testimony that she wants Student placed at a residential school for "enforced instruction." Unfortunately, Petitioner did not offer the testimony of Independent Psychologist, or another expert psychologist, who could offer an opinion on Student's requirement for a residential placement, based upon a current evaluation.  I give little weight to the opinion of Educational Advocate that Student requires a 24 hour therapeutic placement "first and foremost" to address his emotional issues.  Educational Advocate is not a psychologist and she had never evaluated Student or even spoken with him.

As of the hearing date, Petitioner and her representatives had not secured Student's admission to a residential school or identified a residential institution where Student could be placed.  There was also no evidence of the type of therapy Student needed to address his unwillingness to attend school or whether a specific residential school would be able to provide those services.  For its part, DCPS, which holds the burden of persuasion, offered no evidence that Student could be expected to make educational progress at his current therapeutic day school unless his unwillingness to attend school can be overcome.

"[T]he overarching purpose of the least restrictive environment requirement would be for naught if the school system could effectively order residential placement when less restrictive options exist that can afford meaningful educational benefit." *Millay v. Surry Sch. Dep't*, 2009 WL 5184388, (D.Me. Dec. 22, 2009), report and recommendation adopted *sub nom. Millay ex rel. YRM v. Surry Sch. Dep't*, 707 F. Supp. 2d 56 (D. Me. 2010).  I find that on the existing record, I am unable to determine that a

residential institution is Student's least restrictive educational environment.

In *B.D. v. District of Columbia*, 817 F.3d 792 (D.C. Cir. 2016), in the context of compensatory education awards, the D.C. Circuit encouraged hearing officers to order further assessments if needed to discern a student's needs. ("Assessments sufficient to discern B.D.'s needs and fashion an appropriate compensatory education program may now exist. But it may also well be that further assessments are needed. If so, the district court or Hearing Officer should not hesitate to order them, including, if appropriate on the updated record, assessment at a residential treatment facility." *Id.* at 800.)  In the present case,  I conclude that the appropriate course at this juncture is to order DCPS to obtain an independent educational evaluation (IEE) psychological assessment of Student charged, specifically, with assessing Student's need for a residential placement considering his emotional and behavioral disability and how his noncompliance with school attendance requirements relates to his disability, and with recommending appropriate therapy, whether Student is placed in a therapeutic day school or in a residential institution. Pending completion of this evaluation and its consideration by Student's IEP team, I will deny, without prejudice, the Petitioner's request to order a residential placement for Student.

It appears from the *B.D.* decision that the D.C. Circuit anticipated that the hearing officer or court would keep the evidentiary record open until further assessments are completed.  However, because my Hearing Officer Determination is due by May 3, 2017, I will not defer my final decision in this case.  *See* 34 CFR § 300.515(a). If, after Student's IEP team has reviewed the ordered assessment and updated his IEP, Petitioner and DCPS continue to be unable to agree on Student's educational placement, Petitioner may request a new due process hearing on the placement issue.  I would

26

anticipate that such a hearing would be held on the expedited hearing schedule.

## **ORDER**

Based upon the above Findings of Fact and Conclusions of Law, it is hereby

ORDERED:

1.  Within ten business days of the date of this order, subject to obtaining the parent's consent, DCPS shall engage Independent Psychologist or another qualified psychologist, who is neither an employee of DCPS nor an individual who regularly testifies for parents at due process hearings, to conduct a supplemental psychological assessment of Student to specifically assess Student's need for a residential placement considering, *inter alia*, Student's disability, his educational needs, his current emotional and behavioral functioning, and Student's noncompliance with school attendance requirements and its relationship to his disability, and to recommend appropriate treatment whether Student is placed in a therapeutic day school or in a residential institution.  Within 15 business days of receipt of the independent psychological assessment report, DCPS shall convene Student's IEP team, including the parent and her representatives, to review the independent report and other relevant data and to revise Student's IEP, including his educational placement, as appropriate.  If DCPS and Petitioner are then unable to agree upon a suitable educational placement and location of services for Student, Petitioner may request another, expedited, due process hearing to seek appropriate relief, informed by the recommendations of the independent evaluator;

2.  Petitioner's request that DCPS be ordered to fund a prospective residential placement for Student is denied without prejudice and

3.  All other relief requested by the Petitioner herein is denied.

Date:   <u>April 29, 2017</u>          <u>     s/ Peter B. Vaden          </u>
                                   Peter B. Vaden, Hearing Officer

## <u>NOTICE OF RIGHT TO APPEAL</u>

      This is the final administrative decision in this matter.  Any party aggrieved by this Hearing Officer Determination may bring a civil action in any state court of competent jurisdiction or in a District Court of the United States without regard to the amount in controversy within ninety (90) days from the date of the Hearing Officer Determination in accordance with 20 U.S.C. § 1415(i).


cc:     Counsel of Record
         Office of Dispute Resolution
         OSSE Division of Specialized Education
         DCPS Resolution Team