UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHANG CHOI, et al., )
 )
    PLAINTIFFS, )
 )
vs. ) Civil Action No. 17-00003 (JEB/RMM)
 )
DISTRICT OF COLUMBIA, )
 )
    DEFENDANT. )
_____ )

## VERIFIED STATEMENT OF DOUGLAS TYRKA

1. I am over 18 years of age and competent to testify regarding the matters described herein.

2. I am the sole owner of Tyrka & Associates, LLC, counsel for the Plaintiff Ms. McNeil in this action.

3. From its inception in 2005 Tyrka & Associates has always exclusively charged at hourly rates matching those in what is commonly known as "the LSI *Laffey* Matrix," the *Laffey* Matrix adjusted for changes in the legal services component of the Consumer Price Index as described in *Salazar ex rel. Salazar v. D.C.*, 809 F.3d 58, 61 (D.C. Cir. 2015) and other cases. The LSI *Laffey* Matrix is available from multiple sources.

4. Though Tyrka & Associates historically primarily represented clients who could not afford representation, the firm has had several clients pay the firm at the LSI *Laffey* Matrix rates directly, regardless of whether reimbursement is ever obtained. The firm is currently retained by clients at LSI *Laffey* Matrix rates.

5. I received my juris doctorate from the University of Texas School of Law at Austin in June of 1998. Since my graduation from law school, I have worked exclusively in litigation.



PLAINTIFF'S EXHIBIT 9

Since the middle of 2003, at least 90% of my practice has been in the field of special education law, representing parents in the District of Columbia. In my conservative and educated estimate, I have litigated over 1000 IDEA administrative cases and over 50 IDEA federal cases. I have won private school placement – the most substantial relief obtainable in IDEA cases – for more than 100 children, in my conservative estimate.

6. Tyrka & Associates and I in particular are known as experts in special education law in the District of Columbia. I am active in the community of "parent attorneys" in the District of Columbia. Aside from my contributions to semi-public discussions among members of the bar, I often advise other parent attorneys, including very experienced ones. Approximately once per week I answer a telephone call or email from a parent attorney seeking advice on a case. Other IDEA attorneys regularly ask me to take IDEA cases from them to the federal courts.

7. In the past, for several years my firm litigated hundreds of IDEA cases each year for non-paying clients, that is, with no expectation of payment other than from court awards pursuant to the IDEA's fee-shifting provision. In the last several years, it has become very difficult to earn a reasonable income from that work, and in my experienced opinion, impossible to maintain a law firm that relies upon that work for the majority of its work.

8. Below I review the history of my efforts to obtain fees for my IDEA work and explain why IDEA work for non-paying clients has become very financially difficult.

9. Before 2005, I did IDEA work as a subcontractor of another parent attorney. That lawyer paid me for my work when she was paid by DCPS. As I understood the process from many conversations with her, she periodically sent her bills, which included my work, to DCPS, and periodically settled the fees for those bills with them at figures very close to 100% of what she had billed. Through that process, I was paid for my IDEA work in at least 95% of cases at 100%

2

of what I had billed, and was paid from a few months to one year after performing the work. The small number of cases for which I was not fully paid were cases in which the bills had exceeded the attorneys' "fee cap" then in effect in the District of Columbia. The other lawyer billed for my time, and DCPS paid for my time, at an hourly rate between what is commonly known as the "USAO *Laffey* Matrix" rate and LSI *Laffey* Matrix rate.

10. After its formation, Tyrka & Associates billed DCPS for IDEA attorneys' fees for several hundred cases from 2006 through 2008. Those bills all included hourly rates perfectly matching the LSI *Laffey* Matrix rates.

11. On multiple occasions, Quinne Harris-Lindsey, the DCPS attorney responsible for reviewing IDEA attorney fee bills, told me that Tyrka & Associates bills were "clean" and reliable.

12. On two occasions, DCPS settled large groups of Tyrka & Associates' bills. In one of those settlements, DCPS paid the firm 99.9% of what was billed, after applying the "fee cap" of $4,000 per case, and in the other settlement DCPS paid 91% of what was billed after applying the "fee cap."[1] That is, DCPS settled all of the bills at those rates, including those bills which did not exceed the fee cap, so the fee cap did not limit the ultimate payment and thus did not impact settlement.

13. From July 2007 through December 2008, Tyrka & Associates submitted bills regarding 232 IDEA administrative cases to DCPS.

14. In February 2008, my firm and DCPS settled the bills for 34 of those cases. DCPS later made payment pursuant to that settlement.

---

[1] Prior to 2009, federal law prohibited the District of Columbia from paying attorneys' fees for IDEA cases in excess of $4,000 per case. *See, e.g., Calloway v. Dist. of Columbia*, 216 F.3d 1, 4 (D.C. Cir. 2000).

3

15. In September of 2008, DCPS sent to me a document identified titled "Settlement Agreement" regarding 63 of the remaining 198 cases. I immediately signed and returned the document to DCPS, but DCPS never made payment pursuant to that document, despite numerous inquiries.

16. After DCPS' payment pursuant to the February 2008 settlement, DCPS did not issue any other payment regarding any of the 198 bills until April 15, 2009.

17. From April 15, 2009 through July 8, 2009, DCPS made partial payment toward 38 of the 198 bills.[2]

18. On July 14, 2009, most of my firm's clients involved in the 198 unsettled bills filed suit for the costs and fees itemized in most of those bills. As of that time, the District had made no payment at all toward 160 of the unsettled bills, each of which had been submitted to DCPS from seven to seventeen months before that time.

19. From July 14, 2009 through November 4, 2009, DCPS made partial payment toward 53 of the 198 unsettled bills.

20. DCPS made no other payment toward the 198 bills until June 2011. As of that time, DCPS had made no payment at all toward 107 of the 198 unsettled bills.

21. In June 2011, DCPS made partial payment toward 34 of the bills in litigation.

22. Following the June 2011 payment, DCPS had fully paid none of the 198 unsettled bills, had made partial payment toward 125 bills, and had made no payment at all toward the remaining 73 bills, all of which had been submitted to DCPS from 2.5 to 4 years before that time, 65 of which had been in litigation for almost two years.

---

[2] I use the word "partial" because DCPS did not pay the bills in full. DCPS later stated that it considered the payments to be full and final in each case.

4

23. An accurate chart of the facts of the several preceding paragraphs is as follows:

| Date | Event | settled | partially paid | no payment |
|---|---|---|---|---|
| July 07- Dec 08 | 232 bills submitted | 0 | 0 | 232 |
| Feb 08 | 34 bills settled | 34 | 0 | 198 |
| Sep 08 | offer and acceptance re 63 bills, no payment | 34 | 0 | 198 |
| April 09- July 09 | partial payment of 38 bills | 34 | 38 | 160 |
| July 09 | fee litigation begun | 34 | 38 | 160 |
| July 09- Nov 09 | partial payment of 53 bills | 34 | 91 | 107 |
| June 11 | partial payment of 34 bills | 34 | 125 | 73 |

24. Because none of the bills was ever paid in full, my firm's clients did not withdraw any of their fee claims. Approximately 142 of the fees cases begun by me in 2009 remain in litigation, without final resolution of the amounts due, despite my prosecution of those claims, including a motion for contempt.

25. In January 2009, Quinne Harris-Lindsey, the DCPS attorney responsible for reviewing and approving IDEA attorney invoices, informed me that DCPS would no longer negotiate settlements of IDEA attorneys' fees. In September 2009, in a deposition under oath, Ms. Harris-Lindsey stated that DCPS had stopped negotiating IDEA attorney fee settlements on October 1, 2008 at the latest.

26. In the fall of 2009, a District of Columbia attorney opposing me in a suit related to IDEA attorney fees told me that DCPS intended not to pay any bill from my firm while the firm was involved in any litigation with DCPS over any attorneys' fees.

5

27. With only a few exceptions, DCPS had made no payments to my firm since June 2011 except as ordered by a court. The few exceptions were payments made pursuant to the settlement of fees after the substantive litigation of IDEA cases.

28. In 13 cases, I have had to file for contempt or threaten to do so after months of failure by the District to comply with fee orders won in litigation.

29. Before 2011, on those occasions when DCPS made partial payment on a bill before being ordered to do so, on average it paid approximately one-third of the amount originally billed.

30. In fewer than 15 instances in the last nine years, DCPS has sent me an offer to settle all issues in an administrative IDEA case, including attorneys' fees. In those offers DCPS has never offered more than $5,000 in fees, and has repeatedly offered $0 in fees. From many conversations with many parent attorneys, I understand that DCPS much more frequently sends other parent attorneys settlement offers in IDEA administrative cases, but that those offers similarly never contain fees exceeding $5,000.

31. From my long experience reviewed above and my regular communication with many other parent attorneys, I have concluded that 1) it is a waste of time to seek fee reimbursement from the District before filing suit; and 2) parents and lawyers should expect to wait for reimbursement a minimum of 18 months and often several years from the date substantive work begins.

32. In 2005, the DCPS attorney then responsible for reviewing and approving IDEA attorney fee invoices told me that my partner and I represented the students in approximately 10% of all administrative IDEA cases in the District.

33. Through 2005-2008, my firm maintained a client list of approximately 300, and filed more than 200 administrative complaints on behalf of indigent clients each year.

34.     During the years 2005-2009, I was very familiar with the identities of lawyers specializing in parent-side IDEA work in the District of Columbia. During those years, Brown & Associates was the largest such firm by a wide margin, and my firm was the second or third largest.

35.     Through 2005-2008, because negotiated fees with DCPS were fairly reliable and because my firm had a substantial staff as a result, my firm operated much like a public interest organization. The firm assisted our clients in all ways related to special education, without regard for eventual compensability of individual activities.

36.     In 2009, having received no payments from DCPS in more than a year, I laid off my firm's entire staff and closed the firm's offices. Since that time, I have functioned primarily as a solo practitioner, with no full-time associates and no full-time paralegal or clerical help.

37.     In the years since March 2009, I have necessarily prioritized all my work according to expected income. This has meant that I give potential IDEA administrative cases from non-paying clients the lowest priority, though I often would prefer to do more of that work because the students of indigent parents tend to have much greater need of help. When working for a richer client, the difference between winning and losing is usually the difference between the parents paying for services or getting them for free; when working for a poorer client, the difference between winning and losing is always the difference between the student getting necessary services or not getting them.

38.     In the years since March 2009, my firm has filed fewer than 70 IDEA administrative complaints total for clients without the means to pay the firm, after filing hundreds per year total in the preceding several years. In that time, I have turned away many potential clients, all of them non-paying clients with IDEA cases; I have not turned away any paying clients in that time.

7

39. In estimating the likely return for possible work, I put the lowest estimate on work for non-playing clients with IDEA cases for many reasons, including the following: the District's refusal to negotiate fees in good faith and at a reasonable rate; the necessity of litigation for fees; some judges regularly awarding hourly rates of 75% of the rates in the USAO fees matrix; the chance of losing the cases and obtaining no fee; the inability to recover fees for unsuccessful claims and theories; the inability to recover fees for many hours of necessary work, including work in attending necessary meetings; the possibility of judges cutting time entries for various reasons; the inability to recover expert witness costs; the very long wait for fees through litigation; the unpleasant nature of fee litigation work; and the general inconsistency and insecurity of income earned in that way.

40. On several occasions I have been asked to give advice to lawyers beginning a practice focusing on IDEA work for non-paying clients. I consistently tell them that to account for likelihood of success, cuts to work performed, the inefficiencies of working for oneself, and the range of hourly rates awarded, they should expect their effective hourly rate for every hour worked to be approximately 25% of their USAO fees matrix rate, such that a hard-working lawyer in her third year out of school working (not billing) 2000 hours in a year should expect to earn approximately $130,000 at current rates. I also tell them that recovery of any money will require litigation, that at a minimum there will be no recovery until 18 months from the start of the work, and that recovery may take several years. In sum, I tell them that if they work hard they should expect to earn nothing for 2 years, then an inconsistent and insecure income according to the calculations above, with likely periods of several months or more with no income, with no health insurance, no paid leave, and double payroll taxes.

8

41.  I have known many IDEA parent lawyers for many years, including some who work primarily for non-paying clients. I closely watch IDEA fee litigation in this jurisdiction. From my experience running a small firm, from my conversations with other lawyers, and from my close watch of fee litigation I believe that with the sometime application of "75% USAO rates," it is impossible to maintain a practice in which a large portion of the work is IDEA work for non-paying clients. By "maintain," I mean "consistently cover expenses and earn a profit to support a reasonable professional income in this area."

42.  I do not know any lawyer in this jurisdiction supporting a family on IDEA work for non-paying clients. I myself would never attempt to support my family on that work. In the current climate, I can only afford to do any IDEA work for non-paying clients because my wife has a good income and health insurance. Were that not the case, I would likely forgo all work for non-paying clients, and change fields of law if necessary.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 1/8/18

Douglas Tyrka

10