# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DL, *et al.*, on behalf of themselves and all others similarly situated,<br>    Plaintiffs,<br>        v.<br>DISTRICT OF COLUMBIA, *et al.*,<br>    Defendants. | Civil Action No. 05-1437 (RCL) |

## STATEMENT OF INTEREST OF THE UNITED STATES

An accurate matrix that is supported by reliable, unbiased evidence can simplify and expedite fee litigation. *See Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995). Yet in this District, and as evidenced by this case, it has become common for a fee request to do just what the Supreme Court warned against in *Hensley v. Eckerhart*, 461 U.S. 424 (1983) – "result in a second major litigation." *Id.* at 437. The dispute in these fee matrix cases tends to focus on the appropriate inflation index, rather than on the reliability and absence of bias in the base rates themselves. The current trend is also to include with each fee request documents purporting to create a completely new market rate survey.

The United States respectfully submits this Statement of Interest, pursuant to 28 U.S.C. § 517, to provide the Court with its position on the Plaintiffs' pending motion for attorney's fees. Although not a party, the United States has an independent interest in this suit given that it may be held liable for reasonable attorney's fees under statutory fee-shifting provisions akin to the one at issue here. *See Eley v. District of Columbia*, 793 F.3d 97, 100 n.2 (D.C. Cir. 2015) (fee-shifting statutes are generally to be interpreted alike). Moreover, the U.S. Attorney's Office for the District of Columbia ("USAO-DC") has, since 1982, maintained fee matrices that it uses to evaluate requests for payment under statutes that permit prevailing plaintiffs to recover reasonable fees from the Government, and those matrices have also been used in other jurisdictions and contexts. The United States has a compelling interest in facilitating proper

application of the matrices that the USAO-DC has developed, and in explaining, and thereby encouraging legally correct implementation of, reasonable hourly fee matrices in general, even where the United States is not party to a particular case, as decisions in such cases "may affect the interests of the United States government in future federal attorneys' fees litigation." Minute Order, *Eley v. District of Columbia*, No. 11-309 (BAH) (D.D.C. June 8, 2016) (denying motion to strike statement of interest of United States in local IDEA suit and "consider[ing] the views of the United States" offered pursuant to 28 U.S.C. § 517).

As shown below, the USAO-DC fee matrices, which have fairly and efficiently resolved rate disputes in this District for decades, are supported by reliable, unbiased evidence. By contrast, the evidence supporting the so-called LSI Matrix, under which Plaintiffs here seek fees, is neither reliable nor unbiased. Nor is Plaintiffs' market survey.

## BACKGROUND

Although this case presents many issues on the determination of a "reasonable attorney's fee," the United States herein addresses only the question of which of the hourly rate matrices identified by the parties should be applied in complex federal litigation in this District. The first two were developed by the USAO-DC. The third was developed by a party seeking to recover fees. Each matrix has two distinct components: i) base hourly rates, and ii) an inflation index.

    **1.** "*Laffey* **Matrix**": USAO-DC developed the so-called *Laffey* Matrix to set hourly rates for the years between June 1, 1981, and May 31, 2015. The *Laffey* Matrix was based on the hourly rates allowed by this Court in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985). Those base rates were supported "with a barrage of data, including twenty-five attorney affidavits secured specifically for this litigation, information gleaned from

affidavits filed in other cases, and fee data reflected in previous judicial decisions." *Id*. at 372.

Because the original hourly rates used in the *Laffey* Matrix were based on the prevailing market rates in the District of Columbia in 1981-82, they have been adjusted for later years to reflect the change in the costs of living for the Washington, D.C. area during the previous year, using the Consumer Price Index for All Urban Consumers (CPI-U) for Washington-Baltimore, DC-MD-VA-WV, as announced by the Bureau of Labor Statistics for May of each year. *E.g.*, https://www.justice.gov/usao-dc/civil-division (*Laffey* Matrix 2014-15); *see Eley*, 793 F.3d at 101. "Due to its widespread acceptance," this matrix has been called "'the benchmark for reasonable fees in this Court.'" *Miller v. Holzmann*, 575 F. Supp. 2d 2, 18 n.29 (D.D.C. 2008) (Lamberth, J.) (quoting *Pleasants v. Ridge*, 424 F. Supp. 2d 67, 71 n.2 (D.D.C. 2006)); *accord Univ. Legal Servs. Prot. & Advocacy, Inc. v. Knisley*, 2006 WL 3623695, at *6 (D.D.C.) (*Laffey* Matrix "is the preferred method for calculating the awardable fee used in this Circuit").

    **2.**    "**USAO Matrix**": Using more current attorney's fee rate information, the USAO-DC developed a new matrix for use after June 1, 2015.[1] Called the "USAO Matrix," it is distinct from the *Laffey* Matrix, because it is based on different data and employs a different inflation index. Specifically, its base hourly rates were calculated using statistically significant samples of average hourly rates for 2011 in survey data for the D.C. metropolitan area, as reported in ALM Legal Intelligence's 2010 & 2011 Survey of Law Firm Economics ("SLFE").[2] The SLFE is a

---

[1] The United States does not oppose application of the USAO Matrix methodology to earlier periods. Similarly, it does not oppose application of the *Laffey* Matrix methodology to periods after May 2015. The USAO-DC, however, has not issued a USAO Matrix for periods prior to June 1, 2015, nor is it issuing *Laffey* Matrices for periods after May 2015. *See* https://www.justice.gov/usao-dc/civil-division (USAO Matrix 2015-2017) at n.5.

[2] ALM provides news and information for the legal market. http://www.almlegalintel.com/AboutUs.aspx. Its "Survey of Law Firm Economics contains one of the most complete, accurate, and up-to-date sets of economic statistics and financial data available about law firms," including

statistical analysis of "hundreds of lawyers in the Washington, D.C. area" that incorporates specific safeguards to ensure its survey results are sufficiently reliable, including (among other things) thresholds for acceptable sample sizes. Decl. of L. Malowane ¶ 14 (ECF No. 554-11) (filed Feb. 11, 2017). The USAO Matrix employs the Producer Price Index-Office of Lawyers (PPI-OL) index to adjust for inflation rates for years after 2011. https://www.justice.gov/usao-dc/civil-division (USAO Matrix 2015-2017). The USAO-DC anticipates periodically revising the USAO Matrix as more recent, reliable survey data becomes available. *Id.* n.8.

  **3.** "**LSI Matrix**": A third matrix was developed based on rates designed in 1989 by attorney Joseph Yablonski for his own use in *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc) ("*SOCM*"). Although Mr. Yablonski's fee demand in *SOCM* was settled without any decision on the validity of his matrix, he offered it for use in a later case, *Broderick v. Ruder*, No. 86-1834 (D.D.C.), but it does not appear that the Court endorsed its use there, either. Years later, an expert witness in *Salazar v. District of Columbia*, 123 F. Supp. 2d 8 (D.D.C. 2000), adjusted Mr. Yablonski's base rates using the Legal Services Index ("LSI") component of the Consumer Price Index. The resulting inflation-adjusted matrix was accepted by the Court (albeit without considering the validity of the base rates), and became known as the "*Salazar*" or "LSI" Matrix. This matrix normally results in fee awards 25-30% higher than the corresponding fee awards produced by the two matrices prepared by USAO-DC, a difference principally attributable to the wide disparity in base rates – not the marginal differences produced by the various inflation indices applied.

---

billing rates. http://www.lawcatalog.com/productdetail/16690/survey-of-law-firm-economics?slreturn=20170426190020/. *See also infra* note 6.

4

Courts and litigants have used varying terminology to refer to the above three matrices. Indeed, Plaintiffs mischaracterize the LSI matrix as an "update" of the *Laffey* Matrix, suggesting that the only difference between the *Laffey* Matrix and the LSI Matrix is the inflation index used over the years to update the hourly rates. Pl. Mem. at 6, 12, 14 n.16. Because the Yablonski-provided base rates used in the LSI Matrix are wholly distinct from the base rates approved in *Laffey*, and in fact were intended to replace them, this Statement avoids the misleading term "LSI *Laffey* Matrix."[3] As a factual matter, there is nothing "*Laffey*" about the rates Plaintiffs seek. While "*Laffey*," "USAO" and "LSI" all connote matrices purporting to establish prevailing market rates for legal services in the District of Columbia, that is where their similarities end.

## ARGUMENT

### I. THE LSI MATRIX IS NOT BASED ON RELIABLE AND UNBIASED EVIDENCE OF PREVAILING DISTRICT OF COLUMBIA MARKET RATES

Plaintiffs request a fee award based on the LSI Matrix rate for 2016-2017. Assuming *arguendo* those are the relevant years,[4] this Court should decide whether to apply the USAO Matrix, the LSI Matrix, or some other method to determine the appropriate hourly rates. To that end, it is useful to dispel a common misunderstanding surrounding the competing matrices.

As noted, each matrix has *two* distinct and independent components: a set of market rates for a base period, and an index by which those rates are adjusted annually for changes in the cost of living. While the United States believes that the *Laffey* and USAO Matrices are superior to

---

[3] Some courts refer to an "LSI adjusted Laffey Matrix," which suggests that "Laffey" has come to represent a fee matrix the way "Kleenex" has come to mean a facial tissue. However, the term "*Laffey* Matrix" properly applies (only) to the matrix based on the base rates validated in *Laffey v. Northwest Airlines, Inc.*, which was updated each year until 2015 by the USAO-DC.

[4] Because in most contexts fees assessed against the United States cannot be awarded at current rates to account for delay, *Library of Congress v. Shaw*, 478 U.S. 310, 322 (1986); *accord* Pl. Mem. at 25 & n.27, the United States takes no position on the parties' dispute as to whether current rates should be used to calculate the award against the District of Columbia in this suit.

5

the LSI Matrix in both regards, the United States is more concerned with the base rates chosen for the respective periods, which alter the outcomes dramatically, than with the inflation indices used, which only incrementally affect outcomes. *E.g.*, Decl. of M. Kavanaugh ¶ 25 (ECF No. 537-27) (filed Sept. 28, 2016) (Plaintiffs' expert recognizing that the LSI and USAO Matrices use "nearly identical" inflation indices). Despite the base rates' vast difference, the cases upon which Plaintiffs rely, in particular the *Salazar* decisions, focus on which inflation index to use to update the data from prior years, and do not at all examine the reliability of the base rates of the competing matrices. *See, e.g., Salazar*, 809 F.3d at 64; *Salazar*, 30 F. Supp. 3d at 51; *Citizens for Responsibility and Ethics in Washington ["CREW"] v. Dep't of Justice*, 80 F. Supp. 3d 1, 3 (D.D.C. 2015); *Makray v. Perez*, 159 F. Supp. 3d 25, 54-55 (D.D.C. 2016).[5] We do so below.

### A. The Base Rates Supporting the LSI Matrix Are 28-Years Old

The importance of contemporaneous data in establishing base rates cannot be overstated, as Plaintiffs' own expert has previously confirmed. *See* Decl. of M. Kavanaugh ¶ 23 in *CREW v. Dep't of Justice*, No. 11-0754 (D.D.C. filed Dec. 20, 2013) (ECF No. 55-11) ("the more contemporary the observation, the less possibility exists for forecasting error"; an hourly attorney's fee matrix "is more likely to be a more accurate estimate of current rates [if] it utilizes the more recent observations"). However, he conspicuously omits that fundamental point from his declaration in this suit, despite his acknowledgment that the base rates that underlie his

---

[5] The *dicta* Plaintiffs rely on (at 25 n.28) from a 1989 footnote in *Trout v. Ball*, 705 F. Supp. 705 (D.D.C. 1989), merely observes that the hourly rate sought by the special master in that case was lower than the hourly rate for litigators in Yablonski's then newly-created matrix, which later evolved into the LSI Matrix. *See id*. at 709 n.10 & accompanying text. *See also Eley*, 999 F. Supp. 2d at 150-56 (comparing inflation indices without considering methodology or reliability of base rate surveys); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 15-18 & n.29 (D.D.C. 2008) (Lamberth, J.) (comparing metropolitan D.C. Consumer Price Index ("CPI") with legal services sub-component ("LSI") of broader, national CPI) (compiling cases).

6

preferred LSI Matrix are decades old. *See* Kavanaugh Decl. ¶ 3 (ECF No. 537-27).

Indeed, the base rates in the Yablonski declaration are at least 28 years old. Relying on any base rates for multiple decades presents a significant potential for forecasting error, particularly since an error in any one year will have a compounded effect, as each year's data serves as the basis for calculating rates for the next year. Malowane Decl. ¶ 12. Because the USAO Matrix is based on data that is only 6 years old, there is substantially less risk that the forecasting errors inherent in an index will significantly impact a rate calculation for 2016-2017. *See Clemente v. FBI*, No. 08-1252 (BJR) (D.D.C. Mar. 24, 2017), slip op. at 9-10 (applying USAO Matrix, as it is "based on much more current data than the *Salazar* Matrix"). Moreover, the LSI Matrix has no mechanism to correct such forecasting errors: unlike the USAO Matrix, which is based on 2011 (*i.e.*, much more recent) data that will be refreshed as new data becomes available, the LSI Matrix base rates have never changed, and there is no established means by which they ever will. This is important, for "[t]he more years [a] matrix continues without updating its original data source, the more previous years' forecasting errors may be compounded." Malowane Decl. ¶ 12.

**B. The Base Rates Supporting the LSI Matrix Are Unreliable and Biased**

Unlike the rates in the *Laffey* Matrix, which are based on "a barrage of data" approved by the Court in *Laffey*, 572 F. Supp. at 372, the LSI Matrix rates are based on a six-page declaration by a single plaintiff's lawyer. *See* Decl. of J. Yablonski (ECF No. 537-33) in *Broderick v. Ruder*, *supra* (D.D.C. filed June 2, 1989). As explained above, attorney Joseph Yablonski, who believed the *Laffey* rates were too "conservative," *id.* ¶ 2, devised new ones to support his fee request in *SOCM*, in which he represented the plaintiffs. *Id.* ¶¶ 2, 3. However, as also noted *supra*, he concedes that the fee claim for which he designed his matrix was settled, not decided

7

by a court. *Id.* ¶ 3. And he acknowledges that the rates he proposed were different from, and generated differently than, those embraced by this Court in *Laffey*. *Id.* ¶ 5. In fact, the LSI rates have a wholly separate genesis than those validated in *Laffey* and which underlie the *Laffey* Matrix to this day.

Accordingly, it is not surprising that, while Plaintiffs go to great lengths to discuss the genesis of the base rates underpinning the *Laffey* Matrix, they gloss over the rate survey on which the LSI Matrix is based. Indeed, their expert, Dr. Kavanaugh, does not even address the soundness of the methodology used. As Dr. Malowane notes (at ¶ 15), Mr. Yablonski provides only a very limited description of how his survey was conducted, which makes the "statistical reliability of the data . . . much more tenuous" than the data used in the USAO Matrix.[6] *See*

---

[6] Plaintiffs complain that the ALM/SLFE Study should be disregarded because Dr. Malowane (who purchased it, but did not know whether she could lawfully disseminate it under the copyright laws) wrongly refused to allow them access. Plaintiffs' decision to decline to purchase that information from ALM, however, does not affect its reliability. Indeed, as the study can be purchased from ALM for $1799, *see* http://www.lawcatalog.com/productdetail/16690/survey-of-law-firm-economics?slreturn=20170426190020/ – a pittance relative to the fee award they seek here – Plaintiffs' complaints about access ring hollow.

In all events, the United States has since concluded that the rates themselves may be released based, *inter alia*, on a "fair use" exception. Accordingly, the 42nd Annual Survey of Law Firm Economics data from which the USAO Matrix rates derive are:

**WASHINGTON, D.C. METRO AREA YEARS OF LEGAL EXPERIENCE STANDARD HOURLY BILLING RATES**
**As of January 1, 2011**

| Years of Experience | Number of Offices | Number of Lawyers | RATE | | | | |
|---|---|---|---|---|---|---|---|
| | | | Average $ | Lower Quartile $ | Median $ | Upper Quartile $ | Ninth Decile $ |
| Under 2 Years | 13 | 9 | 252 | 235 | 240 | 278 | -- |
| 2 or 3 Years | 13 | 24 | 279 | 255 | 280 | 323 | 345 |
| 4 or 5 Years | 13 | 34 | 288 | 210 | 275 | 360 | 383 |
| 6 or 7 Years | 14 | 26 | 294 | 248 | 295 | 328 | 405 |
| 8 to 10 Years | 12 | 30 | 342 | 283 | 315 | 428 | 483 |
| 11 to 15 Years | 14 | 43 | 403 | 325 | 380 | 470 | 582 |
| 16 to 20 Years | 15 | 40 | 447 | 374 | 450 | 524 | 575 |
| 21 to 30 Years | 19 | 83 | 470 | 400 | 459 | 520 | 634 |
| 31 or More Years | 19 | 61 | 503 | 423 | 460 | 600 | 695 |

8

*CREW*, 80 F. Supp. 3d at 5 ("average billing rates vary from survey to survey based on the composition of the participating firms and other factors"); Malowane Decl. ¶ 13 (explaining features of a reliable survey); *id.* ¶ 15 (noting deficiencies of Yablonski's survey); *accord In re Navy Chaplaincy*, 738 F.3d 425, 429, 431 (D.C. Cir. 2013) (emphasizing importance of statistics "control[ling] for potential confounding factors"); *Friends of the Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 826 (8th Cir. 2006) ("relevant factors" of reliable survey results include "[s]ample size, potential for bias, interviewing techniques, reliability of extrapolating data, and poor recollection"); *cf. Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("*Daubert*'s gatekeeping requirement . . . ensure[s] the reliability and relevancy of expert testimony"). Expert evidence "in the courtroom [must employ] the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" of economics. *Kumho Tire*, 526 U.S. at 152.

What Mr. Yablonski does explain is that his survey arose in part from talks with attorneys at seven law firms, Yablonlski Decl. ¶ 5, and in part from two National Law Journal hourly rate surveys. *Id.* ¶ 6. Yet he gives no indication of how the firms he consulted were chosen, how many attorneys he actually discussed fees with, whether he focused his attention on elite firms with correspondingly high billing rates, what effort he made to include firms with lower rates, or whether his rates were otherwise infected with selection bias, given that he developed them as a tool to secure fees for himself. *See* Malowane Decl. ¶ 15. The named attorneys with whom Mr. Yablonski "confirmed the accuracy of his survey" all appear to have been engaged at that time as plaintiff's lawyers, and there is no indication that he consulted even one defense counsel or other person lacking a potential self-interest in the rates he proposed. *See* Yablonski Decl. ¶ 7.

Mr. Yablonski's reliance on 1988 and 1989 National Law Journal ("NLJ") rate surveys, *see id.* ¶ 6, is likewise suspect. As explained in *Blackman v. District of Columbia*, 677 F. Supp.

9

2d 169 (D.D.C. 2010), which rejected a similar attempt to use an NLJ survey to support a fee matrix, "the National Law Journal survey . . . [was] not a scientific study[,] relied on self-reported rates, which firms may reduce in practice, and [] those rates came from the largest and most prestigious law firms, not from a representative sampling of firms." *Id.* at 176.[7] *Accord Heller v. District of Columbia*, 832 F. Supp. 2d 32, 45-46 (D.D.C. 2011) (rejecting 2009 NLJ survey). By contrast, the USAO Matrix is based on survey data more current and reliable than that used in any other fee matrix presented in this case. *See* Malowane Decl. ¶ 14 (describing methodology of ALM survey, which provides figures only "if there is sufficient data to assure its accuracy"); *id.* n.7 (detailing numbers of data points needed for statistics to be offered by ALM).

Moreover, the recent survey data upon which the District's expert relies demonstrates that the USAO Matrix is a far better measure of the actual market than is the LSI Matrix. In particular, Dr. Malowane's Declaration establishes that the base rates in the USAO Matrix are consistent with the top 10% of the national litigation billing rates for 2014 (as derived from the 42nd Annual Survey of Law Firm Economics).[8] *Id*. ¶ 17 & Table 2. The LSI Matrix significantly exceeds this level. *Id.* For example, under the LSI Matrix, an attorney with 21 years' experience would have a rate of $796, which represents an increase of approximately 25% over the top 10% of the national litigation billing rates for 2014, which is $568. *Id.* What this comparison shows is that, even though the USAO Matrix rates may be lower than the LSI rates, the USAO Matrix rates nevertheless are generous in providing top-decile compensation relative

---

[7] Plaintiffs claim (at 28-29 n.32) that the rates sought in *Blackman* were based on the LSI Matrix and not an NLJ survey, but the decision confirms that the requestor "created its own matrix for its billing rates [and] support[ed] this calculation of rates with survey data from the National Law Journal for the District of Columbia and with declarations." 677 F. Supp. 2d at 176.

[8] Plaintiffs sometimes insist that fee information must be specific to the District of Columbia, Pl. Mem. at 19, but other times insist that, for complex federal litigation, Washington D.C. is a national market, not a local market. *Id.* at 12-13 n.15.

10

to actual national market rates. Indeed, in *CREW* the Court relied in part on a similar analysis by Dr. Malowane to hold that the LSI Matrix rates were excessive. 142 F. Supp. 3d at 21.

## II. THE DATA COLLECTED BY PLAINTIFFS IS NEITHER RELIABLE NOR UNBIASED

Apparently recognizing the insufficiency of the underlying Yablonski data, Plaintiffs offer other data in an effort to demonstrate that the hourly rates produced by the USAO Matrix are "significantly below" average market rates for complex federal litigation in Washington, D.C., and thus should not be applied. A summary of the data Plaintiffs collected appears in a chart captioned "Comparison of LSI Matrix, USAO Matrix 2015-2017, USAO Laffey Matrix, and Washington, D.C. Market Rates Data for 2015-2016." *See* Pl. Ex. 48. As explained below, while this data appears to reflect the hourly billing rates of 24 District of Columbia law firms for the past two years, the absence of critical information renders it impossible to determine whether those firms accurately represent the market, as opposed to a group hand-picked by Plaintiffs to prove their point. And while the data purports to be for complex federal litigation, no explanation is offered of what qualifies as sufficiently "complex."

In its brief (at 15-27), the District thoroughly addresses the methodological problems with Plaintiffs' market analysis and we will not catalog them here. *See also* Malowane Decl. ¶ 16 (noting *inter alia* that Plaintiffs' proffered sample sizes are so small that they would not have been deemed by the SLFE to be "statistically reliable," thus no billing rates would have been offered based on such limited data). But to highlight some of the most serious flaws:

**a. Plaintiffs' Data Reflect Only The Highest Billing Rates, Primarily from Fee Applications in Bankruptcy Cases.** The data for 15 of the 24 firms are taken from Westlaw Legal Billing Reports (attached as Pl. Exs. 43-45; *see* footnotes to Ex. 47), and consist of bankruptcy fee applications submitted by firms that appear to be located (at least in part) in D.C.

11

Aff. of B. Terris ¶ 88 (ECF No. 537-1). Yet bankruptcy cases (which have no opposing party or paying client to seek the customary discounts) have the highest billing rates of all litigation specialties. Malowane Decl. ¶¶ 19-20, 37 & Table 3. *Accord* Decl. of W. Christensen (ECF No. 554-12) ¶ 22; *CREW*, 142 F. Supp. 3d at 19 ("That attorneys litigating bankruptcy cases charged [a given rate] does not prove that this rate is in line with the prevailing rate for complex federal litigation, generally."). Thus, much of the evidence Plaintiffs offer does not appear to accurately represent market rates for complex federal litigation outside the bankruptcy specialty submarket.

**b. Plaintiffs use data from other States as evidence of the D.C. market.** For example, one of the firms marked as "DC" is Pachulski Stang Ziehl & Jones LLP, which does not even have a D.C. office. http://www.pszjlaw.com/about.html. Apparently, it is included because the specific attorney named in the report happens to be admitted in D.C. (as well as Delaware), although he is listed as working exclusively in Delaware, http://www.pszjlaw.com/attorneys-michael-r-seidl.html, and the matter listed was litigated in, and the fee petition filed in, bankruptcy court in Delaware. *See* ECF No. 537-45 at 7. A Delaware firm's application for a $675 hourly fee in a Delaware bankruptcy proceeding is not evidence of D.C. market rates.

**c. The data excludes lower billing rates.** For example, it excludes the rates for all practitioners with titles other than "partner" or "associate," for no apparent reason and with no explanation. The District discusses (at 17) this systematic exclusion of more moderate rates.

**d. The firms in Plaintiffs' chart are mostly large firms.** The Court properly has rejected rates that do not arise from "a representative sampling of firms." *Blackman*, 677 F. Supp. 2d at 176; *Heller*, 832 F. Supp. 2d at 45 (rates charged by the largest law firms do not determine prevailing market rates for complex federal litigation in the District); *Eley*, 793 F.3d at 105 (rejecting view that "lawyers in the largest law firms automatically set the prevailing market

12

rate").[9]  As explained below, large national firms tend to have nominal billing rates at or near the top of the market, regardless of whether they actually recover such rates.  *See CREW*, 142 F. Supp. 3d at 18; *Heller*, 832 F. Supp. 2d at 45; *see also* Christensen Decl. ¶ 13 (comparing a firm's reported billing rate to the "rack rate" posted by a hotel that often is not recovered).

**e. Plaintiffs' Data Fail to Account for the Difference Between Claimed and Actual Billing Rates.**  None of the Plaintiffs' declarations speaks to the amount of fees actually "received," *see Eley*, 793 F.3d at 104; instead, they focus almost entirely on amounts billed or nominally charged.  *See* D.C. Br. at 24 (listing affidavits); *see also* Georgetown Law Center, 2017 Report on the State of the Legal Market (Ex. 13 to D.C. Br.) at 6 ("Like 'rack rates' in hotels, standard rates in law firms have effectively become nominal rates that are arbitrarily set and are almost never paid by any significant client."); *cf.* Christensen Decl. ¶¶ 13-23.  Indeed, Dr. Malowane concludes (Decl. ¶¶ 42-45) that reliance on "billing" versus "actual" rates is not merely inappropriate, it is "misleading."  *See also CREW*, 80 F. Supp. 3d at 5 (noting that clients rarely pay standard billing rates for a host of reasons).  Because these rates have little bearing on the amounts actually recovered, and merely represent the amounts that firms aspire to, Plaintiffs fail "to demonstrate that [their] suggested rates [are] appropriate."  *Eley*, 793 F.3d at 105 (plaintiffs bear the burden of demonstrating the reasonableness of their rates).

---

[9]  Plaintiffs attempt to characterize (and thereby discount) the holding in *Heller* as precluding small firms from receiving market rates.  However, the point of *Heller* is not that a small or public interest firm should receive lower rates, only that such firms generally do – and that fact must be taken into account when determining the prevailing market rate.  These are two discrete issues, and the reasons for the former are irrelevant to the latter.  *Compare CREW*, 142 F. Supp. 3d at 18, 22 (evidence rebutted "proposition that rates are comparable across firms of all sizes such that the average rate at the biggest firms should be taken as the prevailing rate more generally") *with Judicial Watch, Inc. v. Bureau of Land Mgmt.*, 562 F. Supp. 2d 159, 175 (D.D.C. 2008) (Lamberth, J.), *rev'd on other grounds*, 610 F.3d 747 (D.C. Cir. 2010) (attorney who charges discounted rate for public-spirited reasons may receive fee award at market rates).

13

**f. Nominal, but seldom charged, billing rates from firms that principally rely on fee awards or contingencies are not reliable indicators of market rates.** Of the nine firms identified in Plaintiffs' Exhibit 47 that are included based on declarations (rather than Westlaw Legal Billing Reports), two have rates closer to the USAO Matrix than to the LSI Matrix. The others, however, rely on fee awards or contingencies for the bulk of their income. While those firms' declarations assert instances in which counsel have charged the same rates as the LSI Matrix, they notably do not contend that such rates are a normal part of their firms' income streams; in fact, they show the opposite. *See National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1326 (D.C. Cir. 1982) (emphasizing that market rates cannot be based on what attorneys receive in a "single fortunate case"). The District's examination of these declarations individually (at 23-24 of its brief) convincingly demonstrates this point.

**g. Plaintiffs' Data Fails to Account for the Common Practice of Discounting Rates.** Plaintiffs' independent "market data" also fails to account for the discounts and other measures that reduce a firm's actual, realized fees to rates less than their nominal, declared hourly rates. According to a 2015 study, "21% to 30% of all law firm fees come from discounted rates, and [] for larger firms (defined as 250 or more lawyers), discounted fees represent 31 to 40% of total fees." Malowane Decl. ¶ 44; *see also* Christensen Decl. ¶¶ 13-23. Even in *CREW*, where Judge Cooper awarded fees based on the LSI Matrix, the court imposed a percentage reduction to account in part for the fact that billing rates are frequently discounted by firms. 80 F. Supp. 3d at 5 (recognizing "the differences between reported rates and actual law firm billing realization").

All of these factors reinforce the conclusion that Plaintiffs' data is unreliable, self-serving, and overstates market rates. Not only have Plaintiffs thus not met their burden of proof, but the District has successfully demonstrated that the proposed rates are unreasonably high.

14

## III. THE COURT SHOULD NOT MAKE THE PERFECT THE ENEMY OF THE GOOD

While no fee matrix is "unassailable," *CREW*, 142 F. Supp. 3d at 21, such matrices are an accepted, practical "starting point," *Covington*, 57 F.3d at 1109, for determining hourly rates to satisfy the requirements of fee-shifting statutes. And, while the burden of proof to demonstrate a reasonable hourly rate falls on the fee requester, *Eley*, 793 F.3d at 100,[10] the United States nonetheless has demonstrated herein that the USAO Matrix is properly regarded as the benchmark for hourly billing rates for complex federal litigation in this jurisdiction. It is "adequate to attract competent counsel, [yet] does not produce windfalls to attorneys," *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010); it reflects prevailing rates in the community for similar services, *Covington*, 57 F.3d at 1109; and it is methodologically sound, unbiased, and avoids "a second major litigation." *Hensley*, 461 U.S. at 436-37. Both the LSI Matrix and Plaintiffs' market analysis, by contrast, are biased and unreliable, contain unreasonably high rates, and provoke further litigation to resolve fee claims.

## CONCLUSION

For these reasons, the United States agrees with the District of Columbia that the USAO-DC's fee matrices, and not the LSI Matrix or Plaintiff's own market survey, should determine the hourly rates in this proceeding. Further, regardless of which inflation index is applied, the reliable and unbiased base rates that underlie the USAO Matrix should serve as their foundation.

Dated: April 27, 2017　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　CHANNING D. PHILLIPS, D.C. Bar # 415793
　　　　　　　　　　　　　　　　　　United States Attorney for the District of Columbia

　　　　　　　　　　　　　　　　　　DANIEL F. VAN HORN, D.C. Bar # 924092
　　　　　　　　　　　　　　　　　　Chief, Civil Division

　　　　　　　　　　　　　　　　　　By:　/s/ *Peter C. Pfaffenroth*

---

[10] Indeed, correctly applying that burden here, Plaintiffs would be entitled even to the USAO Matrix rates only because the District of Columbia has conceded their application in this case.

15

PETER C. PFAFFENROTH, D.C. Bar # 496637
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
(202) 252-2513
peter.pfaffenroth@usdoj.gov

*Attorneys for the United States of America*