**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANISSA JONES,<br>mother of the minor child D.M., | |
| Plaintiff, | Civil Action No. 15-cv-01505 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Anissa Jones, seeks attorney's fees and costs, totaling $87,738.93, pursuant

to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(3)(B)(i)(1),

from the defendant District of Columbia ("the District") for her counsel's services over thirty

months, from November 2014 through June 2018, in preparing for, substantially prevailing at,

and implementing relief granted by a due process administrative proceeding, as well as

implementing additional relief awarded in the plaintiff's successful appeal in this Court.  Pl.'s

Mot. Atty's Fees & Costs ("Pl.'s Mot."), ECF No. 51; Pl.'s Suppl. to Pl.'s Mot. for Atty's Fees

& Costs ("Pl.'s Suppl. Mot."), ECF No. 52.  The parties have already reached a settlement

regarding the amount of attorney's fees incurred litigating the plaintiff's IDEA claims in this

Court, *see* Notice of Settlement, ECF No. 40; Pl.'s Resp. to July 26, 2017 Order to Show Cause

("Pl.'s Resp. OTSC") at 1, ECF No. 42, but the District objects to the hourly rate at which the

plaintiff seeks reimbursement for the remaining fees incurred litigating her IDEA claims

administratively and implementing the relief awarded.

Specifically, the District contends that the reimbursement rate should be, at most, 75% of

the hourly rate provided in the Attorney's Fees Matrix for 2015-2019, prepared by the Civil

Division of the U.S. Attorney's Office for the District of Columbia ("USAO Matrix"), rather than the full hourly rate set out in that matrix, *see* Def.'s Opp'n Pl.'s Mot. Atty's Fees ("Def.'s Opp'n") at 5-18, ECF No. 53, with additional across-the-board reductions, up to complete denial of any fees, because the plaintiff achieved only "partial success" and allegedly protracted the litigation by rejecting the District's settlement offer, *see* Def.'s Opp'n at 18-20.

The Magistrate Judge to whom this matter was referred recommended that plaintiff's motion be granted in part and denied in part, after agreeing with the District's position on the reimbursement rate of 75% of the USAO Matrix, compounded by a further across-the-board reduction of 10% based on the degree of success obtained, and proposing that the plaintiff be awarded a total of $63,191.87 in fees and costs. *See* Magistrate Judge's Report and Recommendation ("Atty's Fees R&R") at 1, 26, ECF No. 55. At the same time, the Magistrate Judge rejected the District's argument that no additional fees should be paid after finding that the District never made a valid settlement offer to the plaintiff. *Id.* at 29-30.

The plaintiff timely filed objections, *see* Pl.'s Objections to the October 23, 2018 Report and Recommendation of Magistrate Judge Harvey ("Pl.'s Obj."), ECF No. 58, which were fully briefed as of January 22, 2019. For the reasons set forth below, the plaintiff's objections to the Magistrate Judge's recommendation are sustained, the plaintiff's motion is granted, in substantial part, and the plaintiff is awarded $87,543.03 in attorney's fees and costs.[1]

## I.    BACKGROUND

---

[1] The plaintiff requested $87,738.93 in attorney's fees and costs, but the amount awarded will be reduced by $195.90 to reflect photocopying costs of $0.15 per page, rather than the $0.25 per page originally sought, *see* Pl.'s Invoice at 20, in accordance with the Magistrate Judge's recommendation, Atty's Fees R&R at 25, to which no objection was raised by either party, Pl.'s Mem. Supp. Obj. to Atty's Fees R&R ("Pl.'s Obj. Mem.") at 3, ECF No. 58-2; *see generally* Def.'s Opp'n; Local Civ. R. 72.3(b) ("The objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for the objection" and "[f]ailure to file timely objections may waive appellate review of a District Court order adopting the magistrate judge's report.").

The plaintiff is the mother of D.M., a District of Columbia Public Schools ("DCPS") student, who is eligible for special education and related services under the IDEA as a child with a disability, Emotional Disturbance ("ED"). Pl.'s Mot., Ex. 1 (Hearing Officer Determination, issued June 22, 2015 ("2015 HOD")) at 1, ECF No. 51-3;[2] *see also* Mag. J. Report & Recommendation, dated Jan. 31, 2017 ("2017 R&R") at 2, ECF No. 30 (granting part of additional relief plaintiff requested in appeal from 2015 HOD). The facts underlying the administrative action and implementation efforts, for which the plaintiff now seeks attorney's fees and costs, have been fully set out in both the 2015 HOD and the 2017 R&R and thus are only briefly summarized below.

### A. First Administrative Action

D.M. was evaluated for various behavioral and learning disabilities as early as 2011 and found eligible for special education under the IDEA in 2012, when D.M. was in the second grade. 2015 HOD at 12 ¶ 33; 2017 R&R at 2. His initial Individualized Education Program ("IEP"), developed in April 2012, required that D.M. be provided with 16 hours per week of specialized instruction outside of general education, plus substantial additional behavioral support services. 2015 HOD at 12 ¶ 35. Although he apparently progressed under that IEP regime, *id.* at 13 ¶ 40, his IEPs were subsequently modified to reduce the hours of special education, *id.* at 14-15 ¶ 49; 2017 R&R at 4-5. By the 2014-2015 school year, when D.M. was in the fifth grade, he was placed in a general education classroom, over the plaintiff's objection, 2015 HOD at 25 ¶ 108; 2017 R&R at 5. D.M.'s behavior began a marked decline reflected by D.M. being aggressive, hyperactive, and disruptive with suicidal ideation. *See, e.g.*, 2015 HOD at 25 ¶¶ 109-118; *id.* at 30 ¶ 144; *id.* at 31 ¶ 149; *id.* at 43 ¶¶ 196-97.

---

[2]     Pincite citations to the 2015 HOD contain both the page number and paragraph since the paragraphs are not numbered sequentially throughout the document.

D.M.'s behavioral decline prompted the plaintiff and her counsel, after counsel's retention in November 2014, to make repeated requests in late 2014 through April 2015 for DCPS to reevaluate D.M. and provide him with additional services, plus a dedicated aid. *See, e.g.*, *id.* at 27 ¶¶ 119-123; *id.* at 33 ¶ 159; *id.* at 40 ¶¶ 180-81; *id.* at 44 ¶ 203. DCPS made no changes to his IEP, *id.* at 34 ¶¶ 163-169; *id.* at 39 ¶ 177, until April 24, 2015, when five hours per week of specialized instruction—far less than the original IEP that had proven successful—and a dedicated aid were added to his IEP, *id.* at 46 ¶¶ 212-213. The dedicated aid was subsequently removed, however, after approximately one month, in May 2015, over the plaintiff's objection, and D.M. was essentially excluded from instruction by being placed with a Spanish teacher when this teacher had no class, the janitor, or another non-teacher adult. *Id.* at 50-51 ¶¶ 236-241.

On the same date of the IEP modification, April 24, 2015, the plaintiff filed a Due Process Complaint ("DPC") under the IDEA, claiming that DCPS denied D.M. a Free Appropriate Public Education ("FAPE") due to several enumerated actions and inactions by D.M.'s school and DCPS. *Id.* at 2. Following a two-day due process hearing, held on June 5 and 15, 2015, *id.* at 4, at which the plaintiff introduced 56 exhibits and presented the testimony of three witnesses, the hearing officer concluded that, as a matter of law, DCPS failed to provide D.M. with a FAPE as required by the IDEA, *id.* at 71 ¶ 50, and ordered, *inter alia*, that (1) D.M.'s IEP be amended to provide that "[a]ll of the Student's academic instruction [] be specialized instruction provided in the outside of general education setting," *id.* at 72 ¶ 1(a); (2) D.M.'s "instruction [] be provided in a small classroom (i.e. not to exceed 12 students), with a low ratio of students to adults," *id.* at 73 ¶ 1(b); (3) D.M. be escorted "[a]t all times during the school day [] in all non-classroom environments," *id.* at 73 ¶ 1(c); (4) the plaintiff inform DCPS

of "which one (1) of the" requested "Independent Educational Evaluations ("IEEs") Petitioner wishes to obtain" and then DCPS "shall issue to [Plaintiff] an IEE letter authorizing [Plaintiff] to obtain the requested IEE," *id.* at 73-74 ¶¶ 3-4; (5) the IEP Team "develop a [behavior intervention plan ("BIP")] for" D.M., *id.* at 74 ¶ 6; and (6) DCPS convene and revise D.M.'s IEP as appropriate, *id.* at 74-75 ¶¶ 6-7.  The 2015 HOD did not grant all the relief requested by the plaintiff, such as placing D.M. at a private school or other appropriate full-time special education program; requiring DCPS to fund multiple, rather than just one, IEEs for comprehensive evaluations comprising psychological, speech/language, occupational therapy, assistive technology and other testing; and requiring more prompt revisions to the IEP.  *Id.* at 6-7.

Despite the 2015 HOD's direction that all of D.M.'s academic instruction be specialized instruction outside of a general education setting, *see id.* at 72 ¶ 1(a), according to the plaintiff, the District "did not do this," and instead, in July 2015, revised D.M.'s IEP to provide only 20, not "all," hours of specialized instruction "in a mainstream middle school," Pl.'s Reply in Supp. Mot. Atty's Fees ("Pl.'s Reply") at 6, ECF No. 54; *see also* Pl.'s Mot., Ex. 2 (Hearing Officer Determination, issued April 29, 2017 ("2017 HOD")) at 13, ECF No. 51-4 (noting "DCPS' failure to provide in his IEP for all academic instruction to be provided outside the general education setting contravened the requirements of the June 22, 2015 HOD").  According to the plaintiff, D.M. "deteriorated so quickly from July 2015 through November 2015" that "in November 2015 DCPS finally agreed to place [him] at … a full time special education school," Pl.'s Reply at 6, as the plaintiff had requested six months earlier at the 2015 due process hearing, when that request had been denied.  Unfortunately, D.M. was expelled from that special education school in the spring of 2016, before the end of the school year, *id.* at 7.

**B.      Federal Suit Seeking Review of 2015 Hearing Officer Determination**

On September 16, 2015, before DCPS acceded to the plaintiff's request to place D.M. in a full-time special education school, the plaintiff initiated this case seeking review of the 2015 HOD.  *See generally* Compl., ECF No. 1.  The Magistrate Judge to whom the case was referred issued a report, dated January 31, 2017, recommending that, in addition to the relief granted in the 2015 HOD, DCPS be further ordered to "(1) fund an IEE of D.M. comprised of as many assessments as necessary to evaluate D.M.'s suspected areas of disability and to determine an appropriate educational program for him, as determined by the independent professional conducting the IEE and consistent with the standards for evaluations prescribed by the IDEA and its regulations; (2) conduct a new FBA [Functional Behavioral Assessment] of D.M.," and (3) "hold an IEP Team meeting to consider the results of the IEE and FBA within 30 days of their completion."  2017 R&R at 38.  Less than one month later, this Court adopted, in full, the recommendations made in the Magistrate Judge's 2017 Report, to which neither party had lodged any objection.  *See* Order, dated Feb. 22, 2017 ("2017 Order") at 2, ECF No. 31.

**C.      Implementation of 2017 Order and Second Administrative Action**

During the pendency of the plaintiff's civil suit, from September 16, 2015 to February 22, 2017, D.M.'s behavioral problems persisted with "significant disruptive behavior and non-compliance," 2017 HOD at 7 ¶ 6, leading to incidents that resulted in his arrest and a hospital admission, *id.* at 8 ¶ 7.  The plaintiff requested a therapeutic residential placement for D.M. in May 2016, *id.* at 9 ¶ 10, but DCPS instead placed D.M. in a therapeutic day school, *id.* at 9 ¶ 11, where D.M. was chronically truant, *id.* at 10 ¶ 14.

On February 17, 2017, shortly before issuance of the 2017 Order, plaintiff filed a second due process complaint seeking "to secure DCPS funding for a residential educational placement" for D.M.  *Id.* at 14.  After a due process hearing on the second due process complaint, held on

April 13, 2017, *id.* at 2, the hearing officer denied, without prejudice, the plaintiff's request for

DCPS to fund a residential placement for D.M. and ordered an independent psychological

assessment "specifically [to] assess Student's need for a residential placement," *id.* at 27. Due to

D.M.'s deterioration "socially, emotionally, academically, and behaviorally," Pl.'s Resp. OTSC

at 2, however, the psychological assessment required under the 2017 HOD and the additional

IEEs and FBA's required under the 2017 Order could not be conducted, *id.* at 3.

In the fall of 2017, a psychologist was able to gather sufficient information to "issue[] a

report recommending placement in a residential school," Pl.'s Pts and Auth. Supp. Pl.'s Mot. for

Atty's Fees and Costs ("Pl.'s Mem.") at 2, ECF No. 51-2, a placement the plaintiff had requested

in May 2016, if not earlier, and reiterated in January 2017, *see* Pl.'s Reply at 7.[3] In November

2017, DCPS agreed to a residential placement for D.M. *See* Jt. Status Rpt. (Jan. 9, 2018) at 1,

ECF No. 45. When D.M. became agitated and non-compliant at the proposed placement,

however, the plaintiff decided to homeschool him. *Id.* In April 2018, the parties scheduled an

IEP meeting, Jt. Status Rpt. (Apr. 10, 2018), ECF No. 48, and in June 2018, the parties advised

that D.M. had begun attending a private school in the Baltimore area, Jt. Status Rpt. (June 6,

2018), ECF No. 50.

Shortly thereafter, the plaintiff filed the pending motion for attorney's fees and costs,

resolution of which would "obviate the need to continue to maintain this action." Jt. Status Rpt.

(June 6, 2018). This is the plaintiff's second motion for attorney's fees and costs, after the

plaintiff's first motion seeking reimbursement for fees and costs incurred in appealing the 2015

---

[3]     In 2015 the plaintiff requested a "Private School or another appropriate full time special education
program," though the record is unclear whether the plaintiff contemplated that this request included possible
placement in a "therapeutic residential school," as plaintiff later specifically requested, in 2016. *See* 2015 HOD at
6-7; 2017 HOD at 9 ¶ 10 (noting that plaintiff requested, in May 2016, "in light of Student's daily struggles, refusal
to cooperate with the school program and oppositional conduct, that Student be placed in a therapeutic residential
school").

HOD in this Court, *see* Pl.'s Mot. For Attorney's Fees and Costs ("Pl.'s First Fee Mot.") at 1 n.1, ECF No. 37, was settled by the parties, *see* Not. of Settlement, ECF No. 40. As noted, the pending motion seeks fees and costs incurred for 30 months of work on the administrative action underlying the 2015 HOD and subsequent implementation of the 2015 HOD and 2017 Order. Pl.'s Mot., Ex. 3 (invoice for professional services charged from Nov. 13, 2014 to June 11, 2018 ("Pl.'s Invoice")), ECF No. 51-5; Pl.'s First Fee Mot. at 1 n.1.

## II. LEGAL STANDARD

When a party objects to a Magistrate Judge's Report and Recommendation, the Court conducts a *de novo* review. *See* FED. R. CIV. P. 54(d)(2)(D); *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 947 (D.C. Cir. 2017) ("[W]e join a number of our sister circuits in requiring that motions for attorney's fees be reviewed *de novo* if referred to a Magistrate Judge and properly objected to."). The IDEA provides that "the court, in its discretion may award reasonable attorneys' fees … to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i). Attorney's fees under the IDEA are not limited to time spent in, and preparing for, adversarial proceedings alone. "Rather, an attorney can recover for work when there is 'a clear showing that the time was expended in pursuit of a successful resolution of the case in which fees are being claimed.'" *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 735 F. App'x 733, 736 (D.C. Cir. 2018) (per curiam) (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1335 (D.C. Cir. 1982)).

Although the "IDEA provides relatively little guidance to either the courts or litigants regarding how, precisely, these 'reasonable attorneys' fees' are to be calculated," *Reed v. District of Columbia*, 843 F.3d 517, 520 (D.C. Cir. 2016), the statute requires that such fees must be "based on rates prevailing in the community in which the action or proceeding arose for the kind

and quality of services furnished," 20 U.S.C. § 1415(i)(3)(C), and disallows any "bonus or multiplier," *id.* In addition, the statute authorizes "courts to reduce awards of attorneys' fees if they 'unreasonably exceed[] the hourly rate prevailing in the community for similar services by attorneys of reasonably comparable skill, reputation, and experience.'" *Reed*, 843 F.3d at 520 (quoting 20 U.S.C. § 1415(i)(3)(F)(ii)).

In applying a statutory fee-shifting provision allowing recovery of "a reasonable attorney's fee as part of the costs," the "guiding light" is "the lodestar method [which] produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A.*, 559 U.S. 542, 550-51 (2010) (emphasis in original). The lodestar approach applies in IDEA cases using a "two-part framework that takes into account: (1) the 'number of hours reasonably expended in litigation'; and (2) the 'reasonable hourly rate' for the services provided." *Reed*, 843 F.3d at 520 (quoting *Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015)). To meet the first part of this framework, "fee applicants must document the hours spent litigating in IDEA proceedings in which they prevailed." *Id.*

For the second part of the framework, the D.C. Circuit instructs that the appropriate "reasonable hourly rate" may be determined upon consideration of three sub-elements: "(1) 'the attorney['s] billing practices,' (2) 'the attorney['s] skills, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'" *Id.* (alterations in original) ((quoting *Eley*, 793 F.3d at 100) (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995))). The third sub-element regarding the prevailing market rate may be addressed by fee applicants in IDEA cases by relying "on two separate, but inter-related, approaches," *id.* at 521: (1) "attempting to demonstrate that IDEA cases fall within the bounds of th[e] type of litigation"

that use the so-called "*Laffey* Matrix," which the D.C. Circuit has characterized as "apply[ing] only to 'complex federal litigation,'" *id.*; and (2) "providing evidence of the fees charged, and received, by IDEA litigators," *id.*

When seeking reasonable attorney's fees, "the 'fee applicant bears the burden of establishing entitlement to an award, documenting the appropriate hours, and justifying the reasonableness of the rates.'" *Eley*, 793 F.3d at 100 (quoting *Covington*, 57 F.3d at 1107). Once an applicant meets this initial burden, a presumption applies that the number of hours billed and the hourly rates are reasonable. *Covington*, 57 F.3d at 1109 (citing *Blum v. Stenson*, 465 U.S. 894, 897 (1984)). At that point, the burden shifts to the opposing party to "provide specific contrary evidence tending to show that a lower rate would be appropriate." *Covington*, 57 F.3d at 1109-10 (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d at 1326).

## III.    DISCUSSION

The District does not dispute that the plaintiff is "a prevailing party who is the parent of a child with a disability," 20 U.S.C. § 1415(i)(3)(B)(i), and, as such, is generally entitled to reimbursement of reasonable attorney's fees and costs under the IDEA, *see generally* Def.'s Opp'n. Nor does the District dispute any of the charges submitted by the plaintiff's counsel, or her billing practices. S*ee* Pl.'s Reply at 5 ("Defendant does not challenge any specific line items on Plaintiff's invoice for attorney fees and costs such as entries that required an unreasonable amount of time, entries for unreasonable/unrelated activities, or for any other reason."). Instead, the District contests the use of the current USAO Matrix as the measure of the prevailing market rate for IDEA cases, contending that a reasonable rate is "75% of the USAO Attorney's fees matrix rate." Def.'s Opp'n at 1. Further, the District argues that any fee award to plaintiff should be reduced by some additional, unspecified amount due to the plaintiff achieving only

"partial success" in the 2015 HOD, or even up to denial of any additional fees for allegedly protracting the litigation after the District made a settlement offer. Def.'s Opp'n at 18-20. Each of these arguments is addressed below.

### A. The Current USAO Matrix Provides the Reasonable Hourly Rate

As noted, *supra* in Part II, when considering the reasonableness of an attorney's proposed hourly rate for reimbursement for work invoiced in an IDEA case, the D.C. Circuit has instructed examination of "(1) 'the attorney['s] billing practices,' (2) 'the attorney['s] skill, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'" *Eley*, 793 F.3d at 100 (alterations in original) (quoting *Covington*, 57 F.3d at 1107); *Reed*, 843 F.3d at 521 (citing three sub-elements). Application of this three-part test has proven challenging and contributed to extensive litigation in IDEA cases over reimbursement since parents or other guardians, who are seeking to vindicate the civil rights under this law of their children with learning difficulties, are often unable to afford to pay private counsel's billing rates, no matter what that billing rate is or the attorney's level of skills and experience or reputation. This important context has made the task in IDEA cases of "determining an appropriate market rate for the services of a lawyer," *Blum*, 465 U.S. at 895 n.11, which is already "inherently difficult," *id.*, even more so.

#### 1. First and Second Sub-elements: Attorney's Billing Practices and Experience

The first sub-element for establishing a reasonable hourly rate requires the applicant to show the rates her attorney "customarily charges clients." *Covington*, 57 F.3d at 1103. *See also Lee v. District of Columbia*, 298 F. Supp. 3d 4, 11 (D.D.C. 2018) (noting this "factor requires the applicant to show her attorney's 'custom' with respect to billing in IDEA cases"). Plaintiff's counsel states in her affidavit that it is her "normal practice to bill clients who are not indigent at rates equivalent to the current *Laffey* Matrix rates." Pl.'s Mot., Ex. 4 (Decl. of Elizabeth T. Jester, dated June 11, 2018 ("Pl.'s Counsel's Decl.")) ¶ 20, ECF No. 51-6. The D.C. Circuit has

opined that "an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) (quoting *Blum*, 465 U.S. at 895 n.11); *see also Baylor*, 735 F. App'x at 735 (noting that "the District Court appropriately relied on this Court's holding that an attorney's usual billing rate is presumptively the reasonable rate") (internal quotations and citations omitted). As discussed in more detail, *infra* in Part III.A.2, the plaintiff's attorney has bolstered her own affidavit about her personal billing practices and rates as being consistent with the rates set out in the current USAO Matrix, with affidavits from other attorneys and additional evidence showing that her billing rates are in line with prevailing rates. Thus, this first sub-element favors using the USAO Matrix as the prevailing market rate.

To meet the second sub-element, the plaintiff's affidavit describes her significant skill and experience both in litigating to protect children's rights generally and their rights under the IDEA, in particular. When she first entered private practice over thirty years ago, plaintiff's counsel represented children and their families in litigation over lead paint poisoning and the concomitant disabilities caused by such poisoning. Pl.'s Counsel's Decl. ¶ 4. She has been the "featured speaker at several national lead poisoning conferences" and has spoken on the issue at the D.C. Bar Annual Convention. *Id.* As for her credentials in special education law, plaintiff's counsel has served, since its inception, on the D.C. Superior Court Family Division panel of attorneys approved to accept Special Education Attorney appointments, has been an instructor for Continuing Legal Education (CLE) courses sponsored by D.C. Superior Court and the Public Defender Service, as well as for other training programs sponsored by the Bar Association of the District of Columbia's Annual Neglect and Delinquency Practice Institute and the D.C. Public

Defender Service. *Id.* ¶ 5. She has "represented hundreds of District of Columbia families in ascertaining the educational needs of their children with disabilities and procuring appropriate placements," *id.* ¶ 6, and has "participated in hundreds of administrative due process hearings pursuant to IDEA and procured countless settlement agreements in IDEA cases in the District of Columbia," *id.* Finally, "[n]umerous judges of the D.C. Superior Court" have appointed her "in neglect and juvenile cases to represent parents/foster parents/surrogate parents/guardians concerning the educational needs of the children in their care who are wards of the District of Columbia." *Id.* In sum, the plaintiff has demonstrated her skills and experience over the course of a long career dedicated to serving the needs of children.

Therefore, as to the first two sub-elements, the plaintiff has shown her entitlement to fees reimbursed at the requested rate provided in the current USAO Matrix. Notably, the District raises no challenge as to plaintiff's counsel's representations regarding, or satisfaction of, either of the first two sub-elements in establishing a reasonable hourly rate. *See generally* Def.'s Opp'n.

### 2. Third Sub-Element: Prevailing Market Rates in The Relevant Community

The thrust of the District's challenge to the plaintiff's requested fee award is to the third sub-element in establishing a reasonable hourly rate, namely: consideration of the prevailing market rate in the District of Columbia metropolitan area. As support for her position that the current USAO Matrix sets the prevailing market rate applicable here, the plaintiff provides her own counsel's affidavit that these are the rates she charges non-indigent clients, Pl.'s Counsel's Decl. ¶¶ 11, 20, plus affidavits from five attorneys practicing special education law in the District of Columbia, *see* Pl.'s Mem. Exs. 8-12 (Declarations of Carolyn Houck, Douglas Tyrka, Nicholas Ostrem, Stevie Nabors, and Alana Hecht, respectively), ECF Nos. 51-10, 51-11, 51-12,

51-13, 51-14. Those five attorneys attest that they charge hourly rates to paying clients commensurate with, or in excess of, the rates provided in the current USAO Matrix. *See, e.g.,* Houck Decl. ¶ 3, 9 ("The hourly rates I charge my clients [are in line] with the rates set forth in United States Attorneys Office (USAO) attorney's fees matrix" and "[t]he community of attorneys with paying special education clients in the District of Columbia predominately charge their clients at or near the current attorney's fees matrix rates published by the USAO."); Tyrka Decl. ¶ 3-4 ("From its inception in 2005 Tyrka & Associates has always exclusively charged at hourly rates matching those in what is commonly known as "the LSI Laffey Matrix," … [t]hough Tyrka & Associates historically primarily represented clients who could not afford representation, the firm has had several clients pay the firm at the LSI Laffey Matrix rates directly, regardless of whether reimbursement is ever obtained.");[4] Ostrem Decl. ¶ 3 ("The Ostrem Firm has always matched its hourly rates to those in what is commonly known as the '*Laffey* matrix'…."); Nabors Decl. ¶ 5-8 ("After the United States Attorney's Office issued its 'USAO Attorneys' Fees Matrix' in late 2015, we orally surveyed our colleagues and peers who practiced IDEA litigation and determined that the USAO Attorneys' Fees Matrix represented the prevailing rate in the community," and is the rate at which "the firm has been paid."); Hecht Decl. ¶ 12 ("D.C. Disability Law Group, P.C. currently matches its hourly rates to those in what is known as the USAO adjusted *Laffey* matrix and has had several paying clients that have paid these rates.").

Plaintiff also submitted independent surveys of rates charged by attorneys in the District of Columbia. *See* Pl.'s Mem., Exs. 6-7 (survey data compiled by the National Law Journal in

---

[4] The LSI *Laffey* Matrix provides hourly rates that exceed those set out in the current USAO Matrix, and is derived by adjusting for inflation the original *Laffey* Matrix using the Legal Services Index of the nationwide Consumer Price Index. *See Flood v. District of Columbia*, 172 F. Supp. 3d 197, 202 n.1 (D.D.C. 2016); *Salazar v. District of Columbia*, 809 F.3d 58, 62 (D.C. Cir. 2015).

2013 and 2015, respectively, and published by ALM Intelligence), ECF Nos. 51-8, 51-9.  This

survey data, even more recent that the 2011 survey data relied upon in the USAO Matrix, shows

that in 2015 the *national* median rate for a partner at a law firm with 25 or fewer lawyers was

$350/hour, compared to the much higher median rate in the District of Columbia (for all law

firms) at $1,035/hour.[5]  In other words, as the plaintiff observes, "[t]he rates reflected in these

surveys for attorneys in the D.C. area are above the USAO Matrix rates requested by Plaintiff's

attorney."  Pl.'s Mem. at 7.

      Finally, the plaintiff requests that judicial notice be taken of nine affidavits from

attorneys litigating IDEA cases that were relied upon in *Wimbish v. District of Columbia*, 251 F.

Supp. 3d 187, 192 (D.D.C. 2017), four of which affidavits are from the same attorneys

submitting affidavits in this case (*i.e.*, plaintiff's counsel Elizabeth Jester, Douglas Tyrka,

Nicholas Ostrem, and Alana Hecht).  Pl.'s Mem. at 8.  Such evidence from other attorneys

regarding the fee rates used in the same specialty area in the same locale has been expressly

endorsed as relevant in determining the prevailing market rate.  *See Eley*, 793 F.3d at 101 (citing

*Covington*, 57 F.3d at 1109).  Several of the additional attorney affidavits submitted in *Wimbish*

attested to the fact that IDEA litigators in this area generally charge rates in conformity with the

current USAO Matrix and that this matrix reflects the prevailing rate.  *See, e.g.*, Decl. of

Domiento C.R. Hill ("Hill Decl.") ¶ 14, *Wimbish*, 15-cv-1429 (ESM), ECF No. 17-15 (declaring

that 75% of the USAO rate is "unreasonably low and below market rates"); Decl. of Diana Savit

("Savit Decl.") ¶ 14, *id.*, ECF No. 17-12 (stating that she would not "take [a non-paying IDEA]

case unless it was extremely strong on the merits and [she] could reasonably expect to be

---

[5]     Ideally, a comparison could be made between the median rate for partners at law firms with 25 or fewer lawyers *nationally* with the median rate for partners at similarly sized law firms in the *District of Columbia*, but the National Law Journal survey data submitted by the plaintiff only provides the median rate in the District of Columbia *for all firms*.

awarded an hourly rate of at least $500, far above the '75% of USAO Laffey' rate many judges would award me"); Decl. of Emily B. Read, *id.*, ECF No. 17-9 (stating that all of plaintiff's attorneys, including Ms. Read, received "the United States Attorney's Office (USAO) *Laffey* Matrix" rate in *Blackman v. District of Columbia*, 56 F. Supp. 3d 19 (D.D.C. 2014), for successfully obtaining injunctive relief and implementing hearing officer determinations).

Confronted with the evidence provided by the IDEA attorneys, the *Wimbish* Court determined that the affidavits on which the instant plaintiff also seeks to rely "support a finding that full USAO *Laffey* rates are the prevailing rates in the community for IDEA litigation," *Wimbish*, 251 F. Supp. 3d at 192, and ultimately awarded attorney's fees at the USAO Matrix rate, *see id.* As in *Wimbish*, these affidavits support a finding that the USAO rate is the prevailing rate.

In addition to this evidence of what attorneys in this metropolitan region are charging clients for IDEA-related work, the USAO Matrix has been described as "'a useful starting point' in calculating the prevailing market rate." *Eley*, 793 F.3d at 100 (quoting *Covington*, 57 F.3d at 1109). Thus, having begun this analysis of the prevailing market rate with evidence of what attorneys charge paying clients, the discussion continues by reviewing the particular relevance of the current USAO Matrix, followed by review of other considerations, including the rate necessary to attract competent counsel to assist plaintiffs with meritorious IDEA claims.

### a. Current USAO Matrix Is Not Limited to "Complex Federal Litigation"

The Civil Division of the USAO prepares and regularly updates its Attorney's Fees Matrix "for use in cases in which a fee-shifting statute permits the prevailing party to recover." USAO Matrix, Explanatory Note 1 (citing as examples of such statutes, Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-5(k); Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E); and Equal Access to Justice Act, 28 U.S.C. § 2412(b)), *available at*

https://www.justice.gov/usao-dc/file/796471/download.[6]  This USAO Matrix is often referred to as the "*Laffey* Matrix," but this is now a misnomer.  In fact, both parties recognize the difference between the *Laffey* Matrix and the current USAO Matrix.  *See* Pl.'s Mem. at 14 (referring to the *Laffey* Matrix as the "predecessor to the USAO Matrix"); *id.* at 7 n.2 ("Prior to 2015, the U.S. Attorney's Office formulated what was referred to [as] The USAO *Laffey* Matrix.").  The District expressly acknowledges that "[t]he USAO Matrix, which was developed for use after June 1, 2015, is based on different data and utilizes a different inflation index than that used in the *Laffey* Matrix."  Def.'s Opp'n at 11.

The *Laffey* Matrix was "originally compiled to reflect the prevailing market rate for 'complex federal litigation,'" *Reed*, 843 F.3d at 519 (citing *Laffey v. Nw. Airlines, Inc. (Laffey I)*, 572 F. Supp. 354, 372 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds, Laffey v. Nw. Airlines, Inc. (Laffey II)*, 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds, Save Our Cumberland Mountains, Inc. v. Hodel (SOCM)*, 857 F.2d 1516, 1517 (D.C. Cir. 1988) (en banc))*,* and was based on twenty-five affidavits submitted to show the hourly rates charged in 1981-82 by attorneys in complex federal employment litigation, *see Laffey I*, 572 F. Supp. at 371.  By contrast, the USAO does not suggest that use of its current fee matrix is limited to "complex federal litigation"—however that may be defined—and, indeed, the methodology used to prepare the matrix is entirely divorced from the original *Laffey* case rates.  *See* USAO Matrix, Explanatory Note 4 (highlighting that current methodology "replaces that used prior to 2015, which started with the matrix of hourly rates developed in *Laffey*").

---

[6]     The USAO further explains that the "matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, or by other Department of Justice components, or in other kinds of cases," meaning cases without an applicable fee-shifting statute, or where "the hourly rate is limited by statute."  USAO Matrix, Explanatory Note 1.

Instead of relying on hourly rates developed over thirty-five years ago in the *Laffey* case, the USAO now uses an entirely different methodology and derives the hourly rates for attorneys in this area based on "average hourly rates reported in 2011 survey data for the D.C. Metropolitan area, which rates were adjusted for inflation with the Producer Price Index-Office of Lawyers (PPI-OL) index." *Id.* at Explanatory Note 2. The "survey data comes from ALM Legal Intelligence's 2010 & 2011 Survey of Law Firm Economics." *Id.* This ALM Legal Survey data, in turn, is not limited to fees charged by lawyers litigating in federal courts but encompasses a far broader scope of fees charged by lawyers practicing in different sizes of offices, across different types of specialties, in both litigation and non-litigation types of matters. *See Makray v. Perez*, 159 F. Supp. 3d 25, 51 (D.D.C. 2016) (describing 2011 ALM Legal Intelligence survey in declaration of expert economist, Dr. Laura A. Malowene, provided by U.S. Department of Labor, as "provid[ing] data of actual billing rates of attorneys in the Washington, DC area, from law offices of all sizes and types"). The USAO has adopted this methodology because use of this survey data is "[c]onsistent with" the Supreme Court's definition of a "reasonable fee" awarded pursuant to a fee-shifting statute as "a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases." USAO Matrix, Explanatory Note 2.

In short, the USAO Matrix from June 1, 2015 and onward no longer bears any methodological connection to *Laffey* the case or *Laffey* the fee matrix, or to the illusive concept of "complex federal litigation."[7] The current version of the USAO Matrix is in fact *designed* to

---

[7] A minor portion of the plaintiff's requested fees were incurred before June 1, 2015, and were therefore charged pursuant to the USAO *Laffey* Matrix for 2014-2015, which was $520 per hour. *See* Pl.'s Invoice at 1-5; Pl.'s Counsel's Decl. at 5. The USAO *Laffey* Matrix had only five strata for attorney experience, with the highest stratum being 20+ years of experience. By contrast, the USAO Attorney's Fees Matrix has nine strata, with the highest stratum being 31+ years of experience. Plaintiff's counsel had 31+ years of legal experience by 2014, *see* Pl.'s Counsel's Decl. at 1, such that her hourly rate of $520 for that period, billed under the USAO *Laffey* Matrix for attorneys with 20+ years of experience, falls below the rate of $568 per hour for attorneys with 31+ years of experience in 2015-2016 under the current USAO Matrix. In short, as compared to the current USAO Matrix, the

be representative of the prevailing hourly rates for a broad range of legal work in this area, not just for "complex federal litigation."  To the extent that the attorney hourly rates provided in the *Laffey* Matrix have been deemed inapplicable to IDEA cases, because IDEA cases fall short of qualifying as "complex federal litigation," *see, e.g.*, *Reed*, 843 F.3d at 525 (observing that being "able to demonstrate that IDEA cases are 'complex federal litigation' to which the *Laffey* Matrix presumptively applies []will not be easy"); *Price v. District of Columbia*, 792 F.3d 112, 117 (D.C. Cir. 2015) (Brown, J., concurring) (finding that "*Laffey* Matrix rates are irrelevant to the prevailing-rate determination" for "IDEA administrative due process hearings" since such cases do not command the same rates as complex federal litigation), the new methodology employed by the USAO Matrix now renders that analysis inapposite.[8]  The District simply fails to address the fact that unlike the original *Laffey* Matrix, the USAO Matrix is untethered to complex federal litigation and based on data "from law offices of all sizes and types," other than solo practitioners, involved in all types of legal work—not just federal litigators in complex litigation.

Despite the USAO's updated data and methodology, the District argues that, "[n]evertheless, both the *Laffey* Matrix and the USAO Matrix were intended to be applied in *complex federal litigation* in the District," Def.'s Opp'n at 11 (emphasis in original), by which the District seems to mean that both matrices were intended to apply *only* to complex federal litigation.  The District supports this claim by citing the United States' Statement of Interest

---

USAO *Laffey* Matrix set a *lower* hourly rate for attorneys with many years of experience, meaning plaintiff's request for that lesser amount is also reasonable.

[8] The plaintiff argues, as an alternative justification for her proposed hourly rate, that either IDEA cases in general, or this IDEA case, in particular, is equivalent to "complex federal litigation" and therefore "presumptively" deserving of *Laffey* or USAO Matrix rates.  Pl.'s Mem. at 10-13; Pl.'s Reply at 3-4.  Plaintiff's argument arises, of course, from the case law suggesting "two separate" ways of establishing an attorney's rate with evidence of either (1) the prevailing market rate for the attorney's services, or (2) the attorney's work being akin to "complex federal litigation," *Eley*, 793 F.3d at 100.  Further consideration of this argument is unnecessary because the plaintiff has satisfied the "prevailing market rate" rubric and the current USAO Matrix is no longer tethered to the original *Laffey* matrix or "complex federal litigation."

submitted in *D.L. v. District of Columbia*, 05-cv-1437 (RCL), *see* Def.'s Opp'n at 11, but that

Statement of Interest does not support the District's claim, *see* Def.'s Opp'n, Ex. 3, Statement of

Interest of the United States ("US-SOI"), ECF No. 53-3.  Instead, the United States' Statement of

Interest addressed the more limited question "whether a district court charged with awarding

'reasonable' attorneys' fees under a federal fee-shifting statute abused its discretion when it

based its award on the hourly rates set forth in a particular 'matrix' maintained by the" USAO.

*Id.* at 1.  Although the parties in *D.L.* agreed that the case qualified as complex federal litigation,

that characterization of the case was beside the point for the United States, which took "no

position" on that issue.  *See* Brief for the United States as Amicus Curiae Supporting Appellees

at 6, *D.L. v. District of Columbia*, No. 18-7004 (D.C. Cir. filed Jul. 20, 2018).  Instead, the

United States merely defended the merits of the USAO Matrix as "superior to the LSI *Laffey*

Matrix," *id.* at 2, which the *D.L.* plaintiffs' sought to use for reimbursement.

      In other words, the issue addressed by the United States' Statement of Interest in *D.L.*

was not whether, or to what extent, the current USAO Matrix appropriately applies to cases that

qualify, or not, as "complex federal litigation," but rather, which of two matrices should be used

in a case involving a statutory fee-shifting statute requiring determination of a "reasonable

hourly rate" for the Washington, D.C. Metropolitan region.  In this regard, the United States

emphasized "[a] request for attorney's fees should not result in a second major litigation," *id.* at 6

(quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)), and "a reliable and agreed-upon rate

matrix is critical to achieving that goal," *id.* at 7; *see also id.* ("affirming the district court's

adoption of the USAO Matrix would go a long way toward eliminating the need for parties to

engage in extensive litigation over rate issues in the future, thereby rendering fee litigation more

efficient for courts, parties, and lawyers") (quotations omitted).  Notably, in *D.L.*, on appeal, the

USAO Matrix was criticized as "not sufficiently tailored to complex federal litigation conducted in D.C.," *id.* at 13, because the underlying data "reflect[ed] hourly rates for all legal services offered by law firms in a four-state area, not rates for complex federal litigation in D.C. alone," *id.* (quotations omitted). The government explained that, "even if rates for complex federal litigation are in the top 10% of litigation rates," *id.* at 15, "the rates in the USAO Matrix are sufficiently high" to serve as a "reasonable proxy," *id.* In sum, without limiting application of the USAO Matrix to only "complex federal litigation," the government stressed that the "USAO Matrix is far superior to the LSI Matrix because it is based on substantially more recent, reliable, and precise data concerning the 'prevailing' market rates in the relevant community, [and] are therefore 'reasonable' and 'adequate to attract competent counsel, [without] produc[ing] [a] windfall[] to attorneys.'" *Id.* at 24 (alterations, other than first alteration, in original; citations omitted).

That the current USAO Matrix is not tethered to use in complex federal litigation is good news since, as the D.C. Circuit has astutely noted, *"Laffey* is not very helpful in explicating 'complex federal litigation,'" *Reed*, 843 F.3d at 525, and "[u]nfortunately, the case law provides little guidance to litigants attempting to demonstrate that IDEA cases constitute 'complex federal litigation,'" *id.* at 526. Engaging in the costly, time-consuming and ultimately unhelpful practice of drawing ill-fitting, subjective comparisons between IDEA litigation work and federal litigation work in another specialized area to qualify for *Laffey* Matrix rates can now be jettisoned with use of the current USAO Matrix, which, again, is derived using recent 2011 survey data reflecting a mix of legal services collectively offered by "law offices of all sizes and types" in this metropolitan area.

### b. USAO Matrix Applies to IDEA Administrative Proceedings

Having already reached a settlement regarding her fees for the federal litigation portion of this IDEA case, the plaintiff now seeks reimbursement for her success in the administrative proceeding and the time expended in implementing the administrative order and the order of this Court. The District contends that the administrative nature of the proceeding for which the plaintiff seeks reimbursement warrants a discount from the USAO Matrix rate. *See* Def.'s Opp'n Pl.'s Obj. Mem. at 4-5, ECF No. 60 ("'[A] rate equivalent to 75 percent of *Laffey* rates approximates the prevailing market rate for IDEA administrative proceedings....'" (quoting *Reed v. District of Columbia*, 134 F. Supp. 3d 122, 131 (D.D.C. 2015))). This Court disagrees with the District's reasoning that a lower hourly rate automatically should apply to IDEA administrative proceedings, particularly one, as here, that involved a pre-hearing conference, a two-day hearing, over eighty exhibits by both parties, thirteen "disclosed" witnesses who were listed to testify, and four of whom actually testified, including the plaintiff. Pl.'s Mem at 10-11; 2015 HOD at 3.

Retiring comparisons to "complex federal litigation," with its myopic discounting of the administrative portion of IDEA cases, will bring IDEA attorney's fees cases back in line with the statutory text of the IDEA. Ultimately, no statutory basis supports a distinction, when calculating IDEA attorney's fees, between prevailing in an administrative proceeding or in a federal court. Over thirty years ago, the District argued that plaintiffs, who were successful on the administrative level, were not entitled to recover any attorneys' fees under the virtually identical language of IDEA's predecessor statute. *See Moore v. District of Columbia*, 907 F.2d 165, 167 (D.C. Cir. 1990) (en banc). The D.C. Circuit flatly rejected that argument. *Id.* The relevant statutory text, then, as now, reads: "[i]n *any action or proceeding* brought under this section, the court, in its discretion, may award reasonable attorneys' fees ...." 20 U.S.C. §

22

1415(i)(3)(B)(i) (emphasis added). The D.C. Circuit held that Congress intended this broad language to encompass administrative proceedings and civil actions alike, since the Court was "at a loss to give meaning to the distinction between 'action' and 'proceeding' short of inferring that Congress meant to authorize fees for parents who prevail either in a *civil action* or in an *administrative proceeding* under [the IDEA.]" *Moore*, 907 F.2d at 167 (emphasis in original).

In authorizing fee awards for parties who prevail in administrative actions alone, *see id.*, the IDEA makes no distinction between a reasonable rate for fees in administrative proceedings and court proceedings, *see* 20 U.S.C. § 1415(i)(3)(B)(i). Indeed, the district court in *Moore*, in granting the plaintiffs' counsels' hourly rates, made no distinction between the hourly rate to be awarded for the attorneys' work in the administrative proceeding and the hourly rate to be awarded for all other aspects of the case, such as the award for fees-on-fees litigation. *See generally Moore v. District of Columbia*, 674 F. Supp. 901 (D.D.C. 1987); *see also Robinson v. District of Columbia,* 61 F. Supp. 3d 54, 64 (D.D.C. 2014) (rejecting the District's argument that legal work in administrative proceedings should be compensated at a lower rate than in federal court and observing that "such a position would be enormously short-sighted and provide a perverse incentive for attorneys to fail—and fail quickly—before administrative tribunals in order to initiate federal court proceedings for which the attorney would be entitled attorneys' fees at a full, regular and reasonable rate").

Congress has demonstrated that it knows exactly how to make a distinction between attorney's fees awards in different types of proceedings, when such a distinction is intended. For example, in the Social Security context, Congress limits the amount of attorneys' fees available when a litigant is successful in an administrative proceeding before the Social Security Commissioner, *see* 42 U.S.C. § 406(a)(2)(A) (setting cap for recovering fee in administrative

proceeding at no more than $4,000), as compared to when the litigation continues in District

Court, *see id.* § 406(b) (setting cap for recovering fees at "25 percent of the total of the past-due

benefits to which the claimant is entitled by reason of such judgment"). As this Court previously

noted in *Robinson*, 61 F. Supp. 3d at 64, no such distinction is drawn in the IDEA.

The fact that Congress explicitly intended the attorneys' fees provision in the IDEA to

cover both administrative and civil actions, and that Congress declined to mandate a lower fee

for administrative actions, as it has done in other contexts, is a strong statutory refutation of the

idea that an attorney's work in an IDEA administrative proceeding is deserving of lower

compensation than an attorney's work in an IDEA court proceeding.

### c. Hourly Rates at Which IDEA Attorneys Are Actually Paid Is Irrelevant Given Nature of IDEA "Submarket"

Notwithstanding that the USAO Matrix provides the prevailing hourly rates for a broad

swath of lawyers in this metropolitan area, and that plaintiff's counsel and other lawyers, whose

affidavits have been submitted and referenced, actually charge fees at or above those rates to

paying clients, the District discounts this evidence as insufficient in "showing that the attorneys

actually *received* the rates charged, except, of course on the comparatively rare occasion when

the District Court awards these unreasonable rates." Def.'s Opp'n at 8 (emphasis in original).

The District's focus on what attorneys are paid for their IDEA work, rather than what they

charge to paying clients, simply highlights the sad lack of a marketplace for lawyers engaging in

IDEA litigation. *See Merrick v. D.C.*, 134 F. Supp. 3d 328, 340 n.7 (D.D.C. 2015) ("[G]iven the

existence of the fee-shifting statute in [IDEA cases] and the relative rarity of paying special

education clients, one can hardly say that a 'market' exists for services similar to the services

offered in this [IDEA] case.").

Indeed, plaintiff's counsel fully acknowledges that "[w]ith very limited exceptions, my clients are indigent or unable to afford payment of attorney fees and costs." Pl.'s Counsel's Decl. ¶ 20; *see also* Pl.'s Obj. Mem. at 5 ("As indicated in the attached affidavits, of the small subset of attorneys who do seek attorney's fees in successful IDEA litigation, most of the cases they handle are those of indigent clients who are not in a position to pay even token fees up front."). Rather than an effective attack on use of the USAO Matrix in IDEA cases, as the District intended, this challenge simply highlights whether awarding attorney's fees at rates *lower* than the USAO Matrix, as the District urges, achieves the goal of the fee-shifting provision to attract an adequate supply of capable counsel for meritorious cases. *See, e.g.*, *Covington*, 57 F.3d at 1112 ("'Congress after all did not simply express its intent that the fees would attract counsel, but rather that they would be adequate to attract *competent* counsel.'" (quoting *SOCM*, 857 F.2d at 1521); *accord Perdue,* 559 U.S. at 552 (describing attraction of competent counsel as purpose of fee-shifting in 42 U.S.C. § 1988). In keeping with the purpose of fee-shifting statutes to enable meritorious cases to be brought, the plaintiff points out that IDEA "cases are undertaken with the knowledge that if the client does not prevail … there will be no fees." Pl.'s Obj. Mem. at 5-6. Thus, IDEA practitioners must scrutinize the merits of the cases they bring since they work on a contingency-fee basis only to receive, if successful, the rates that their peers performing work for paying clients receive regardless of success.[9]

The District's criticism of the plaintiff's reliance on the USAO Matrix when IDEA plaintiffs generally cannot pay those rates is misplaced. Simply because IDEA clients may be

---

[9]    Moreover, the IDEA excludes from attorney's fees awards time spent in many IEP Team meetings, *see* 20 § 1415(i)(3)(D)(ii) ("Attorneys' fees may not be awarded relating to any meeting of the IEP Team unless such meeting is convened as a result of an administrative proceeding or judicial action, or at the discretion of the State, for a mediation described in subsection (e)."), and the D.C. Circuit excludes expert witness fees from IDEA cost awards, *see Goldring v. District of Columbia*, 416 F.3d 70, 71 (D.C. Cir. 2005).

indigent and unable to afford payment, does not mean that their attorney's rate, awarded pursuant to a fee-shifting statute, should be reduced. To the contrary, clients' systematic inability to pay is expected in the context of many fee-shifting statutes, including civil rights statutes, such as the IDEA. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 725 (1987) (plurality opinion) ("We agree that a fundamental aim of such statutes is to make it possible for those who cannot pay a lawyer for his time and effort to obtain competent counsel, this by providing lawyers with reasonable fees to be paid by the losing defendants.")*; see also City of Burlington v. Dague*, 505 U.S. 557, 574 (1992) (Blackmun, J., dissenting) ("[A case] in which potential plaintiffs can neither afford to hire attorneys on a straight hourly basis nor offer a percentage of a substantial damages recovery-is exactly the kind of case for which the fee-shifting statutes were designed."); Frances Kahn Zemans, *Fee Shifting and the Implementation of Public Policy*, 47 Law & Contemp. Probs. 187, 205-06 (1984) ("Many of the fee award statutes are clearly intended to tip the litigation balance to compensate somewhat for the inordinately unequal economic status of disputants.").

As result, the Court plays a significant *de facto* role in establishing the customary, "prevailing" rate for IDEA cases. In this regard, use of the USAO Matrix has garnered support in this Circuit as a reasonable approximation of prevailing hourly rate for IDEA litigation. *See Reed*, 843 F.3d at 528-29 (Tatel, J., concurring) ("Based on my own experiences and hearing dozens of these cases and authoring opinions in many, I think it quite obvious that IDEA litigation is as complex as Title VII litigation" and is "sufficiently complex to warrant *Laffey* rates."); *Eley*, 793 F.3d at 105 (Kavanaugh, J., concurring) ("[I]n my view, the United States Attorney's Office *Laffey* matrix is appropriate for IDEA cases.").[10]

---

[10] Other Judges on this Court have also awarded full USAO Matrix rates in IDEA cases. *See, e.g., Gaston v. District of Columbia*, 2015 WL 5332111, at *1 (D.D.C. Sept. 10, 2015) (Chutkan, J.); *Copeland v. District of*

#### d. The USAO Rate Would Attract a Sufficient Number of Competent Counsel

A reasonable fee is "one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys." *Blum*, 465 U.S. at 897. The D.C. Circuit has not addressed whether 75% of the USAO Matrix rate is sufficient to accomplish this goal in IDEA cases, though Judge Tatel has separately written that "[d]eeming IDEA litigation eligible for *Laffey* rates would comport with the Supreme Court's instruction that a reasonable fee is one 'adequate to attract competent counsel,'" *Reed*, 843 F.3d at 529 (Tatel, J., concurring) (quoting *Blum*, 465 U.S. at 893). In *Reed*, the plaintiff-appellants raised the argument on appeal that the rates awarded by the District Court in that case (75% of the USAO Matrix) were "insufficient to attract competent counsel to take on these kinds of cases and, as such, are impermissibly low," *Reed*, 843 F.3d at 524, but the Circuit decided that this issue "should be left for another day when the claims can be appropriately fleshed out," *id.* The plaintiff brings this issue to the fore in the instant case, claiming that "USAO Matrix rates are needed to attract competent counsel." Pl.'s Mem. at 9.

The plaintiff supports her argument with declarations from both her own counsel and other IDEA practitioners explaining the insufficiency of fee amounts in the District of Columbia, forcing IDEA practitioners to take fewer clients. *See, e.g.*, Pl.'s Counsel's Decl. ¶ 21 (explaining that due to DCPS' refusal to reimburse reasonable attorney fees and costs, she can no longer afford to employ her Spanish-speaking paralegal, resulting in "a significant decrease in the

---

*Columbia*, 208 F. Supp. 3d 255, 257 (D.D.C. 2016) (Cooper, J.); *Taylor v. District of Columbia*, 2018 WL 4616053, at *3 (D.D.C. Sept. 26, 2018) (Friedrich, J.); *Merrick v. District of Columbia*, 316 F. Supp. 3d 498, 515 (D.D.C. 2018) (A.B. Jackson, J.); *Merrick v. District of Columbia*, 134 F. Sup. 3d 328, 331 (D.D.C. 2015) (A.B. Jackson, J.); *Joaquin v. District of Columbia*, 210 F. Supp. 3d 64, 69 (D.D.C. 2016) (Lamberth, J.); *Shaw v. District of Columbia*, 210 F. Supp. 3d 46, 51 (D.D.C. 2016) (Lamberth, J.); *D.L. v. District of Columbia*, 267 F. Supp. 3d 55, 69 (D.D.C. 2017) (Lamberth, J.); *Green v. District of Columbia*, 102 F. Supp. 3d 15, 23 (D.D.C. 2015) (Mehta, J.); *Wimbish*, 251 F. Supp. 3d at 195 (Sullivan, J.); *Yoo v. District of Columbia*, 2019 WL 117606, at *2 (D.D.C. Jan. 7, 2019) (K.B. Jackson, J.).

number of clients" that she is able to represent, and that she can no longer represent non-English speaking clients); Tyrka Decl. ¶ 42 ("I do not know any lawyer in this jurisdiction supporting a family on IDEA work for non-paying clients."); Ostrem Decl. ¶ 9 ("The reasons I have found it impossible to sustain a practice for indigent parents and students by relying on the 'fee-shifting' provision of the IDEA include … some judges regularly awarding hourly rates at 75% of the rates in the USAO fees matrix … and the general inconsistency and insecurity of income earned through fee litigation."); Hecht Decl. ¶ 33 ("The failure of DCPS to timely pay attorneys' fees affected [Brown & Associates, the largest special education law firm in the District of Columbia] significantly, such that the law firm had to lay off two thirds of its staff."); Hecht Decl., *Wimbish*, 15-cv-1429 (ESM), ECF No. 17-7 ¶ 17[11] ("If all judges, instead of only some, were to award the hourly rate for my work proposed by the District, 75% of the United States Attorney's Office version of the 'Laffey matrix,' I would likely be forced to leave my current practice and either work only for paying clients or find entirely different work."); Hill Decl. ¶ 12 ("I have turned away many potential clients who have sought my help during the last two years, solely because the firm cannot afford to maintain a fulltime staff to assist me."); Decl. of Maria G. Mendoza ("Mendoza Decl.") ¶ 10, *Wimbish*, 15-cv-1429 (ESM), ECF No. 17-14 (declaring that she has "almost completely discontinued [non-paying IDEA] work because it was financially impossible," and as result, has "turned away many potential clients who have sought my help").

In choosing to award 75% of *Laffey*, another judge on this Court has reasoned that the "sheer number of [IDEA] cases" receiving awards at 75% of *Laffey* indicates that such awards will not "dissuade all competent counsel in the region from taking such cases." *Reed*, 134 F.

---

[11]       Two declarations from Alana M. Hecht are presented in this case, one dated December 13, 2016, docketed at ECF No. 51-14, and another dated August 12, 2015, docketed in *Wimbish*, 15-cv-1429 (ESM), ECF No. 17-16, and incorporated by reference, as requested by plaintiff, *see* Pl.'s Mem. at 8.

Supp. 3d at 131.  This observation begs the question of how many IDEA litigators have left this practice area due to reimbursement at less that the USAO Matrix rate.  Evidence presented in this case suggests that at least some litigators no longer accept non-paying IDEA clients.  *See, e.g.*, Pl.'s Counsel's Decl. ¶ 21; Ostrem Decl. ¶ 9; Hill Decl. ¶ 12; Mendoza Decl. ¶ 10.  Thus, even if this observation were narrowly true, a more probative question would be: how many meritorious IDEA cases have been unable to attract competent counsel?  The declarations submitted in this case suggest real hardship among IDEA practitioners, and a curtailing of their practices, not because of an insufficient number of would-be plaintiffs seeking vindication of their children's IDEA rights, but because IDEA attorneys cannot afford to accept as clients those potential IDEA plaintiffs unable to afford to pay fees or to bring their cases.

*     *     *

In sum, the plaintiff has established the reasonableness of using the USAO Matrix as her attorney's rate by offering substantial evidence as to "(1) 'the attorney['s] billing practices,' (2) 'the attorney['s] skill, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'"  *Eley*, 793 F.3d at 100 (alterations in original) (quoting *Covington*, 57 F.3d at 1107).  Of these three factors, the District contested only whether the prevailing market rate for plaintiff's counsel's time is the rate provided in the current USAO Matrix.  The Court concludes that the current USAO Matrix, which is predicated on legal services survey data from "law offices of all sizes and types" in this metropolitan area, *Makray*, 159 F. Supp. 3d at 51, provides a reasonable approximation of the prevailing market rates for IDEA attorneys and therefore the fees "adequate to attract competent counsel," *Blum*, 465 U.S. at 897.  This conclusion is bolstered by declarations from the plaintiff's attorney and other IDEA practitioners in this metropolitan area averring to the USAO Matrix rates they customarily charge paying

clients, as well as the compelling evidence documenting IDEA practitioners cutting staff even as

they turn away potential clients, due to significant reductions in the hourly rates for fee awards,

compounded by delays in payment by the District, *see, e.g.*, Pl.'s Counsel's Decl. ¶ 21; Ostrem

Decl. ¶ 9; Hecht Decl. ¶ 33; Hill Decl. ¶ 12; Mendoza Decl. ¶ 10; Tyrka Decl. ¶¶ 36-38, which

evidence shows that cut-rates fall short of attracting competent counsel to this practice area.

Moreover, the current USAO Matrix's methodological independence from the original *Laffey*

case and the *Laffey* Matrix avoids any need to "go down the rabbit hole of trying to determine"

whether an IDEA case is comparable to "complex federal litigation," *Wimbish*, 251 F. Supp. 3d

at 192 n.3, when deciding whether to award fees at the current USAO Matrix rates. Finally, the

District's demand for an automatic discount of hours spent litigating in administrative

proceedings, as compared to in federal court, is rejected as without any statutory basis.

 The District's remaining arguments are addressed next.

 **B.** **No Fee Reduction is Warranted by Plaintiff's Degree of Success in 2015 HOD**

 Despite the plaintiff's undisputed status as a "prevailing party" in the 2015 HOD, the

District argues for a reduction in any award of attorney's fees because the plaintiff "achieved a

less than stellar result." Def.'s Opp'n at 19. While the Supreme Court has indicated that the

district court has broad discretion to reduce fee awards based on success, "the fee award should

not be reduced simply because the plaintiff failed to prevail on every contention raised in the

lawsuit." *Hensley*, 461 U.S. at 435.

 No reduction in the fee award is warranted in the instant case because the plaintiff

achieved substantial success. The hearing officer concluded that DCPS had denied D.M. a

FAPE and ordered that DCPS "revise the Student's IEP to reflect that *all* of his academic

instruction should be specialized instruction in a small classroom setting." Pl.'s Reply at 11.

Moreover, as discussed above, the plaintiff's appeal of the administrative decision resulted in

substantial additional relief: the District was ordered to provide "a comprehensive IEE with assessments in all areas and a mandatory IEP meeting to review the reports from the assessments." *Id.* In assessing the plaintiff's success in the administrative action for which the plaintiff now seeks attorney's fees, consideration of the plaintiff's ultimate success on appeal is essential since that result reflects what the hearing officer should have concluded in the first instance. *See Jester v. District of Columbia*, 474 F.3d 820, 821 (D.C. Cir. 2007) ("If the parent wins in district court after losing in the administrative hearing, the parent is eligible to recover attorney's fees and costs expended in litigating the controversy from beginning to end."). The District's effort to reduce the fee award with a blinkered focus on the outcome of the 2015 HOD is simply not persuasive.

The District relies on three IDEA cases in which attorney's fees were reduced based on outcomes as support for its position—but those cases are inapposite. Def.'s Opp'n at 18 (citing *A.S. v. District of Columbia*, 842 F. Supp. 2d 40 (D.D.C. 2012) (Rothstein, J.), *B.R. v. District of Columbia*, 802 F. Supp. 2d 153 (D.D.C. 2011) (Urbina, J.), and *Dickens v. Friendship-Edison P.C.S.*, 724 F. Supp. 2d 113, 121-123 (D.D.C. 2010) (Kay, Mag. J.)). In *A.S. v. District of Columbia*, the Court concluded "that plaintiffs attained only half of the relief they sought" in an administrative proceeding, which apparently was not appealed, and "[t]herefore, …impose[d] a reduction of 50 percent on the final award of attorneys' fees." 842 F. Supp. 2d at 47, 49. Likewise, in *B.R. v. District of Columbia*, the fee award was reduced by half because, though prevailing on one appealed claim from an HOD, the plaintiffs lost their other "unnecessary" claim for reimbursement of private school tuition, which had in fact already been paid by DCPS, was therefore moot, and in the words of the court, "should never have [been] brought." 802 F. Supp. 2d at 164-65. Finally, in *Dickens v. Friendship-Edison P.C.S,* the fee award was reduced

for a plaintiff who prevailed on only one of three claims at an HOD because the losing claims were asserted against a charter school defendant that "was no longer responsible for [the student's] FAPE, as he had transferred to a different school before the hearing," "resulting in unnecessary expenditures of time and effort." 724 F. Supp. 2d at 122. Thus, in all three of these cases, the fee awards were reduced for unsuccessful administrative claims that were either not appealed or firmly rejected on appeal to the district court. By contrast, here, the plaintiff achieved substantial relief in the 2015 HOD and then obtained additional relief on appeal, demonstrating the errors made in the 2015 HOD. The District's apparent position that plaintiffs should be penalized with reductions in fee awards for errors made in administrative proceedings that require correction on appeal is counter-productive and rejected.

Notably, the District ignores without comment that in all three of these IDEA cases upon which it relies, the then extant USAO *Laffey* Matrix is used to determine the prevailing market rate and in computing the hourly rate for attorney's fees. *See A.S.*, 842 F. Supp. 2d at 49 (finding, over the District's objection, "that using the *Laffey* Matrix is appropriate" because "[t]his was not a 'straightforward' due process hearing, but clearly involved complex issues concerning A.S.'s disability and placement"); *B.R.*, 802 F. Supp. 2d at 164 (noting that "Courts in this district routinely refer to the *Laffey* Matrix to determine the reasonableness of requested attorney's fees in IDEA actions," and that "the *Laffey* Matrix represents the prevailing rates for attorneys in the District of Columbia," and "appropriately uses it as a guide to determine a reasonable attorney's fee award" (collecting IDEA cases applying *Laffey* Matrix)); *Dickens,* 724 F. Supp. 2d at 119-120 (recognizing USAO Matrix "as a measure for the reasonableness of hourly rates in IDEA cases," and applying those hourly rates without objection from the defendant, except as to those lawyers whose "actual billing practices" are less and did not show a

"public-spirited" motive for the lower rates (citing *Jackson v. District of Columbia*, 603 F. Supp. 2d 92, 96-97 (D.D.C. 2009) ("Courts in this district have routinely held that attorneys' fees in IDEA actions are reasonable if they conform to the *Laffey* Matrix.")).

In sum, no reduction in the plaintiff's fee award is warranted based on certain unsuccessful claims asserted in the administrative proceeding, the majority of which unsuccessful claims were subsequently corrected on appeal with the award of additional relief. Further, the cases relied upon by the District in seeking a fee reduction bolster the conclusion that the current USAO Matrix provides the appropriate hourly rate to apply here.

### C. District Concedes Magistrate Judge's Finding That DCPS Did Not Make A Settlement Offer

The District originally contended that the plaintiff's motion for attorney's fees should be denied "in its entirety" because "the relief ultimately obtained[] was no better than the relief Plaintiff requested in settlement, and the District offered that relief." Def.'s Mem. at 19. As support for this contention, the District presented an email string between counsel to the parties showing that, on February 12 and 19, 2016, the District outlined in broad terms the steps that the District "could agree" to take to resolve the litigation. *See generally* E-mails from Aaron Finkhousen, Assistant Attorney General, Office of the Attorney General for the District of Columbia, to Elizabeth Jester, plaintiff's counsel, ECF No. 53-1. The Magistrate Judge described these emails as "an open-ended discussion of settlement between the parties without any clear offer with definite terms being provided by Defendant," Atty's Fees R&R at 30, and therefore declined to reduce or preclude attorney's fees based on the District's purported offer. The District did not object to that finding in the Magistrate Judge's Report and Recommendation and, therefore, the District's settlement offer argument is conceded. *See* LCvR 72.2(b); Def.'s

Notice (Dec. 12, 2018), ECF No. 57 (providing notice that the District "makes no objection to Magistrate Judge Harvey's Report and Recommendation").

Despite this concession, the District nonetheless attempts to resuscitate its settlement offer argument in its opposition to plaintiff's objection, asking that the Court award no more than the amount recommended by the Magistrate Judge because the "Plaintiff unreasonably prolonged this litigation by declining the District's offer of settlement." Def.'s Opp'n Pl.'s Obj. Mem. at 7-8.

The IDEA provides that "whenever the court finds that [] the parent, or the parent's attorney, during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy … the court shall reduce, accordingly, the amount of the attorney's fees awarded." 20 U.S.C. § 1415(i)(3)(F). Even if it were assumed (contrary to the record and to the District's conceding this argument) that the District's February 19, 2016 email to plaintiff's counsel amounted to a formal settlement offer, the claim that the plaintiff "unreasonably protracted" litigation by not accepting this purported offer is also not supported by the record. The purported settlement offer was made in February 2016, approximately eight months after the June 22, 2015 HOD was issued, and approximately five months after the plaintiff had initiated the lawsuit seeking review of that HOD. Certainly, the plaintiff cannot be said to have "unreasonably protracted" the final resolution of litigation by declining to accept an offer of settlement made long after the administrative action was completed, and the appeal of that decision was filed.

At best, the thrust of the District's argument is that fees incurred after the February 2016 purported settlement offer should be reduced, but this argument is not well articulated and, in any event, is also not persuasive. The District speculates that "if Plaintiff would have accepted

34

this offer at the time, perhaps D.M. would not have faced the problems that led to the difficulties in implementing the Court's award of additional assessments." Def.'s Opp'n at 19.  The District's effort to find fault with the plaintiff's efforts to address D.M.'s issues borders on the farcical, given that D.M. languished in an inappropriate placement by DCPS, with insufficient IEPs developed by DCPS, over the plaintiff's objections, for at least the two school years of 2014-2015 and 2015-2016, resulting in DCPS being found to have denied D.M. a FAPE.  In the end, it took plaintiff's filing of two administrative complaints and the instant lawsuit to achieve D.M.'s placement in a full-time special education program in November 2015 and, finally, to a residential program in December 2017.  In these circumstances, no reduction in the fee award is warranted by the District's purported settlement offer.

IV.    **CONCLUSION**

For the foregoing reasons, the plaintiff's motion is granted.  Having prevailed in her effort to obtain relief under the IDEA, the plaintiff is entitled to reimbursement of attorney's fees and litigation costs she incurred in pursing her successful administrative due process claim. Further, because she has met her burden of justifying her requested reimbursement rate for the hours her attorney and paralegal reasonably expended in connection with this effort, the plaintiff is entitled to attorney's fees at the full USAO Matrix rate.  As a result, the District shall pay the defendant $87,543.03 in attorney's fees.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.


Date: February 15, 2019


_____
BERYL A. HOWELL
Chief Judge